1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2    Including Professional Corporations
   JENNIFER M. HOFFMAN, Cal. Bar No. 240600
3  350 South Grand Avenue, 40th Floor
   Los Angeles, California 90071-3460
4  Telephone:    213.620.1780
   Facsimile:    213.620.1398
5  E-mail:       jhoffman@sheppardmullin.com

6  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
7    Including Professional Corporations
   ANNA S. McLEAN, Cal. Bar No. 142233
8  Four Embarcadero Center, 17th Floor
   San Francisco, California 94111-4109
9  Telephone:    415.434.9100
   Facsimile:    415.434.3947
10 E-mail:       amclean@sheppardmullin.com

11 SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
12   Including Professional Corporations LP
   JEFFREY S. CROWE, Cal. Bar No. 216055
13 KATHERINE C. SAMPLE, Cal. Bar No. 259325
   650 Town Center Drive, 10th Floor
14 Costa Mesa, California 92626
   Telephone:    714.424.8231
15 Facsimile:    714.428.5997
   E-mail:       jcrowe@sheppardmullin.com
16               ksample@sheppardmullin.com

17 Attorneys for Defendant
   STATE FARM GENERAL INSURANCE COMPANY

18
                    UNITED STATES DISTRICT COURT
19
           NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION
20

21 MELISSA PITKIN and DAN GROUT, on        Case No. 3:23-cv-00924-WHO
   behalf of themselves and all others similarly   Judge: Hon. William H. Orrick
   situated,
22
                                            **CLASS ACTION**
           Plaintiffs,
23
                                            **DEFENDANT STATE FARM GENERAL
        v.                                  INSURANCE COMPANY'S OPPOSITION
24                                          TO PLAINTIFFS' MOTION TO CERTIFY
   STATE FARM GENERAL INSURANCE             CLASS, APPOINT CLASS
25 COMPANY, an Illinois Corporation,        REPRESENTATIVES, AND APPOINT
                                            CLASS COUNSEL**
26         Defendant.
                                            FAC Filed:       August 4, 2023
27                                          Trial Date:      April 6, 2026

28

# <u>TABLE OF CONTENTS</u>

Page

I.    INTRODUCTION AND STATEMENT OF ISSUES ............................................... 1

II.    BACKGROUND FACTS ......................................................................... 3

     A.    Plaintiffs' State Farm Policy and Personal Property Coverage Terms .......... 3

     B.    State Farm Policies and Procedures Regarding Settlement of Personal Property Claims and Use of Verisk's XactContents® Tool ........................ 4

     C.    State Farm Issues Plaintiffs Various Payments on Various Bases ................. 6

     D.    Plaintiffs File Their Complaint in this Copycat Class Action ........................ 8

     E.    Plaintiffs Obtain and Ignore Discovery Unhelpful to Class Certification ...................................................................................... 9

     F.    Plaintiffs Disregard all of State Farm's Data in Moving for Class Certification ...................................................................................... 11

III.    PLAINTIFFS' EXPERTS' OPINIONS ARE SPECULATIVE AND INADMISSIBLE ................................................................................ 12

IV.    CLASS CERTIFICATION SHOULD BE DENIED .............................................. 19

     A.    Plaintiffs Bear the Burden of Demonstrating all of Rule 23's Requirements .................................................................................... 19

     B.    Plaintiffs Fail to Demonstrate Predominance under Rule 23(b)(3) ............... 20

         1.    Contrary to Controlling Ninth Circuit Authority, Plaintiffs' Predominance Argument Incorrectly Assumes that a Statutory Violation Establishes Liability .................................................. 20

         2.    Plaintiffs' Damages Model Does Not Reliably or Validly Calculate Classwide Damages, Which Also Means That Individual Issues Predominate ................................................ 24

     C.    Plaintiffs' Conclusory Manageability Argument Does Not Satisfy Rule 23(b)(3)'s Superiority Requirement .......................................... 28

         1.    Plaintiffs' Speculation that Class Members Can be Readily Identified is Divorced from their Class Definition and Conflicts with the Evidence ..................................................... 28

         2.    Plaintiffs Offer No Trial Plan, and Ignore the Individualized Issues that Render Class Treatment Unmanageable ..................... 31

     D.    Plaintiffs Underplay the Significance of *Ramyead*, Which Also Defeats Superiority ........................................................................... 32

     E.    Plaintiffs Are Not Adequate Representatives under Rule 23(a)(3) ............... 34

SMRH:4910-9567-6439.1    DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

F.     Plaintiffs Offer No Evidence or Argument Supporting their Bare
Request for Rule 23(b)(2) Certification, Thereby Waiving the Issue ........... 35

V.     CONCLUSION ...................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Ass'd Gen. Contr. of Am., San Diego Chapter, Inc. v. Cal. Dep.*
    713 F.3d 1187 (9th Cir. 2013)......................................................................... 27

*Basurco v. 21st Century Ins. Co.*
    108 Cal.App.4th 110 (2003) ................................................................... 23, 24

*Black Lives Matter L.A. v. City of L.A.*
    113 F.4th 1249 (9th Cir. 2024) .................................................................... 19

*Boucher v. First Am. Title Ins. Co.*
    2012 WL 3023316 (W.D. Wash. July 24, 2012) ........................................ 31

*Boyer v. City of Simi Valley*
    2024 WL 993316 (C.D. Cal. Feb. 13, 2024)............................................... 12

*California Fair Plan Assn. v. Garnes*
    11 Cal.App.5th 1276 (2017) ......................................................................... 9

*Castro v. State Farm Gen. Ins. Co.*
    256 F.Supp.3d 1048 (N.D. Cal. 2017) (Orrick, J.) ...................................... 32

*Coleman v. Brown*
    938 F.Supp.2d 955 (E.D. Cal. 2013)............................................................ 19

*Comcast Corp. v. Behrend*
    569 U.S. 27 (2013).......................................................................... 19, 24, 27

*In re ConAgra Foods, Inc.*
    302 F.R.D. 537 (C.D. Cal. 2014) ................................................................ 32

*Costa v. Travelers Commer. Ins. Co.*
    2012 U.S. Dist. LEXIS 120715 (N.D. Cal. Aug. 24, 2012) (Illston, J.) ..................... 22

*Daniel F. v. Blue Shield of Ca.*
    305 F.R.D. 115 (N.D. Cal. 2014).......................................................... 28, 29

*Daubert v. Merrell Dow Pharms., Inc.*
    509 U.S. 579 (1993).............................................................................. 12, 13

*Davis v. Lab'y Corp. of Am. Holdings*
    2024 WL 489288 (9th Cir. Feb. 8, 2024).................................................... 30

*Domingo ex rel. Domingo v. T.K.*
   289 F.3d 600 (9th Cir. 2002) .......................................................................................... 13

*Doucette v. Jacobs*
   106 F.4th 156 (1st Cir. 2024) ................................................................................... 13, 14

*Drimmer v. WD-40 Co.*
   343 F. App'x 219 (9th Cir. 2009) ................................................................................... 34

*Ellis v. Costco*
   657 F.3d 970 (9th Cir. 2011) ..................................................................................... 19, 35

*In re Facebook*
   282 F.R.D. 446 (N.D. Cal. 2012) ................................................................................... 31

*Flodin v. Cent. Garden & Pet Co.*
   2024 U.S. Dist. LEXIS 192904 (N.D. Cal. Oct. 23, 2024) .......................................... 24

*Fosmire v. Progressive Max. Ins. Co.*
   277 F.R.D. 625 (W.D. Wash. 2011) .................................................................. 14, 16, 34

*General Elec. Co. v. Joiner*
   522 U.S. 136 (1997) ........................................................................................... 13, 14, 16

*Greisen v. Hanken*
   925 F.3d 1097 (9th Cir. 2019) ....................................................................................... 35

*Hanon v. Dataproducts Corp.*
   976 F.2d 497 (9th Cir. 1992) ......................................................................................... 30

*Harris v. Fedex Corp. Svcs., Inc.*
   92 F.4th 286 (5th Cir. 2024) .......................................................................................... 12

*Jama v. State Farm Mut. Auto. Ins. Co.*
   113 F.4th 924 (9th Cir. 2024) ....................................................................................... 23

*James v. Uber Techs. Inc.*
   338 F.R.D. 123 (N.D. Cal. 2021) ................................................................................... 28

*Johnson v. Hartford Casualty Insurance Company*
   No. 15-CV-04138-WHO, 2017 WL 2224828 (N.D. Cal. May 22, 2017) ............ passim

*Johnson v. Nissan North America, Inc.*
   2022 WL 2869528 (N.D. Cal. July 21, 2022) (Orrick, J.) ............................................ 16

*Kamakahi v. Am. Soc'y for Reprod. Med.*
   305 F.R.D. 164 (N.D. Cal. 2015) ................................................................................... 15

*Kamm v. Cal. City Dev. Co.*
  509 F.2d 205 (9th Cir. 1975) ........................................................................ 33

*Khasin v. R.C. Bigelow, Inc.*
  2016 WL 1213767 (N.D. Cal. Mar. 29, 2016) (Orrick, J.) ............................ 24

*Laboratory Corp. of America v. Davis*
  No. 24-304, 2025 WL 288305 (U.S. Jan. 24, 2025) ..................................... 30

*Lara v. First Nat'l Ins. Co.*
  25 F.4th 1134 (9th Cir. 2022) ............................................................... passim

*Love v. Fire Ins. Exch.*
  221 Cal. App. 3d 1136 (Ct. App. 1990) ....................................................... 31

*Lytle v. Nutramax Labs., Inc.*
  114 F.4th 1011 (9th Cir. 2024) ......................................................... 13, 16, 25

*Lytle v. Nutramax Labs., Inc.*
  Case No. 24-576 (petition for certiorari docketed Nov. 25, 2024) ............... 13

*Maison D'Artiste v. Am. Int'l Group, Inc.*
  2020 WL 4037219 (C.D. Cal. Jan. 23, 2020) ............................................... 11

*Newell v. State Farm Gen. Ins. Co.*
  118 Cal.App.4th 1094 (2004) ....................................................................... 23

*North Star Reins. Corp. v. Sup. Ct.*
  10 Cal.App.4th 1815 (1992) ......................................................................... 31

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods*
  31 F.4th 651 (9th Cir. 2022) (en banc) ............................................ 19, 30, 35

*In re Onglyza*
  93 F.4th 339 (6th Cir. 2024) ........................................................................ 13

*Orshan v. Apple, Inc.*
  2023 U.S. Dist. LEXIS 90034 (N.D. Cal. Mar. 31 2023)........................ 19, 24

*Perez v. State Farm Mut. Auto Ins. Co.*
  2012 WL 3116355 (N.D. Cal. July 31, 2012)............................................... 13

*Prudential-LMI Com. Ins. v. Superior Ct.*
  51 Cal. 3d 674 (1990)................................................................................... 32

*Ramyead v. State Farm General Insurance Company*
  No. 20STCV06274, 2023 Cal. Super. LEXIS 25326
  (Cal. Super. Ct. April 12, 2023) ............................................................................ passim

*Schwarzschild v. Tse*
  69 F.3d 293 (9th Cir. 1995) ...................................................................................... 20

*Sherman v. Albertson's LLC*
  2024 WL 3730241 (C.D. Cal. Aug. 7, 2024) ........................................................... 19

*Slade v. Progressive Sec. Ins. Co.*
  856 F.3d 408 (5th Cir. 2017) .................................................................................... 35

*Small v. Allianz Life Insurance Company of North America*
  122 F.4th 1182 (9th Cir. 2024) ........................................................................... passim

*State Farm Fire & Cas. Co. v. Superior Court*
  206 Cal. App. 3d 1428 (1988) .................................................................................. 22

*Steen v. Am. Nat'l Ins. Co.*
  2023 WL 4004192 (C.D. Cal. June 14, 2023) ......................................................... 28

*Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*
  308 F.R.D. 630 (N.D. Cal. 2015) (Chen, J.) ............................................................ 34

*Tovar v. U.S. Postal Serv.*
  3 F.3d 1271 (9th Cir. 1993) ...................................................................................... 19

*Villa v. San Francisco Forty-Niners, Ltd.*
  104 F. Supp. 3d 1017 (N.D. Cal. 2015) ................................................................... 20

*W. States Wholesale, Inc. v. Synthetic Indus., Inc.*
  206 F.R.D. 271 (C.D. Cal. 2002) ............................................................................. 34

*Wal-Mart Stores, Inc. v. Dukes*
  564 U.S. 338 (2011) ...................................................................................... 19, 31, 35

*Waller v. Truck Ins. Exch.*
  11 Cal.4th 1 (1995) .............................................................................................. 22, 30

*Zamani v. Carnes*
  491 F.3d 990 (9th Cir. 2007) .................................................................................... 35

*Zinser v. Accufix Res. Inst., Inc.*
  253 F.3d 1180 (9th Cir. 2001) ............................................................................ 31, 32

SMRH:4910-9567-6439.1

Statutes

Cal. Bus. & Prof. Code
    § 17208 ............................................................................................................... 31

Cal. Code Civ. Proc.
    § 337(a) ............................................................................................................... 31

California Code of Regulations
    § 2695.9 ................................................................................................................. 9

California Insurance Code
    § 2051 ............................................................................................................ passim
    § 2071 ................................................................................................................... 32
    § 10103.7 ................................................................................................................ 7
    § 10113.71 ............................................................................................................ 20

Federal Rules of Civil Procedure
    Rule 23 ........................................................................................... 1, 19, 20, 28
    Rule 23(a) ............................................................................................................ 19
    Rule 23(b) ............................................................................................................ 19
    Rule 23(b)(2) ................................................................................................. 12, 35
    Rule 23(b)(3) ................................................................................................. passim
    Rule 23(c)(2) ....................................................................................................... 28
    Rule 702 ................................................................................................. 12, 13, 18
    Rule 702(b) .......................................................................................................... 12

1

<u>**OPPOSITION TO MOTION TO CERTIFY CLASS**</u>

2      State Farm General Insurance Company ("State Farm") hereby submits this Opposition to

3 Plaintiffs' Melissa Pitkin's and Dan Grout's ("Plaintiffs'") Motion to Certify Class, Appoint Class

4 Representatives, and Appoint Class Counsel (ECF 61) ("Motion") as follows:

5 **I.**    <u>**INTRODUCTION AND STATEMENT OF ISSUES**</u>

6      Plaintiffs' Motion is a thinly veiled Motion for Summary Judgment and should be denied.

7      Plaintiffs devote the majority of their brief to arguing that State Farm's methodology for

8 calculating Actual Cash Value ("ACV") for personal property or contents in California violates

9 California Insurance Code Section 2051. State Farm recently prevailed on that same issue in a

10 putative class action in California state court, *Ramyead v. State Farm General Insurance*

11 *Company*, No. 20STCV06274, 2023 Cal. Super. LEXIS 25326 (Cal. Super. Ct. April 12, 2023),

12 (the "*Ramyead* Action"). The *Ramyead* trial court upheld State Farm's ACV methodology, which

13 applies depreciation to an item's replacement cost ("RC"), including applicable sales tax, based on

14 the legislative history of the statute and recent California decisional law underscoring the

15 importance of legislative history in interpreting Section 2051. Plaintiffs ignore that decisional law

16 and *Ramyead* in their Motion, and instead focus on this Court's decision in *Johnson v. Hartford*

17 *Casualty Insurance Company*, No. 15-CV-04138-WHO, 2017 WL 2224828 (N.D. Cal. May 22,

18 2017), which reached a different result on different reasoning without the benefit of that recent

19 decisional law. *Ramyead* is now fully briefed on appeal before the Second District Court of

20 Appeal, and may ultimately be determinative of the central legal issue framed in this case.

21      But, that merits issue is *not* framed at this stage of this case. Nor is it determinative of

22 liability on *any* claim. That is because, as the Ninth Circuit recently recognized in *Small v. Allianz*

23 *Life Insurance Company of North America*, 122 F.4th 1182 (9th Cir. 2024), there is no private right

24 of action for violation of California's Insurance Code. Rather, Plaintiffs must still meet the

25 elements of the causes of action alleged. And Plaintiffs' burden here, at the class certification

26 stage, is to demonstrate with admissible evidence that those elements can be established based on

27 common proof across the class consistent with Rule 23. Plaintiffs fail to meet their burden.

28      Despite alleging four causes of action in their Complaint, their Motion briefs only one:

breach of contract.  Plaintiffs brief class certification only under Rule 23(b)(3), but their discussion overlooks the elements of breach and causation and argues only the issue of contract damages.  As support, they offer purported expert opinions on ascertainability, which their experts disclaimed during deposition, and a proposed classwide damages methodology, which rests on unsupported assumptions that are actually false, as State Farm's evidence shows.

Specifically, Plaintiffs' experts assume that State Farm insureds receive payment on contents or Coverage B claims equal to the amount in the ACV column in an XactContents® report.  But that fundamental assumption underlying Plaintiffs' experts' opinions is not true *on even Plaintiffs' claim*.  Plaintiffs received two Coverage B payments without any associated XactContents® report, and later received payment of less than the ACV total in an XactContents® report because of an applicable sublimit.[1]  The data set produced in *Ramyead* (which includes claims during the putative class period in this case, and data from both the XactContents® tool, which is owned by third-party Verisk, and State Farm's own claim system) shows that ACV valuations in XactContents® reports and payments actually made on claims differ significantly.

Discovery of Plaintiffs' experts revealed a total absence of understanding that the available evidence did not support the assumptions underlying their opinions, *because Plaintiffs' counsel never gave it to them*.  State Farm produced the *Ramyead* data set to Plaintiffs' counsel in May 2024, explained its limitations, and asked if Plaintiffs' counsel wanted State Farm to reproduce the data set for the entire time frame at issue in this action.  Plaintiffs' counsel never responded and, apparently, never gave the *Ramyead* data to their experts.  That Plaintiffs' experts' never even saw the actual data means that *all* of their opinions fail as speculative and unreliable.  Their opinions fail on other grounds too, as detailed below.  These failings preclude certification.

Plaintiffs' Motion also fails to demonstrate the required elements of predominance and superiority.  Plaintiffs ignore the individualized inquiries inherent in putative class member claims, and indeed in their own class definition which has three prongs, only one of which they address, and all of which are individualized.  Specifically, class membership requires not only that

---

[1] A sublimit or special limit may apply to certain property or losses depending on, among other things, the nature of the property at issue or the location of the subject loss.

1    an insured received an ACV payment based on an RC less depreciation methodology, but also that

2    the loss was covered, and that the insured is not "reasonably certain" to receive payment equal to

3    or greater than their applicable limits.  Plaintiffs' Motion entirely ignores the last two prongs, and

4    instead relies only on speculative and inadmissible expert opinions regarding the first, which State

5    Farm's evidence negates.  Plaintiffs are also inadequate representatives based on their apparent

6    and inexplicable waiver of their own claim for RC benefits, which far outweighs any damages

7    they could recover under the theory alleged in this action.

8         Plaintiffs may simply expect that this Court will rubber-stamp class certification here

9    because it granted both summary judgment and class certification on a different record in the

10   *Johnson* case eight years ago, before *Small*, *Ramyead* and other relevant decisional law from the

11   Ninth Circuit and the California Court of Appeal.  This Court should not take Plaintiffs' invitation.

12   It should independently apply existing law to the arguments and evidentiary record in *this case*,

13   and hold that Plaintiffs have not met their burden here.

14   **II.    BACKGROUND FACTS**

15   **A.    Plaintiffs' State Farm Policy and Personal Property Coverage Terms**

16        State Farm issued a homeowners policy to Mildred Cussins and Bonnie Pitkin[2] for their

17   property located at 8154 Mill Creek Road, Healdsburg, CA (the "Property"), for the period October

18   6, 2019 to October 6, 2020, Policy No. 57-C4-6752-1 (the "Policy").  (Blazewich Dec., ¶ 4).  The

19   Policy included main policy form FP-7955, CA, as well as homeowners endorsement form FE-

20   3422.  (*Id.*).  Subject to the Policy's terms, conditions, and exclusions, the Policy included

21   Coverage B – Personal Property limits of $506,574, as well as various applicable special limits.[3]

22   Regarding settlement of Coverage B claims, the Policy provides for settlement of damaged

---

[2] Mildred Cussins and Bonnie Pitkin are Plaintiff Melissa Pitkin's grandmother and mother, respectively.  Following receipt of the subject Claim, State Farm retroactively added Melissa Pitkin and Dan Grout as named insureds.  State Farm issued a separate homeowners policy to Bonnie Pitkin for her neighboring property, addressed below.  (Blazewich Dec., ¶¶ 4, 26).

[3] Special limits or sublimits applicable to Coverage B under the Policy include: Jewelry and Furs ($1,500/$2,500); Cash ($200); Business Property ($1,500/$750); Securities and Other Papers ($1,000); Watercraft ($1,500); Trailers ($1,500); Stamps ($2,500); Firearm Theft ($2,500); Silverware and Goldware Theft ($2,500); Electronic Data Processing Equipment ($5,000). (Blazewich Dec., ¶¶ 5-6).  The Policy also includes a sublimit of up to 10% of Coverage B where loss occurs away from the insured residence.  (Blazewich Dec., ¶ 6).

personal property in various ways, including actual cash value ("ACV"), market value, and replacement cost ("RC").  (Blazewich Dec., ¶ 7).  However, payment under the Policy will not exceed the cost to repair the property, the cost to replace the property, any special limit of liability, or the applicable Coverage B limit, whichever is less.  (Blazewich Dec., ¶ 7).

**B.**     **State Farm Policies and Procedures Regarding Settlement of Personal Property Claims and Use of Verisk's XactContents® Tool**

When a claim is reported to State Farm, State Farm claims personnel open a new claim in State Farm's Enterprise Claims System ("ECS"), and a unique claim number is assigned. (Blazwewich Dec., ¶ 3).  ECS is a proprietary electronic relational database that stores State Farm claims data in various forms.  (Thorpe Dec., ¶¶ 4, 6, 20).

Soon after a claim is opened in ECS, State Farm claims personnel generally contact the insured or claimant to discuss the claim.  (Blazewich Dec., ¶ 3).  Depending on the circumstances of a particular claim, State Farm may settle a covered personal property or contents loss during such a first contact.  (Blazewich Dec., ¶ 14).  If a claim involves more than a few items or is not settled during a first contact, then claims personnel may utilize the XactContents® tool to assist in valuing lost property for claim settlement purposes.  (*Id*.).  Third-party Verisk owns the XactContents® tool, which is one of several valuation tools included in its suite of Xactware products, and allows insurers, including State Farm, to use it.  (Hoffman Dec., ¶¶ 4-5, Ex. 2, Peterson Dep., p. 57:12-58:8; Ex. 3, Melzer Dep., p. 95:18-22).  XactContents® can assist claims personnel in making decisions on a claim, but ECS records what actually happened on a claim. (Blazewich Dec., ¶¶ 2-3, 17).

Although all information in ECS is electronically stored, only certain fields of information may be queried across claims.  (Thorpe Dec., ¶ 4).  For example, ECS includes fields regarding the date and amount of Coverage B payments, but does not store information regarding the nature or basis of Coverage B payments in a form that can be searched across claims.  (Thorpe Dec., ¶ 6). XactContents® Payment Tracker Worksheets or reports may contain ACV and RC calculations for particular items, but that information reflects a calculation, not a claim payment.  (Thorpe Dec., ¶¶ 9, 15).  XactContents® reports generated in connection with particular claims may be

1    stored in ECS in PDF form which are not field-searchable in ECS.  (*Id.,* ¶¶ 9, 20).

2    　　　　State Farm's ECS database exists separate and apart from any database maintained by

3    Verisk.  (Thorpe Dec., ¶ 8).  Consequently, a query of ECS does not include data contained in

4    Verisk's XactContents® system, and vice versa.  (Thorpe Dec., ¶ 9).  Similarly, data fields in

5    XactContents® do not necessarily align with fields in ECS or, even when the labels align, do not

6    necessarily contain the same information.[4]  For example, both XactContents® and ECS have

7    payment fields, but payment fields in XactContents® require manual entry by claims personnel

8    while ECS payment fields automatically update upon issuance of payment through ECS.

9    (Blazewich Dec., ¶¶ 2-3, 17; Thorpe Dec., ¶¶ 7, 9).  Consequently, payment information included

10   in XactContents® may not, and often does not, align with payment information in ECS.  (Thorpe

11   Dec., ¶¶ 14-15).  In short, XactContents® is a tool, while ECS is the claim record.  (Thorpe Dec.,

12   ¶¶ 7-8; Blazewich Dec., ¶¶ 2-3, 14-15).

13   　　　　When provided certain information, XactContents® can generate reports containing RC

14   and ACV calculations for contents consistent with State Farm's ACV methodology in California.[5]

15   (Blazewich Dec., ¶¶ 14-15).  XactContents® reports may also include pricing for other expenses

16   paid under Coverage B, such as storage fees, which are not contents subject to an RC or ACV

17   valuation.  (Blazewich Dec., ¶¶ 16).  Such expenses are included with contents in the "Summary"

18   portion of an XactContents® report, and in the corresponding "Actual Cash Value" or ACV

19   column in the Line Item Detail portion of the report even though they are not contents paid at

20   ACV or RC.  (Blazewich Dec., ¶¶ 16, 21, Ex. 7).

21   _____

22   [4] For example, in the *Ramyead* class action, State Farm requested a query of XactContents from
     Verisk, and then added to that query data from ECS.  (Thorpe Dec., ¶¶ 10-15).  The resulting

23   spreadsheet included data from payment date and amount fields in XactContents and Coverage B
     payment date and amount fields in ECS.  (Thorpe Dec., ¶¶ 15-16).  Of the more than 40,000 rows

24   of data in the spreadsheet, more than 9,000 rows did not have a payment date and amount in ECS
     that corresponded to a payment date and amount in XactContents.  (Thorpe Dec., ¶¶ 12, 15).

25   [5] The XactContents® tool has the ability to calculate replacement cost (RC) and actual cash value
     (ACV) for particular items by determining the replacement cost (RC) of the item, including sales

26   tax where applicable, and then applying depreciation (ACV = RC – depreciation).  (Blazewich
     Dec., ¶ 15).  In making these calculations, XactContents® may consider an item's description,

27   quantity, age, condition, retail cost (before taxes), and sales tax rate.  (Blazewich Dec., ¶¶ 15-16).
     State Farm claims personnel may need to manually input information into the XactContents® tool

28   to complete these calculations.  (Blazewich Dec., ¶ 16).

XactContents® Payment Tracker Worksheets or reports begin in draft form. (Blazewich Dec., ¶ 17). State Farm claims personnel may finalize the report and provide a copy to claimants with claim payments. (*Id.*). However, State Farm claims personnel can make claim payments without finalizing the report or entering claim payment information into XactContents®. (*Id.*). As mentioned above, and in contrast to ECS, XactContents® does not automatically record payment information. (Blazewich Dec., ¶¶ 2-3, 17; Thorpe Dec., ¶¶ 7, 9). Claim payment information in XactContents® appears only to the extent that claims personnel manually enter it, and the entered information may not align with payments actually made on a claim or the basis for the payments.[6] (Thorpe Dec., ¶¶ 9, 14-18). Similarly, claims personnel may make Coverage B payments through ECS without any use of the XactContents® tool at all.[7] (Blazewich Dec., ¶ 17).

Where a limit, sublimit or deductible is implicated, and corresponding limit, sublimit or deductible information entered into XactContents®, that may impact the claim payment, but will not change the ACV summary in an XactContents® report. (*Id.*, ¶ 42). In such cases, an ACV calculation may remain in XactContents®, but will not correspond to available coverage or payment to the insured.[8]

For all of these reasons, determining the nature and basis of claim settlement payments in ECS requires a claim-by-claim review.

## C.  State Farm Issues Plaintiffs Various Payments on Various Bases

Plaintiffs made a claim under their State Farm homeowners policy after their home and its

---

[6] For example, Plaintiffs' December 2022 XactContents® report characterizes the payment as an ACV payment under the XactContents "Payment Type" field, but that payment included some property settled without depreciation applied. (Blazewich Dec., ¶ 21 & Ex. 7). Similarly, the XactContents "Payment Type" "Payment Date" and "Payment Amount" fields for the Ramyeads' claim were blank, while State Farm's ECS system accurately reflected the fact and amount of State Farm's Coverage B payment in the amount of $750.75. (Thorpe Dec., ¶ 16 & Ex. 2).

[7] This happened in the Pitkins' claim. State Farm initially made two advance payments to the Pitkins based on a percentage of their coverage limit, and without generating any associated XactContents® report. (Blazewich Dec., ¶¶ 10-11).

[8] This also happened in the Pitkins' claim. They claimed a cash loss of $220, but their policy included a cash sublimit of $200. (Blazewich Dec., ¶ 21). The ACV summary remained at $230,288.44, but the payment was $20 less, reflecting application of the sublimit. (*Id.*). Although depreciation and sales tax were not applied to cash in the Pitkins' claim, they were incorrectly applied to cash claimed in another sample claim. (Blazewich Dec., ¶ 44). However, that error did not impact payment due to application of the sublimit in that claim too. (*Id.*).

contents were destroyed in the Walbridge fire in 2020.  (Blazewich Dec., ¶ 8).  State Farm settled

Plaintiffs' Coverage A dwelling claim on a replacement cost (RC) basis, consistent with its

general practice of paying RC on Coverage A dwelling claims in California.  (*Id.,* ¶ 12).

State Farm issued various payments to Plaintiffs on various bases for their Coverage B

contents claim.  First, State Farm issued advance payments totaling $202,629 pursuant to

California Insurance Code section 10103.7.  (Blazewich Dec., ¶ 10-11).  Effective in 2019, that

statute requires insurers to make contents payments to insureds who experience a total dwelling

loss related to a government declared emergency based on a percentage of the Coverage A limit,

not RC or ACV. [9]  State Farm issued those payments without using XactContents®.  (*Id.*, ¶ 10).

Two years later, the Pitkins through their counsel submitted an inventory of their lost

contents.  (Blazewich Dec. ¶ 13).  The inventory was 87-pages long and included over 2,000

items.  (*Id.*).  State Farm considered the information provided by Plaintiffs, as well as information

provided by the XactContents® tool, in determining whether and to what extent to issue additional

payments to Plaintiffs under Coverage B.  (Blazewich Dec., ¶¶ 13, 18).  On December 16, 2022,

State Farm issued an additional payment to Plaintiffs in the amount of $27,638, which included

payment for some items on an ACV basis and other items on an RC basis.  (Blazewich Dec., ¶ 21

& Ex. 7).  The payment also applied a sublimit for certain personal property, which reduced the

settlement payment below the total sum of the ACV column in the report.[10]  (*Id.*).  The ACV

column in Plaintiffs' XactContents® report did not take that sublimit into account, however.  (*Id.*).

Plaintiffs, through their counsel, claimed that State Farm underpaid their loss (but *not*

based on how it considered sales tax in calculating ACV).  (Blazewich Dec., ¶ 22).  By way of a

January 9, 2023 letter, Plaintiffs alleged that State Farm applied an excessive depreciation factor to

---

[9] Advance payments on this basis may exceed contract benefits provided on an ACV basis. (Blazewich Dec., ¶¶ 26-29).  For example, advance payments issued to Mrs. Pitkins' parents on their claim arising out of the Walbridge Fire, whom Plaintiffs' counsel also represent, exceeded the ACV value of their contents.  (*Id.*, ¶¶ 26-29 & Exs. 11-13).  After receiving advance payments totaling $332,034.30, they submitted a list of their lost contents and State Farm requested an XactContents® report.  That report included an RC estimate of $412,903.54, including sales tax of $31,241.41, and an ACV valuation of $207,331.80, which was $124,702.50 less than their advance payments.

[10] Items in that ACV column included storage fees (not paid on an ACV or RC basis) and property for which no depreciation was applied (*i.e.* paid at RC).  (Blazewich Dec., ¶ 21).

1   their artwork and collectibles.  (*Id.*).  Plaintiffs also claimed that, for certain items where they

2   initially failed to provide age or pricing source information, State Farm should reimburse those

3   items at RC, now that Plaintiffs submitted the missing information with their January 9 letter.  (*Id.*,

4   Ex. 8).  In total, Plaintiffs requested an additional $211,303 in Coverage B benefits.  (*Id.*, Ex. 8).

5         State Farm considered the additional information provided by Plaintiffs and, on January

6   24, 2023, issued a supplemental payment of $180,215.  (Blazewich Dec., ¶ 24).  State Farm also

7   supplied a second XactContents® report reflecting its calculations and payment.  (*Id.*).  Again, the

8   ACV column included property estimated at both ACV and RC or market value basis, and the

9   total of that column did not match the total payment due to the applied sublimit.  (*Id.,* ¶ 23).

10  **D.**      <u>**Plaintiffs File Their Complaint in this Copycat Class Action**</u>

11        Plaintiffs then retained additional counsel and, on March 1, 2023, filed their Complaint in

12  this action.  (ECF 1).  Plaintiffs' Complaint centers on the allegation that State Farm's ACV

13  methodology, which applied to only some of their contents items considered in their supplemental

14  payments, violates California Insurance Code section 2051.  (*Id.*).  According to Plaintiffs, State

15  Farm wrongfully applied depreciation to RC, which includes applicable sales tax, in calculating

16  ACV.  (*Id.*).  Plaintiffs' Complaint does not mention State Farm's initial advance payments or

17  acknowledge that State Farm's subsequent payments were made on both an ACV and RC basis

18  and reduced by an applicable sublimit.  Nor does Plaintiffs' Complaint mention the approximately

19  $30,000 in additional benefits that Plaintiffs claimed, and State Farm did not pay, unrelated to the

20  ACV methodology issue.

21        Plaintiffs' Complaint also fails to mention the pendency of the *Ramyead* Action, which

22  State Farm has defended since 2020 in California state court.  Like Plaintiffs herein, the plaintiffs

23  in the *Ramyead* Action allege that State Farm improperly "depreciated the sales tax on the

24  personal property portion of Plaintiffs' homeowner's insurance claim."  (RJN, Ex. 1, ¶ 19).

25        In 2023, the court in the *Ramyead* Action granted summary judgment in favor of State

26  Farm, finding both that State Farm's ACV methodology comports with Section 2051 and that the

27  plaintiffs' claims were untimely and barred by the policy's contractual limitations period.  (RJN,

28  Ex. 2).  The *Ramyead* court found, among other things:

> The legislative history for Section 2051 and the rulemaking file for the 2006 amendments to Title 10 of the California Code of Regulations Section 2695.9 show that the phrase "physical depreciation" in Section 2051 was intended to communicate that depreciation of labor is not a component of physical depreciation.
>
> The legislative history for Section 2051, and the rulemaking file for the Insurance Commissioner's 2006 amendment to [Section 2695.9] also reflect an understanding and intent that depreciation would apply to items of physical property, not the cost components of a physical property item. Neither the amendments to Section 2051 and Section 2695.9, nor the underlying legislative history and rulemaking file, reflect any concern with the practice of calculating ACV as the cost to replace personal property, including applicable sales tax, less depreciation.
>
> The Court also does not agree that the reference to "physical depreciation" in Section 2051 connotes some sort of "tangible versus intangible" or "separate versus independent" dichotomy for depreciating the RC of personal property items. That theory ignores that retail price is also intangible and non-physical. In addition, under the express terms of Section 2051, an insurer can only owe sales tax if it is part of the cost of the item, because ACV is "the amount it would cost the insured to … replace the thing" less depreciation. Cal. Ins. Code § 2051.

(*Id.*, pp. 3-4). Thus, the *Ramyead* Court focused primarily on the legislative history, consistent with the *California Fair Plan Assn. v. Garnes,* 11 Cal.App.5th 1276 (2017), which also looked to legislative history in interpreting Section 2051.

The court in the *Ramyead* Action did not reach the issue of whether the Ramyeads' subject property experienced direct, physical loss sufficient to trigger coverage under their homeowners policy. (RJN, Ex. 3). Specifically, the Ramyeads claimed that State Farm underpaid ACV for two furniture items, but the record reflected a factual dispute regarding whether one of the two furniture items was actually damaged. (RJN, Ex. 5; Blazewich Dec., ¶¶ 32-36).

The plaintiffs in *Ramyead* appealed to California's Second District Court of Appeal in June 2023, and briefing completed in January 2025. (RJN, Ex. 4). The *Ramyead* Action will thus result in the first appellate court decision addressing how to account for sales tax in calculating ACV for contents under Section 2051, and may ultimately be dispositive of this case.

### E.    Plaintiffs Obtain and Ignore Discovery Unhelpful to Class Certification

Meanwhile, discovery proceeded in this case. State Farm served straightforward requests on Plaintiffs asking them to, among other things, specify what amounts they claimed State Farm owed them when. (Hoffman Dec.,¶ 8, Ex. 7). Plaintiffs objected, asserting that the issue was the

1   subject of expert discovery.  (*Id*., Interr. nos. 10-13, 17-18).  During their subsequent depositions,

2   Plaintiffs still could not state what they contend State Farm owed them when.  (Hoffman Dec., ¶ 7,

3   Ex. 5, M. Pitkin Dep., pp. 113:2-116:25; Ex. 6, D. Grout Dep., pp. 37:17-38:7).

4           In February 2024, Plaintiffs propounded interrogatories asking State Farm to, among other

5   things, "[i]dentify all Potential Class Members to whom You paid ACV benefits to settle all or

6   part of a Relevant Claim at any time from January 1, 2005 to the present …."  (Hoffman Dec., ¶ 9,

7   Ex. 8, Interr. no. 1).  Plaintiffs defined "Relevant Claim" as "any claim for covered loss of covered

8   property submitted under a Relevant Policy that You settled, in whole or in part, on an ACV

9   basis."  (*Id*., Definitions, #25).  Plaintiffs also asked State Farm to specify the property for which it

10  did and did not pay RC benefits for all such claims.  (*Id*., Interr. no. 2).

11          State Farm responded that it could not provide the information Plaintiffs requested short of

12  a claim-by-claim review.  (Hoffman Dec., ¶ 10, Ex. 9, Response to Interr. nos. 1-2).  State Farm

13  objected to conducting an individualized review of many thousands of claims in order to provide

14  the requested information, which would be antithetical to class treatment.  (*Id*.).

15          Meet and confer discussions proceeded.  State Farm explained that, although it could not

16  provide the requested ACV and RC payment information short of a claim-by-claim review, it

17  could provide other information by requesting it from Verisk and querying its own ECS system.

18  (Hoffman Dec., ¶11, Ex. 10, p. 5).  State Farm offered to provide Plaintiffs' counsel with a copy of

19  the data set that it had collected from Verisk and its ECS system in the *Ramyead* Action, for

20  discussion (the "Combined *Ramyead* Data Set").  (*Id*.; Thorpe Dec., ¶¶ 6, 9, 10-16).  The

21  Combined *Ramyead* Data Set included more than 40,000 rows and about 50 columns of data for

22  homeowners claims with XactContents® reports generated from 2016 to 2021; about half of the

23  columns include data from Verisk's XactContents® tool, and the other half include data from

24  ECS.  (Thorpe Dec., ¶¶ 10-15).  Plaintiffs accepted the offer.  (Hoffman Dec., ¶¶ 12-13, Exs. 11-

25  12).  Plaintiffs also asked State Farm to provide information regarding the number of claims with

26  Coverage B payments and the number of claims with XactContents® reports.  (*Id*., ¶ 12, Exs. 11).

27          On May 7, 2024, the parties submitted a Joint Statement regarding discovery.  In it,

28  Plaintiffs' counsel asserted that the data fields being discussed by the parties were "critically

1   important to issues of class certification." (ECF 57, p. 8:15). On May 17, 2024, the Court

2   referred any discovery dispute regarding data or anything else to Mag. Judge Westmoreland.

3          State Farm subsequently provided the Combined *Ramyead* Data Set to Plaintiffs on May

4   10, 2024. (Hoffman Dec., ¶ 13, Ex. 12). As explained to Plaintiffs, the data set showed a

5   disconnect between the data in XactContents® and the data in ECS. (Hoffman Dec., ¶ 14, Ex.

6   13). For example, nearly 10,000 rows of data (about 25% of the report) had no payment recorded

7   in ECS that matched the payment information in XactContents®. (*Id.*; Thorpe Dec., ¶ 15). Over

8   4,000 entries had no entry in the "Payment Type" field in XactContents®. (Thorpe Dec., ¶ 14).

9          Meet and confer regarding the data continued until May 24, 2024, when State Farm sent a

10  letter declining Plaintiffs' informal request for information untethered to the issues in this case.

11  (Hoffman Dec., ¶¶ 15-16, Exs. 14-15). State Farm also asked whether Plaintiffs still wanted State

12  Farm to provide information regarding the difference between the number of claims with

13  Coverage B payments and the number of claims with an XactContents® report. (*Id.*, ¶ 16, Ex. 15,

14  p. 2). Plaintiffs did not respond. (*Id.*, ¶ 17).

15  **F.     Plaintiffs Disregard all of State Farm's Data in Moving for Class Certification**

16         Months later, on October 17, 2024, Plaintiffs filed their motion for class certification.

17  Narrower than their Complaint, they now seek certification of the following class:

18         All persons who, between **January 1, 2015** and the present, were or are a named insured
           under a property insurance policy issued in California by Defendant, who suffered a
19         ***covered loss*** to real or personal property for which they ***received payment of actual cash
           value (ACV) benefits that were reduced due to depreciation of sales tax***, and who were
20         paid or are ***reasonably certain*** to be paid benefits in an amount that is less than the
           applicable policy limits. (emphasis added).

21         Plaintiffs devote the bulk of their Motion to arguing the merits of their theory that State

22  Farm violated Section 2051, repeatedly citing to the *Johnson* decision.[11] In the limited portion

23  addressing class certification, Plaintiffs state that they seek certification of all four causes of action

24

25  _____

26  [11] Plaintiffs also cite to a January 23, 2020 District Court decision in *Maison D'Artiste v. Am. Int'l
    Group, Inc.*, 2020 WL 4037219 (C.D. Cal. Jan. 23, 2020), which cited *Johnson* in deciding a
    motion to dismiss on other grounds. They do not mention that the *Maison D'Artiste* court later

27  denied class certification with prejudice for failure to proffer a viable damages model, *Maison
    D'Artiste*, 2021 WL 2546734, *4 (C.D. Cal. Mar. 9, 2021), and ultimately granted summary

28  judgment for the insurer. *Maison D'Artiste*, 2021 WL 4707000, at *3 (C.D. Cal. May 12, 2021).

alleged in the Complaint.  (ECF 61, p. 8:24-9:2).  However, they do not address the elements of *any* of these causes of action in their Motion, or offer any argument or authority supporting their bare request for certification under Rule 23(b)(2).  (*Id.*, pp. 1:24-25, 8:18).  They also do not explain how the class period could possibly extend back to 2015 when they filed their Complaint in 2023 and their claims have, at most, a four-year statute of limitations.  (*Id.*, p. 8:20-24).  And, they rely on three experts to support their claims that the class is readily ascertainable and their damages methodology is workable, none of whom mention the Combined *Ramyead* Data Set.

As detailed below, State Farm deposed Plaintiffs' experts, all of whom confirmed that they never saw or even knew about the Combined *Ramyead* Data Set.  They also admitted that they assumed, and disclaimed having an independent opinion, that the class was readily identifiable.  That admitted speculation, and other flaws in Plaintiffs' experts' logic, compels the finding that Plaintiffs have fallen far short of their evidentiary burden here.

## III.    PLAINTIFFS' EXPERTS' OPINIONS ARE SPECULATIVE AND INADMISSIBLE

When faced with a proffer of expert testimony, a district court must determine whether the testimony is both reliable and relevant.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) ("*Daubert I*").  Rule 702, amended effective December 1, 2023, requires courts "to analyze the expert's data and methodology at the admissibility stage more critically than in the past." *Boyer v. City of Simi Valley*, 2024 WL 993316, at *1 (C.D. Cal. Feb. 13, 2024).  Rule 702 now requires the court to find, by a *preponderance of the evidence*, both that an expert's testimony has a sufficient factual basis *and* reflects a reliable application of accepted principles and methods as part of its threshold gatekeeper role.  Fed. Rule Evid. 702 (expert testimony admissible only if the proponent has shown that "*it is more likely than not that* … (b) the testimony is based on *sufficient facts or data*; (c) the testimony is the product of *reliable principles and methods*; and (d) the expert's opinion reflects a *reliable application of the principles and methods to the facts of the case*") (emphasis added); *Harris v. Fedex Corp. Svcs., Inc.*, 92 F.4th 286, 303 (5th Cir. 2024) (district court "abdicated its role as gatekeeper" by allowing an expert "to testify without a proper foundation" in contravention of Rule 702(b)).  Amended Rule 702 thus calls into question prior decisions concluding that such issues go to weight and not admissibility.  *In re Onglyza*, 93 F.4th

1  339, 348 n.7 (6th Cir. 2024) (recognizing that the amendment necessarily impacts the validity of

2  earlier decisions that incorrectly held that an expert's factual basis and methodology raise

3  "questions of weight and not admissibility").

4         Rule 702 applies at the class certification stage, although courts "oscillate[]" between

5  applying a full or more limited inquiry depending on the issues involved.[12]  *Lytle v. Nutramax*

6  *Labs., Inc.*, 114 F.4th 1011, 1030 (9th Cir. 2024).  At a minimum, a proffering party must show

7  that the expert's methodology is reliable based on the available factual record.  *Id.* at 1031 (district

8  court properly considered expert testimony at class certification stage where expert "reviewed

9  documentary evidence and marketing data" and defendant had not shown that expert's

10 "methodology [was] flawed or … that he will improperly apply that method to the facts").

11        Even before Rule 702's amendment, courts recognized that "an analytical gap between the

12 data and the opinion offered" compels exclusion.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146

13 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a court to admit

14 opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Perez v.*

15 *State Farm Mut. Auto Ins. Co*., 2012 WL 3116355 at *5-6 (N.D. Cal. July 31, 2012) (expert failed

16 to identify a methodology and based his report only on his subjective opinions and cherry-picked

17 sources); *see also Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) ("The

18 reasoning between steps in a theory must be based on objective, verifiable evidence and scientific

19 methodology of the kind traditionally used by experts in the field.").  Rule 702 incorporates that

20 longstanding principle, which applies with force here.  *Doucette v. Jacobs*, 106 F.4th 156, 170 (1st

21 Cir. 2024) (expert's "failure to ground her conclusions in the specifics of the record – or to even

22 consider key aspects of the record – meant that the report fell far short of Rule 702's requirement

23 that her 'testimony [be] based on sufficient facts or data' and that she 'reliabl[y] appl[y] the

24 principles and methods to the facts of the case'")

25        ***All*** of Plaintiffs' experts reports contain an analytical gap between the data and the

26 opinions offered, because ***none of them even saw the data***.  All three experts confirmed during

27 ──────────────────────

28 [12] The United States Supreme Court may soon resolve the issue.  *Lytle v. Nutramax Labs., Inc*., Case No. 24-576 (petition for certiorari docketed Nov. 25, 2024).

their deposition that they had never received the Combined *Ramyead* Data Set – or any data set – from Plaintiffs.  (Hoffman Dec., ¶¶ 3-5, Ex. 1, Regan Dep. 148:20-149:25; Ex. 2, Peterson Dep., p. 136:19-137:22; Ex. 3, Melzer Dep., p. 144:13-21).  That Plaintiffs had that data set and failed to provide it to their experts alone compels exclusion of their opinions.  *Joiner*, 522 U.S. at 146; *Doucette*, 106 F.4th at 170; *Fosmire v. Progressive Max. Ins. Co.,* 277 F.R.D. 625, 631 (W.D. Wash. 2011) (excluding expert damages opinion where the plaintiffs had the insurer's data but the expert had not reviewed or tested his model on it).  But, their opinions fail for other reasons too:

**<u>Greg Regan</u>**: Mr. Regan spent a total of 5-10 hours on his report.  (Hoffman Dec., ¶ 3, Ex. 1, Regan Dep., p. 53:14-18).  His damages methodology constitutes only a simple formula that rests on several flawed assumptions.  (ECF 62-1, p. 7).  Among other things, Mr. Regan's formula *assumes* that every putative class member (including the Pitkins) received payment equal to the sum of the ACV column in their XactContents® report.  (Hoffman Dec., ¶ 3, Ex. 1, Regan Dep. pp. 84:25-87:15; 118:13-120:3).  That assumption is false even for the Pitkins, who were paid less than the ACV column total due to an applied sublimit.  (Blazewich Dec., ¶¶ 21, 24).  The ACV column in an XactContents® report does not apply sublimits, or account for advance payments or deductibles, as their own XactContents® report reflects and Plaintiffs' other expert, Mr. Peterson, recognizes.  (Hoffman Dec., ¶ 4, Ex. 2, Peterson Dep., pp. 135:2-25).

Mr. Regan also *assumes* that class members are readily identifiable, while disclaiming *any* opinion on the issue.  (Hoffman Dec., ¶ 3, Ex. 1, Regan Dep., p. 139:24-141:18).  He "think[s] it would be the Court who will determine, based upon the facts in evidence, whether or not policyholders are reasonably certain to be paid benefits in an amount less than the applicable policy limits," as Plaintiffs' class definition requires.  (*Id*. at 138:19-23).

Mr. Regan formulated his purported classwide damages "methodology" without looking at *any* data related to putative class members claims.  (Hoffman Dec., ¶ 3, Ex. 1, Regan Dep., 149:3-25).  That data – which State Farm produced to Plaintiffs and which Plaintiffs once characterized as "critical" to class certification – shows a significant disconnect between an ACV valuation in an XactContents® report and a payment actually made on a claim as recorded in ECS.  (Hoffman Dec., ¶¶ 13, 15, Exs. 12, 14; Thorpe Dec., ¶¶ 10-15, 17-18; Steffey Dec., pp. 13:20-15:23).  It thus

1  disproves the fundamental assumption underlying Mr. Regan's model *i.e.* that putative class

2  members received Coverage B payments equal to the ACV valuation in their XactContents®

3  report.  (Steffey Dec., p. 13:20-16:12)

4          Mr. Regan also had no knowledge or understanding of ECS, or the data it maintains, on

5  which to base his **speculation** that he "could" account for the shortcomings in his opinion with

6  additional data.  (Hoffman Dec., Ex. 1, Regan Dep., p. 144:17).  The following exchange

7  underscored that:

> Q: Do you have any understanding regarding the differences between
>     XactContents and ECS, as you sit here today?
> A: Not as I sit here today.
> …
> Q: Do you have an understanding, as you sit here today, of what fields are
>     electronically searchable in ECS?
> …
> A: Based upon my experience working with many different database systems, I
>     would anticipate that virtually every field is searchable.
> Q: But you don't have an understanding as to what those fields in ECS are,
>     correct?
> A: Not at this time, no. The fields that are applicable to my methodology to
>     calculate damage – damages are sufficiently identifiable in the XactContents
>     database.
> …
> Q: How often, to your knowledge, if you have any knowledge of it, do indemnity
>     payments for a Coverage B contents claim in ECS differ from an ACV
>     valuation in XactContents?
> …
> A: Consistent with my prior response, I do not know if that issue exists ….

18  (*Id.* at pp. 144:11-146:6).  Mr. Regan does not know about the disconnect between ACV

19  valuations in XactContents® and Coverage B indemnity payments in ECS because Plaintiffs'

20  counsel never gave him the data that they had showing it.  (*Id.*, at pp., 144:2-146:13, 149:4-25;

21  Steffey Dec., p. 13:20-16:12).  And, his "mere suggestion" that he could somehow account for that

22  disconnect with some unspecified data does not suffice.  *See Kamakahi v. Am. Soc'y for Reprod.*

23  *Med.*, 305 F.R.D. 164, 181 (N.D. Cal. 2015) ("The mere suggestion that more data could improve

24  the model is insufficient, at least without any showing that the data is available.").

25          His failure to rely on any data beyond Plaintiffs' two XactContents reports in formulating a

26  classwide damages methodology also conflicts with his *own* advice on the subject.  Mr. Regan, in

27  his role on the AICPA Forensic & Litigation Damages Task Force, co-authored a Practice Aid that

28

-15-

dedicates an entire chapter to the issues that arise when an expert relies on selective information from a client or retaining counsel.  (*See* Hoffman Dec., ¶ 6, Ex. 4 ).  The chapter reviews the potential biases and risks associated with relying on selective information and recommends that experts question the source of data and further corroborate evidence to ensure that such data are "testable" and linked "to the operative reality of the company's business."  (*Id.*, at p. 31).  Mr. Regan departed from those basic principles here.  He did not consider or even request any putative class member data from XactContents® or ECS.  (Hoffman Dec., ¶ 3, Ex. 1, Regan Dep., p. 55:13-59:5 & Ex. 1, App. B).  He relied only on two XactContents® reports for Plaintiffs' claim, but did not review them closely enough to realize that Plaintiffs did *not* receive payment equal to their ACV calculation, as he incorrectly assumed.  (*Id.*, p. 84:25-87:15; 118:13-120:3).  In only one other case did Mr. Regan offer a class damages model without reviewing putative class member data which was, perhaps not coincidentally, another Cotchett Pitre case.  (*Id.*, p. 51:13-52:19).  According to Mr. Regan, he did not review data in that case "because [the defendant] had not yet produced such data."  (*Id.* at p. 52:19).  That, of course, is not the case here.

To be clear, State Farm is *not* challenging Mr. Regan's methodology because it was not performed.  *Compare Lytle,* 114 F.4th at 1024; *Johnson v. Nissan North America, Inc*., 2022 WL 2869528 (N.D. Cal. July 21, 2022) (Orrick, J.).  State Farm is challenging his methodology because it disregards the available data and relies on speculative and false assumptions, including that every insured was paid the sum total of their ACV column in their XactContents® report.  *Johnson*, 2022 WL 2869528 at *12 (*citing Joiner*, 522 U.S. at 146); *Fosmire*, 277 F.R.D. at 631.

**David Melzer**: Mr. Melzer's report does not rely on specialized knowledge helpful to this Court.  He has never testified or qualified as an expert on any issue, (Hoffman Dec., ¶ 5, Ex. 3, Melzer Dep., p. 57:19-23), has never held himself out as an expert witness prior to this lawsuit, (*Id.*, at p. 59:3-6), and his experience consists of less than ten years working in the claims departments of other insurers. (ECF 62-3, pp. 11-14).  He has no experience with data analysis, no understanding of principles of data analysis, (Hoffman Dec., ¶ 5, Ex. 3, Melzer Dep., p. 59:8-60:20), no experience with State Farm's ECS system, and no understanding of the capabilities and

1   functionality of ECS.  (*Id.* at p. 142:14-145:21).  According to his testimony and invoices, he spent

2   about 5 hours preparing his report.  (*Id.*, at p. 132:25-133:19 & Ex. 4).

3         Plaintiffs purport to rely on Mr. Melzer to support that members of the class are readily

4   identifiable.  (ECF 61, p. 14:3-5).  In his written report, Mr. Melzer opines that "Plaintiffs will be

5   able to identify the members of the class" based on unspecified data "housed within State Farm's

6   Customer Relationship Management systems and estimating software like XactContents."  (ECF,

7   62-3, ¶ 26).  When asked his understanding as to the requirements for class membership in this

8   case, however, he claimed to have no idea, adding: "it's outside the scope of work I was asked to

9   opine on."  (Hoffman Dec., ¶ 5, Ex. 3, Melzer Dep., p. 123:17-125:6).  When asked what facts

10  were needed to ascertain whether an insured would likely replace an item, which relates to the

11  "reasonably certain" to not be paid limits element of Plaintiffs' class definition, he had a similar

12  answer.  (*Id.* at pp. 139:16-140:16) ("I don't have an opinion on that.").

13        Mr. Melzer's other testimony *supports State Farm*.  For example, Mr. Melzer

14  acknowledged that his prior carrier ran claims reports through its internal database and not

15  XactContents® because the internal database had claim handling information not available in

16  XactContents®.  (*Id.*, at p. 105:21-111:21).  That is consistent with State Farm's evidence

17  supporting that ECS, and not XactContents®, is the claim record.  (Thorpe Dec., ¶¶ 4, 8).  Mr.

18  Melzer also testified that, as a claims manager for another carrier, he revised XactContents®

19  estimates just as frequently as he reviewed them:

20      Q   And in your 11 months as a claims manager, how many times did you review high-
    level XactContents reports?

21      A   Weekly.  How many times a week, I can't quantify that.
        . . .

22      Q   How many times through your high level review, did you change the information
    contained in an XactContents Payment Tracker report?

23      A   Often. Probably about one time or more a week.

24      Q   So weekly?
        A   So weekly.

25

26  (Hoffman Dec., ¶ 5, Ex. 3, Melzer Dep., pp. 49:19-50:12).  In other words, in Mr. Melzer's

27  experience, XactContents® reports are routinely changed, which suggests a lack of reliability for

28  purposes of forming assumptions across the class based on XactContents® data alone.

**Eugene Peterson**: Mr. Peterson holds himself out as an expert on XactContents®, although his knowledge of XactContents® is plainly limited:  throughout his deposition he mistakenly referred to "Xactimate," the Xactware tool that can estimate building property, not personal property—even where the question was about XactContents®.  (*See, e.g.*, Hoffman Dec., ¶ 4, Ex. 2, Peterson Dep., pp. 43:12-15; 48:2-7; 49:9-50:1; 78:19-79:3).   One of his two entries for time spent on his report (which total just over four hours) reads: "Rework report—changing it to XactContents."  (*Id.*, at 85:7-10 & Ex. 4).  He did not recall whether he did anything to refresh himself on XactContents® before reworking that prior Xactimate report, and concedes that he has testified about Xactimate substantially more times than about XactContents®.  (*Id.*, at 91:17-92:1).

More fundamentally, Mr. Peterson has no knowledge of State Farm's ECS, the information it stores, or its functionality.  Mr. Peterson states in his Report that "[u]sing XactContents® and the State Farm database, it is feasible to efficiently determine where depreciation was taken and calculate and prove what damages, if any, specific insureds or groups of insureds are entitled to." (ECF 62-2, p. 5).  But Mr. Peterson clarified that, by "the State Farm database," he meant only a price list stored in Xactware—not ECS.  (Hoffman Dec., ¶ 4, Ex. 2, Peterson Dep., pp. 110:16-21, 112:2-19).  He has never heard of ECS.  (*Id.*, at 116:10-17; 130:2-20).  He similarly has no knowledge whether and to what extent ACV calculations in XactContents® "estimates" align with claim payment information in ECS for Plaintiffs' own claim or for any other putative class member.  (*Id.*, at 129:10-23).  He, like Plaintiffs' other experts, never received any data related to other potential class member claims from Plaintiffs' counsel.  (*Id.*, at p. 136:19-137:22).  His opinion should be disregarded as speculative and unhelpful.[13]

---

[13] Peterson was the plaintiff's Xactimate expert in *Johnson, supra* 2017 WL 2224828.  The Court permitted his testimony in that case, which predated new Rule 702, reasoning that "Peterson's testimony is aimed at explaining the function of Xactimate.  Peterson's testimony is not offered to readjust property losses."  Peterson conceded in *Johnson* that an examination of individual claim files would be required to determine whether depreciation calculated by Xactimate was actually paid, *id.* at *3, but the challenges that fact presents to a classwide damages calculation do not appear to have been explored in *Johnson*—perhaps because of the limited scope of Peterson's testimony or the limited record in *Johnson*, which does not appear to have included data allowing for a comparison between data in Xactimate and payments actually made on claims.

IV.   **CLASS CERTIFICATION SHOULD BE DENIED**

A.   **Plaintiffs Bear the Burden of Demonstrating all of Rule 23's Requirements**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Small*, 122 F.4th at 1197 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011)).  "To certify a class, plaintiffs bear the burden of satisfying each of the four requirements of Federal Rule of Civil Procedure 23(a) – numerosity, commonality, typicality and adequacy – and at least one requirement of Rule 23(b)." *Id.* (citing *Olean Whole. Groc. Coop., Inc. v. Bumble Bee Foods*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc).

The party seeking certification bears the burden of proof.  *Black Lives Matter L.A. v. City of L.A.*, 113 F.4th 1249, 1258 (9th Cir. 2024).  The rule "does not set forth a mere pleading standard;" rather, a party must satisfy Rule 23's requirements through "evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33; *Wal-Mart*, 564 U.S. 338, 350 (2011) (same); *Black Lives Matter*, 113 F.4th at 1258 ("[P]laintiffs cannot plead their way to class certification through just allegations and assertions.").  "[P]laintiffs 'must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23" by a preponderance of the evidence." *Small*, 122 F.4th at 1197 (quoting *Black Lives Matter*, 113 F.4th at 1258).  Even then, certification is only appropriate if the court is "satisfied", after a rigorous analysis, that Rule 23 is met. *Olean*, 31 F.4th at 664.  "Class certification is thus not to be granted lightly." *Black Lives Matter*, 113 F.4th at 1258.

A movant also cannot remedy a failure to present sufficient evidence with a class certification motion by including it on reply.  *See, e.g., Tovar v. U.S. Postal Serv.*, 3 F.3d 1271, 1273 (9th Cir. 1993) (new reply evidence stricken); *Orshan v. Apple, Inc.*, 2023 U.S. Dist. LEXIS 90034 (N.D. Cal. Mar. 31 2023) (striking new expert evidence offered on reply in support of class certification); *Coleman v. Brown*, 938 F.Supp.2d 955, 974 n.35 (E.D. Cal. 2013).  Where the evidence submitted by the parties conflicts, the Court may need to weigh that evidence at the class certification stage.  *Sherman v. Albertson's LLC*, 2024 WL 3730241, at *5 (C.D. Cal. Aug. 7, 2024) (citing *Ellis v. Costco*, 657 F.3d 970, 982 (9th Cir. 2011).

In addition, the one-way intervention doctrine bars any merits determination at this stage,

because State Farm has not waived the rule. *See, e.g.*, *Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995); *see also Villa v. San Francisco Forty-Niners, Ltd.*, 104 F. Supp. 3d 1017, 1021 (N.D. Cal. 2015). Accordingly, the Court should disregard Plaintiffs' extensive briefing on the merits of their liability theory, and instead focus on whether Plaintiffs have met their evidentiary burden under Rule 23. They have not.

**B.**     **Plaintiffs Fail to Demonstrate Predominance under Rule 23(b)(3)**

       **1.**     **Contrary to Controlling Ninth Circuit Authority, Plaintiffs' Predominance Argument Incorrectly Assumes that a Statutory Violation Establishes Liability**

Plaintiffs focus on a single issue in their Motion – whether State Farm's ACV methodology comports with Section 2051 – but ignore that resolution of that issue does ***not*** determine liability on any claim, because there is no private right of action for violation of Section 2051. *Small*, 122 F.4th 1182; *Lara v. First Nat'l Ins. Co.*, 25 F.4th 1134 (9th Cir. 2022). Rather, as the Ninth Circuit recently reiterated, Plaintiffs must still establish the elements of breach of contract. *Small*, 122 F.4th at 1191. "And for breach of contract, there must be damages *caused by* the breach." *Id.* (emphasis in original).

*Small* and *Lara* are instructive. The plaintiffs in *Small* sought certification of a breach of contract claim against a life insurer based on an alleged common policy of violating California Insurance Code section 10113.71. *Id.* at 1187-88. The District Court granted certification, but the Ninth Circuit reversed, reasoning that a violation of an insurance statute alone does not support a breach of contract claim against an insurer. *Id.* at 1197-99. Instead, "because Plaintiffs must not only establish a violation but that the violation caused them harm, common questions do not predominate because causation cannot be determined on a class-wide basis." *Id.* Thus, even if the insurer in *Small* breached the contract by violating an insurance statute, whether that failure harmed insureds required individualized inquiries that swamped any common issue. *Id.*

Similarly, in *Lara*, the Ninth Circuit found that individual issues predominated, notwithstanding the common issue of whether a condition adjustment violated Washington's statutorily-mandated ACV methodology. *Lara*, 25 F.4th 1139-1140. As in *Small*, the Ninth Circuit reasoned that the alleged statutory violation did *not* establish liability on a breach of

contract claim. *Id.* at 1138-39.  Rather, a claimant must establish proof of injury resulting from the violation or breach, and "[i]t's proof of these injuries that will be individualized." *Id.* at 1139. Like Plaintiffs herein, the plaintiff in *Lara* claimed that each class member's injury equaled the amount of the challenged adjustment, but the Ninth Circuit disagreed:

> "[T]hat's still not right.  If the condition adjustment was applied for a plaintiff but then that plaintiff still got an amount equal to what he or she would have gotten if the adjustment was not applied (or more than that), then there was no breach of contract because there was no injury.  And this could easily have happened: CCC or Liberty could have adjusted the value back up, Liberty could have made a higher offer, or the parties could have done appraisals."

*Lara*, 25 F.4th at 1140.

The same is true here.  Even if class membership were limited to insureds with XactContents® reports (which it is not), State Farm could have adjusted the report value, or settled the claim for more than the report, or the claimant could make an RC claim.  The Pitkins' own claim makes that clear.  During settlement negotiations, after the Pitkins' challenged State Farm's initial valuation and submitted additional evidence of replacement, State Farm adjusted the valuation and issued a new payment of more than $180,000.[14]  (Blazewich Dec., ¶¶ 22-24).

Alternatively, State Farm may have requested an XactContents® report, but already paid an insured more than the ACV calculation in that report.  That happened in Ms. Pitkin's parents' claim – they received an advance payment that far exceeded their subsequent ACV calculation in their XactContents® report.  (Blazewich Dec., ¶ 29).  Because they received ACV benefits *plus* additional benefits, application of State Farm's ACV methodology to their claim did not cause harm even if Plaintiffs' statutory violation theory were correct (which it is not).

---

[14] Claims commonly include more than one XactContents® report.  Plaintiffs, for example, received two.  (Blazewich Dec., ¶¶ 21, 24 & Exs. 7, 9).  The Combined *Ramyead* Data similarly reflects 38 separate XactContents reports for the first 10 claims alone.  (Thorpe Dec., ¶ 2 & Ex. 1). On average, each claim in that set had 2 associated XactContents® reports.  (Steffey Dec. p. 15:11-17).  The reason for separate reports, and the nature and basis of payments made on claims with such reports, cannot be ascertained short of a claim-by-claim review.

1    The Ramyeads' claim involved even more fundamental, and individual, questions

2 regarding whether State Farm's ACV valuation caused them harm, including the threshold

3 question of coverage.  The record in *Ramyead* showed a factual question as to whether all items of

4 property claimed in the loss were actually damaged.  (Blazewich Dec., ¶¶ 32-36; RJN Ex. 5)*.*  The

5 *Ramyead* court never reached that coverage question as it granted summary judgment on other

6 grounds (the propriety of State Farm's ACV methodology, and the one-year suit limitation).

7    The above examples reflect what *Lara* and other California courts recognize: that an

8 insurer may issue payments during settlement negotiations for various reasons, irrespective of

9 whether the insured has actually demonstrated coverage under the terms of the insurance contract,

10 and notwithstanding application of its ACV methodology in an XactContents® report.[15]  Because

11 insurers may settle claims outside of litigation for various reasons, and because California does not

12 recognize coverage by estoppel, a pre-suit claim payment does *not* establish coverage *or* resulting

13 harm.  *Waller v. Truck Ins. Exch.*, 11 Cal.4th 1, 34 (1995) (absent evidence of detrimental reliance,

14 California does not recognize coverage by estoppel); *State Farm*, 206 Cal.App.3d at 1431.  Nor

15 does a pre-suit claim payment avoid the need for individualized assessments regarding how claims

16 were handled and paid.  *Lara*, 25 F.4th at 1139.  As State Farm's evidence shows, determining the

17 nature and basis of claim payments recorded in ECS requires a file-by-file review.  Plaintiffs do

18 not address this point, or acknowledge *Lara* or *Small*.  In fact, they do not cite *any* Ninth Circuit

19

20

21

22

23

24

---

25 [15] *State Farm Fire & Cas. Co. v. Superior Court*, 206 Cal. App. 3d 1428, 1431 (1988) ("Because
insurance companies often adjust claims for reasons entirely unrelated to their merits, State Farm's
26 decision to pay money to the Blacks may not be construed either as an admission of liability or as
the substantive equivalent of accepting its obligations under the policy."); *Costa v. Travelers*
27 *Commer. Ins. Co.*, 2012 U.S. Dist. LEXIS 120715 (N.D. Cal. Aug. 24, 2012) (Illston, J.) (noting
that the fact that the insurer paid to settle the claim does not bear on the coverage question).
28

1  case decided in the last five years in their brief.[16]

2  Instead, they focus on this Court's 2017 decision in *Johnson*. In *Johnson*, this Court found

3  that the ACV methodology challenge would not require individualized assessments of property. It

4  distinguished *Newell v. State Farm Gen. Ins. Co.,* 118 Cal.App.4th 1094 (2004) on that basis.

5  *Newell*, however, recognized the impropriety of class claims for property damage under California

6  law because of the need for individualized assessments regarding the facts of the loss, the fact of

7  damage, the extent of damage, and how the insurer actually handled and paid the claim. And *Lara*

8  now makes clear that, contrary to *Johnson*, the fact of a claim payment and the challenge to a

9  valuation methodology does *not* avoid the need for individualized assessments of how a claim was

10  actually handled. Instead, the logic of *Newell* and similar California authority aligns with *Lara*

11  and applies here too.[17] Under that authority, the issue is *not* whether the policy the Pitkins

12  challenge to State Farm's ACV methodology directly demands a property reassessment. The issue

13  is what class members will need to show to establish their breach of contract claims. *Newell* and

---

14

15  [16] On Reply, Plaintiffs may attempt to distinguish *Lara* based on *Jama v. State Farm Mut. Auto. Ins. Co.,* 113 F.4th 924 (9th Cir. 2024), which is itself distinguishable and included a strong

16  dissent. *Jama* involved a challenge to valuation methodology for a damaged vehicle under Washington law. *Id.* *Jama* found that the District Court did not abuse its discretion in

17  decertifying a "condition class" under *Lara* because there was "no way to know without individualized inquiry whether such a class member received less than their car's actual cash value

18  and therefore suffered any injury." *Id.* at 936. However, *Jama* found that another "negotiation class" could proceed because "[i]n the absence of defendants' allegedly unlawful conduct, each

19  class member indisputably would have been paid the amount they actually received, plus the amount of the putatively unlawful negotiation deduction." *Id.* at 933 n.5. That is not the case

20  here. Here, coverage limits, sublimits, advance payments and even coverage questions may all impact whether and to what extent a particular insured was harmed, even assuming Plaintiffs'

21  liability theory were correct and the proposed class included only those initially paid based on valuation reports (which it does not). Indeed, the fire policies at issue here fundamentally differ

22  from the auto policies at issue in *Jama*, which typically insure one item of property – a vehicle – and have no dollar limit, sublimit or statutory advance payment potential related to the insured

23  vehicle. The factual record here underscores that distinction given the significant disconnect between XactContents® valuations and payments actually made. (*See, e.g.,* Steffey Dec., pp.

24  13:20-16:12; Thorpe Dec., ¶¶ 14-16).

25  [17] *Newell,* 118 Cal.App.4th at 1103 (affirming dismissal of class allegations, reasoning that "[e]ven if State Farm and Farmers adopted improper claims practices to adjust Northridge

26  earthquake claims … each putative class member's potential recovery would involve an individual assessment of his or her property, the damage sustained and the actual claims practices

27  employed"). *Basurco v. 21st Century Ins. Co.,* 108 Cal.App.4th 110, 118 (2003) (class treatment inappropriate because, even if insurer had a wrongful policy, each class member would still have

28  to show that their underlying claim had merit – *i.e.*, "the existence of damage, the cause of damage, and the extent of damage would have to be determined on a case-by-case basis").

*Basurco* and now *Lara* and *Small* make clear that breach of contract claims in this context require a class member to establish *all* of the elements of the claim, including that their claim is covered and that their items claimed are covered, *and* that application of State Farm's ACV methodology actually caused each class member harm. Those individualized inquiries cannot be ignored in the face of the record here, which includes the Combined *Ramyead* Data Set showing a significant disconnect between calculations in an XactContents® report and how a claim was actually handled and paid, evidence which did *not* exist in *Johnson*. (Steffey Dec., pp. 13:20-15:12).

In short, even if State Farm applied its ACV methodology to a claim, there can be any number of reasons why that application did not cause an insured harm. And, there can be any number of reasons why a claim payment does not align with an ACV valuation in XactContents®. Indeed, the potential class member data produced to Plaintiffs in this case, and which they wholly ignore in their Motion, reflects a significant disconnect between an XactContents® ACV valuation and payments actually made on claims. (Steffey Dec., pp. 13:20-16:12; Thorpe Dec., ¶¶ 14-16). Harm simply cannot be presumed across the class in the face of that evidence, which Plaintiffs never provided to their experts or mention in their Motion.

      **2.**     **<u>Plaintiffs' Damages Model Does Not Reliably or Validly Calculate Classwide Damages, Which Also Means That Individual Issues Predominate</u>**

Plaintiffs also bear the burden on class certification to show that "damages are capable of measurement on a classwide basis." *Comcast Corp.*, 569 U.S. at 34. "The Ninth Circuit has emphasized that although 'the need for individualized findings as to the amount of damages does not defeat class certification', [citation], a plaintiff must still proffer a common methodology for *calculating* damages or restitution." *Flodin v. Cent. Garden & Pet Co*., 2024 U.S. Dist. LEXIS 192904 (N.D. Cal. Oct. 23, 2024) (italics in original); *Orshan v. Apple, Inc*., 2023 U.S. Dist. LEXIS 90034 (N.D. Cal. Mar. 31 2023) (denying class certification based on, among other things, the failure to offer a viable classwide damages model); *Khasin v. R.C. Bigelow, Inc.*, 2016 WL 1213767 (N.D. Cal. Mar. 29, 2016) (Orrick, J.).

To meet their burden, Plaintiffs must present a damages model that *both* (1) can be applied classwide; and (2) is consistent with their theory of liability. *Comcast*, 569 U.S. at 35. In

considering an unexecuted damages model on class certification, "the question a district court must ask is whether the model will likely be able to generate common answers at trial.  The fact that a model is underdeveloped may weigh against a finding that it will provide a reliable form of proof.  *Merely gesturing at a model or describing a general method will not suffice to meet this standard.*  Rather, plaintiffs—or their expert—must chart out a path to obtain all necessary data and demonstrate that the proposed method will be viable as applied to the facts of a given case."  *Lytle*, 114 F.4th at 1032 (emphasis added).  Plaintiffs chart no path.  They offer only an unexecuted model of damages that is neither viable nor reliable as applied to even their *own* claim.

According to Plaintiffs, class damages reflect "the difference between the payment from State Farm and the undepreciated ACV."  (ECF 61, p. 10:4).  Relying on Mr. Regan, they offer a simplistic item-based formula that considers only sales tax, an item's age, and an item's life, which they claim can be applied to every item included in an XactContents ACV calculation to accurately calculate class member damages.  (ECF 62-1, ¶¶ 20-22) ("To calculate the damages for all Class Members, this same methodology may be applied to each item of any potential Class Members' claim and totaled.").  Mr. Regan is wrong.  His formula does not account for numerous variables, is based on a fundamentally flawed assumption, and fails as both an item-specific methodology and overall damages methodology.  Stated differently, it lacks both reliability and validity.  (Steffey Dec., pp. 6:1-7:11, 10:21-16:12).

The formula fails as an item-specific methodology, because it ignores that an ACV calculation in XactContents includes items paid at RC.  Mr. Regan understands that XactContents has only three condition selections (average, below average, and above average), and asserts based on that understanding that a "similar" item-specific formula can apply when "below average" or "above average" is selected.  (ECF 62-1, p. 7).  But, as Plaintiffs' other expert recognizes and the Pitkins' own XactContents® reports show, XactContents® also includes "New" and "Repl" condition options.  (ECF 62-2, p. 3; Blazewich Dec., ¶ 16 & Exs. 7, 9).  The Pitkins' XactContents® report included items with those conditions in its ACV calculation, but no depreciation was applied and they were effectively paid at RC.  (*Id*.).  Mr. Regan's formula would nonetheless apply depreciation to those items and, thus, overstate Plaintiffs' damages.  (Steffey

1    Dec., p. 13:4-20).

2        Mr. Regan's formula also does not account for the fact that State Farm will not apply more

3    than 80% depreciation to an item.  (*Id.*; Blazewich, ¶ 15).  He should have known that fact too,

4    because Plaintiffs' own XactContents® reports recount it.  (ECF 64-1, p. 2).  Again, applying Mr.

5    Regan's formula to the items in the Pitkins' XactContents® report would apply more than 80%

6    depreciation to some items and, thus, overstate the Pitkins' item-specific damage on this basis too.

7    (Steffey Dec., p. 13:4-20).

8        Even if Mr. Regan's item-specific formula could be adjusted to account for these variables,

9    which Plaintiffs have not established, his model has another fundamental problem.  Specifically,

10   he bases it on the assumption that every class member received both an XactContents® report *and*

11   payment equal to the total of the ACV column in their XactContents® report.  (Hoffman Dec., ¶ 3,

12   Ex. 1, Regan Dep, pp. 118:25-124:6).  Based on that assumption, he and Plaintiffs' other experts

13   equate item-specific depreciation applied to the sales tax portion of RC with putative class

14   member damages.  (Steffey Dec., p. 10:21-13:24).  But, all of Plaintiffs' experts ignore that

15   Plaintiffs received less than the total of the ACV column in both of their XactContents® reports

16   due to an applied sublimit.  (Blazewich Dec., ¶¶ 21, 24).  Mrs. Pitkins' parents, in contrast,

17   received more than the ACV column total due to an advance payment.[18]  (Blazewich Dec., ¶ 29).

18       The Combined *Ramyead* Data similarly reflects a significant disconnect between the ACV

19   calculation in XactContents® and payments actually made on a claim and recorded in ECS.

20   (Thorpe Dec., ¶¶ 14-16 & Ex. 1-3; Steffey Dec., pp. 13:20-16:12).  Mr. Regan does not account

21   for *any* of these differences among the putative class.  Nor could he, because Plaintiffs *never gave*

22   *him the data*.  That failure to consider the available record, which conflicts with his underlying

23   assumptions, renders his opinion both unreliable and invalid.  (Steffey Dec., pp. 4:1-16:12).

24   _____

[18] Mr. Regan's damages model also does not account for advance payments or sublimits.
25   (Hoffman Dec., ¶ 3, Ex. 1, Regan Dep., p. 128:5-11, 151:11-152:7; Steffey Dec., pp. 12:13-13:3).
     When asked about sublimits during his deposition, Mr. Regan vaguely responded that, "i[f] the
26   Court accepts my methodology, I anticipate that further data will be available from State Farm that
     reflects the impact of any limitation of any sublimits …."  (Hoffman Dec., ¶ 3, Ex. 1, p. 151:11-
27   152:1).  He had no idea what that data would be, and offered no details as to how such unspecified
     data could be used to formulate a valid and reliable classwide damages methodology.  (*Id.*, p.
28   152:2-7).

1    A random sample of 25 additional potential class member claims showed similar variations

2 between ACV valuations in XactContents® and payments actually made on claims.  (Mulcahey

3 Dec., ¶ 5; Thorpe Dec., ¶ 25 & Ex. 3; Blazewich Dec., ¶¶ 37-46 & Ex. 16-33); *Ass'd Gen. Contr.*

4 *of Am., San Diego Chapter, Inc. v. Cal. Dep*., 713 F.3d 1187, 1196 (9th Cir. 2013) (recognizing

5 that "anecdotal evidence complements statistical evidence because of its ability to 'bring the cold

6 numbers convincingly to life'") (internal citation omitted).  Of those 25 sample claims, only 20

7 had an XactContents® report.[19]  (Blazewich Dec., ¶ 38).  Of those 20 claims, only 1 had a

8 Coverage B indemnity payment value matching the ACV column total in their XactContents®

9 report.  (*Id*., ¶ 40).  Of the 19 other claims with an XactContents® report, 9 involved payments

10 reduced due to limits or sublimits.  (*Id*., ¶ 41).  Considered in context with the data and statistical

11 analysis, which Plaintiffs ignore, State Farm's evidence compellingly demonstrates that the

12 fundamental assumption underlying Plaintiffs' damages methodology – that all class members

13 received payment equal to the ACV calculation in their XactContents® reports – fails.

14    Finally, Plaintiffs' damages methodology does not even purport to account for

15 extracontractual damages, unjust enrichment, or restitution.  (Hoffman Dec., ¶ 3, Ex. 1, Regan

16 Dep., p. 97:21-101:02).  It relates only to a contract measure of damages, because it attempts to

17 calculate allegedly underpaid ACV benefits only.  (ECF 62-1, p. 2).  Mr. Regan's failure to align

18 the damages methodology with Plaintiffs' other claims for monetary relief thus renders his opinion

19 insufficient to support certification of Plaintiffs' Bad Faith and UCL claims too.[20]  *Comcast Corp.*,

20 569 U.S. at 35 ("Model purporting to serve as evidence of damages in class action must measure

21 only those damages attributable to plaintiffs' theory of liability….").

22

23

---

24 [19] The record here also reflects that more than 10,000 insureds with Coverage B payments during
the purported class period had no XactContents® report.  (Thorpe Dec., ¶¶ 17, 19).  Determining

25 whether and to what extent those class members' claims were settled based on State Farm's ACV
methodology would require a claim-by-claim review.

26 [20] It is also another example of Mr. Regan failing to adhere to generally accepted principles in the
field, as he himself has articulated them.  (Hoffman Dec., ¶ 3. Ex. 1, Regan Dep., pp. 30:9-31:17

27 (discussing presentations he had given advising that a "damage practitioner … understand when
testifying how their damage analyses correlate to the claims being articulated" and "attempt[] to

28 ensure that the damages analysis is linked to the cause of the harm being alleged")).

**C.** **Plaintiffs' Conclusory Manageability Argument Does Not Satisfy Rule 23(b)(3)'s Superiority Requirement**

Rule 23(b)(3) "also only allows damages classes if the district court finds 'that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.' Whether a class action will be manageable 'is, by … far, the most critical concern in determining whether a class action is a superior means of adjudication.'" *Lara*, 25 F.4th at 1138 (internal citations omitted). Here, Plaintiffs offer a single, conclusory statement on manageability, citing only to their expert's conclusory and unreliable opinions. (ECF 61, p. 14:3-6). It fails.

**1.** **Plaintiffs' Speculation that Class Members Can be Readily Identified is Divorced from their Class Definition and Conflicts with the Evidence**

The superiority inquiry includes manageability which, in turn, includes consideration of whether members in a Rule 23(b)(3) class can be readily ascertained. This requires consideration of both whether the class definition is sufficiently definite, and whether identification of members of the class is administratively feasible. *James v. Uber Techs. Inc.*, 338 F.R.D. 123, 130 (N.D. Cal. 2021) (to "be ascertainable, the class definition must be 'definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member' before trial, and by reference to 'objective criteria'") (citation omitted). "Defining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the best notice practicable in a Rule 23(b)(3) action." *Daniel F. v. Blue Shield of Ca.*, 305 F.R.D. 115, 121 (N.D. Cal. 2014) (internal quotations and citation omitted). "While Rule 23 does not impose any explicit requirement concerning the class definition, courts generally accept that the definition must be precise, objective, and presently ascertainable before the class action can proceed." *Id.* at 121-22 (internal quotations and citation omitted); *Steen v. Am. Nat'l Ins. Co.*, 2023 WL 4004192 (C.D. Cal. June 14, 2023) (declining to certify proposed class of policyholders and beneficiaries due to, among other things, ambiguity in class definition).

Plaintiffs also offer no facts – only speculation – supporting that their proposed Rule 23(b)(3) class can be readily identified through objective criteria, and they ignore State Farm's

data which proves their speculation wrong.  Plaintiff's purported ascertainability expert, David Melzer, speculates that "Plaintiffs will be able to identify members of the class" without specifying how, and while later disclaiming having any opinion on the issue.  (ECF 62-3, p. 7, 16-20; Hoffman Dec., ¶ 5, Ex. 3, Melzer Dep., pp. 123:17-126:19).  Mr. Regan and Mr. Peterson offer similar speculative statements in their reports, but disclaim forming an opinion on the issue and/or never received data on which they could base such an opinion.  (Hoffman Dec., ¶¶ 3-4, Ex. 1,  Regan Dep., p. 138:4-139:7; Ex. 2, Peterson Dep., p. 136:2-137:13).  As detailed above and in Dr. Steffey's report, the data does not support their speculation.  (Steffey Dec., pp. 10:21-16:12).

Plaintiffs' showing here echoes that in *Daniel F.*, 305 F.R.D. 115, which involved claims that an insurer wrongfully denied mental health treatment claims.  To support ascertainability, the plaintiffs in *Daniel F.* offered a declaration from a company that assisted insureds with denied claims, which speculated that class members could be identified based on a record review.  *Id.* at 123.  Blue Shield's evidence, in contrast, showed that it did not maintain internal codes that would allow for class member identification across claims.  *Id.*  Rather, determining class membership would require an individualized review, which was antithetical to class treatment.  Because the plaintiffs in *Daniel F.* offered no "workable method by which members of the proposed class" could be identified, they failed to meet their burden of demonstrating manageability.  *Id.* at 125.

Similarly here, determining whether insureds had a "covered loss," received an ACV payment based on RC less depreciation, and are "reasonably certain" to be paid less than "applicable policy limits" would require individualized determinations based on the facts of each insured's claim.  (ECF 61, p. 8:20-23).  Plaintiffs offer no objective criteria that can be readily applied to the class to confirm reasonable certainty that an insured will not be paid their applicable limit.  (*Id.*).  Their experts ignore that element of Plaintiffs' class definition too.  In fact, the record here does not establish that element as to the Pitkins themselves, who have until December 2025 to make an RC claim, and whose RC valuation exceeds their Coverage B limit by more than $100,000.  (Blazewich Dep., ¶¶ 24-25).

Membership in Plaintiffs' proposed class also requires a "covered loss," which neither Plaintiffs nor their experts address.  (ECF 61, p. 8:21-22).  As discussed above, California does not

1   recognize coverage by estoppel absent a fact-sensitive determination of detrimental reliance.

2   *Waller*, 11 Cal. 4th 1, 34 (1995).  Consequently, the "covered loss" element of the class definition

3   cannot be assumed based on a prior claim payment.  In addition, and as the Ramyead claim shows,

4   even if a loss is covered, certain personal property claimed in that loss may not be.  (Blazewich

5   Dec., ¶¶ 32-36).  Coverage determinations with respect to both the loss as a whole, and individual

6   items claimed in a loss, are inherently individualized and antithetical to class treatment.  Inclusion

7   of the "covered loss" requirement here makes the class definition either unmanageable due to

8   those individualized issues or impermissibly fail-safe, to the extent Plaintiffs claim coverage

9   questions should be ignored.  *See Olean,* , 31 F.4th at 669 n.14.

10          The class definition also includes members who lack standing because they suffered no

11  harm as a result of State Farm's application of its ACV methodology.  Indeed, as mentioned

12  above, this is true of Ms. Pitkin's parents, who received an ACV valuation *after they had already*

13  *received an advance payment from State Farm that far exceeded it.*  (Blazewich Dec., ¶ 29).

14          Notably, the U.S. Supreme Court will soon rule on the question of whether a class can

15  include uninjured members in *Laboratory Corp. of America v. Davis,* No. 24-304, 2025 WL

16  288305, at *1 (U.S. Jan. 24, 2025) (granting *certiorari* on the question: "Whether a federal court

17  may certify a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) when some

18  members of the proposed class lack any Article III injury.")  In *Davis,* the Ninth Circuit, applying

19  its earlier decision in *Olean*, 31 F.4th at 665, upheld certification reasoning "that some potential

20  class members may not have been injured does not defeat commonality at this time."  *Davis v.*

21  *Lab'y Corp. of Am. Holdings*, 2024 WL 489288, at *2 n.1 (9th Cir. Feb. 8, 2024).  The Ninth

22  Circuit's position that there is no Article III impediment to certifying a class that includes

23  members without any Article III injury is directly at issue in *Davis.*

24          The class definition is also overbroad as to subject matter.  It includes insureds paid ACV

25  for real property, but the Pitkins make no showing that State Farm pays ACV for real property in

26  California or that such insureds could be readily identified.  The Pitkins, their parents, and the

27  Ramyeads all received RC for building property.  (Blazewich Dec., ¶¶ 12, 27, 33).  Consequently,

28  the Pitkins also are not typical of such class members, to the extent any exist.  *Hanon v.*

1   *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

2       Finally, the class definition is impermissibly overbroad in time.  Plaintiffs filed this lawsuit

3   in 2023 and allege causes of action which have, at most, a four year statute of limitations.  Cal.

4   Code Civ. Proc. § 337(a) (breach of contract); *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136,

5   1144 n.4 (Ct. App. 1990) (bad faith); Cal. Bus. & Prof. Code § 17208 (UCL); *North Star Reins.*

6   *Corp. v. Sup. Ct.*, 10 Cal.App.4th 1815, 1822 (1992) (declaratory relief).  Yet, they seek to

7   represent a class of insureds with "covered loss[es]" who received claim payments from 2015 to

8   the present.  (ECF 61, p. 8).  They offer no evidence or law supporting certification of a class

9   dating back eight years before the filing of this lawsuit.[21]

10      **2.      Plaintiffs Offer No Trial Plan, and Ignore the Individualized Issues that**

11      **Render Class Treatment Unmanageable**

12      Oftentimes, in order to assess superiority, the Plaintiff must present a "suitable and realistic

13  plan for trial of the class claims."  *Zinser v. Accufix Res. Inst., Inc.,* 253 F.3d 1180, 1189 (9th Cir.

14  2001) (internal quotations and citation omitted).  A valid trial plan must consider a defendant's

15  due process right to assert affirmative defenses to every claim.  *Dukes*, 564 U.S. at 367; *see also*

16  *Boucher v. First Am. Title Ins. Co.*, 2012 WL 3023316, at *8 (W.D. Wash. July 24, 2012).  "If

17  each class member has to litigate numerous and substantial separate issues to establish his or her

18  right to recover individually, a class action is not 'superior.'"  *Zinser*, 253 F.3d at 1192.  This

19  includes damages calculations.  *In re Facebook*, 282 F.R.D. 446, 459 (N.D. Cal. 2012) ("At a

20  minimum, the need for an individualized assessment of damages is a factor in the superiority

21  analysis.").

22      Plaintiffs do not offer *any* trial plan.  They argue only the alleged statutory violation

23  (which does not support liability as explained in *Lara* and *Small*), an ascertainability argument

24  premised on experts who disclaim having an opinion on the issue, and a flawed damages model.

25

26  _____

[21] As discussed below, the policy also includes suit limitations provisions, which vary depending
on the nature and handling of a loss.  *Infra*, p. 32.  In addition, equitable tolling may apply to

27  extend the applicable limitations period pending a coverage investigation or settlement payment.
*Id.*  Accordingly, determining the applicable limitations period and when the limitations period

28  runs on a particular claim also raises individual issues antithetical to class treatment.

1    They offer no feasible approach for actually establishing liability as to each putative class member

2    (or even identifying them), and no reliable or viable model for calculating classwide damages

3    assuming the common ACV methodology issue is resolved in their favor (which it should not be).

4            Nor do Plaintiffs mention any of State Farm's affirmative defenses (of which they are well

5    aware, because State Farm established one on summary judgment in the *Ramyead* action).  *In re*

6    *ConAgra Foods, Inc.*, 302 F.R.D. 537, 580 (C.D. Cal. 2014) ("'[The] court cannot rely merely on

7    assurances of counsel that any problems with predominance or superiority can be overcome.'")

8    (quoting *Zinser*, 253 F.3d at 1189).  Specifically, in addition to granting State Farm summary

9    judgment on the ground that it correctly calculates ACV for contents under Section 2051, the

10    *Ramyead* court also granted summary judgment on the alternative ground that the policy's suit

11    limitations period applied to bar the claim.  (RJN, Ex. 2).  A suit limitation differs from a statute of

12    limitation, and determining when the limitation period runs requires investigation into both the

13    handling of the claim and the nature of the loss.  *Prudential-LMI Com. Ins. v. Superior Ct.,* 51 Cal.

14    3d 674, 691, 700 (1990) (holding that equitable tolling applies to the suit limitations period during

15    the handling of the claim); Cal. Ins. Code § 2071 (providing for a 12-month suit limitation period

16    generally, which extends to 24 months where the loss resulted from a government-declared

17    disaster).

18            Individual claims may also involve fraud or merely a lack of cooperation, either of which

19    may void coverage, and which State Farm has the due process right to raise where appropriate.

20    *Castro v. State Farm Gen. Ins. Co.,* 256 F.Supp.3d 1048 (N.D. Cal. 2017) (Orrick, J.) (granting

21    summary judgment for State Farm based on application of fraud or concealment provision).  These

22    and other potential defenses require claim-specific resolution to determine liability, separate and

23    apart from the common ACV methodology issue, and render class treatment inappropriate.

24    **D.**     **Plaintiffs Underplay the Significance of *Ramyead*, Which Also Defeats Superiority**

25            Plaintiffs claim that superiority exists because they "are unaware" of any similar case "in

26    this Court or the Ninth Circuit."  (ECF 61, p. 13:21-22).  That is not the standard and, as Plaintiffs

27    are well aware, the *Ramyead* action (which they do not even acknowledge by name) has been

28    pending for years.  That the *Ramyead* action is proceeding in state court and not federal weighs

1    *against* superiority, not in favor of it, because the ACV methodology challenged here and in

2    *Ramyead* turns on state law and will soon be resolved by a state appellate court.

3         *Kamm v. Cal. City Dev. Co*., 509 F.2d 205 (9th Cir. 1975), is instructive.  In *Kamm*, the

4    plaintiffs sought to certify a class of investors under Rule 23(b)(3) against the promoters and

5    affiliates of a desert land promotion scheme known as California City.  *Id.* at 206-07.  The trial

6    court dismissed and struck the class claims for lack of superiority because of another

7    representative action brought in state court.  *Id.* at 209.  The Ninth Circuit affirmed, reasoning that

8    the following factors, among others, supported the decision: (a) that the class action "would

9    require a substantial expenditure of judicial time which would largely duplicate and possibly to

10   some extent negate the work on the state level,"; (b) that "[n]o member of the class is barred from

11   initiating a suit on his own behalf; (c) that "[a]lthough the class action aspects of the case have

12   been dismissed, appellants' action is still viable"; and (d) "[d]efending a class action would prove

13   costly to the defendants and duplicate in part the work expended over a considerable period of

14   time in the state action."  *Id.* at 212.  The Ninth Circuit also rejected the plaintiffs' claim that the

15   class action should proceed because it sought different relief than secured in the state action.  *Id.* at

16   213.  Regardless of the label of the cause of action, "both actions involve the same fraudulent

17   conduct of the defendants and both seek to provide relief for those injured thereby."  *Id.*

18        Similarly here, both *Ramyead* and this case seek relief based on the same alleged challenge

19   to State Farm's contents ACV methodology.  In fact, *Ramyead* may provide broader relief than

20   sought here, because it was filed three years before this case and therefore includes insureds whose

21   claims arose three years earlier.  Although the *Ramyead* plaintiffs allege different causes of action,

22   they seek the same measure of monetary relief that Plaintiffs seek in their Motion here: allegedly

23   underpaid policy benefits.[22]  (RJN, Ex. 1 & Ex. 3, p. 39).  State Farm has litigated the *Ramyead*

24   action for nearly five years, and the common legal issue in both this case and *Ramyead* is now

25   fully briefed and framed for resolution by California's Second District Court of Appeal.  (RJN,

26   Ex. 4).  If affirmed, that finding will not only control *Ramyead* but will instruct and may control

27   ───────────────────────

28   [22] Counsel in *Ramyead* attempted to disclaim the monetary relief claim during the summary
     judgment hearing, which the court rejected.  (RJN, Ex. 3, p. 41, fn. 12).

this case too.  If reversed, *Ramyead* will go back to the trial court, which may consider certifying a class effectively seeking the same relief sought here and dating back three more years.

**E.      Plaintiffs Are Not Adequate Representatives under Rule 23(a)(3)**

Plaintiffs' own potential waiver of a claim for RC benefits, and the potential for barring other class members from seeking similar relief, also makes Plaintiffs inadequate representatives.

Plaintiffs are pursuing this action to recover some unspecified amount which not even their experts have calculated, but which is necessarily far less than what they could recover if they made an RC claim.  Specifically, Plaintiffs' XactContents® report estimated the RC of their contents at $619,586.02, including sales tax of $46,602.81.  (Blazewich Dec., ¶ 24).  State Farm paid Plaintiffs about $410,000 under Coverage B, or about 66% of their estimated RC, and informed Plaintiffs that they have about $100,000 in RC benefits remaining.  (Blazewich Dec., ¶¶ 24-25).  Plaintiffs have only until December 2025 to make that claim.  (*Id.*).  Whatever the precise amount of their claim in this case, it logically cannot exceed 34% of the estimated sales tax, or about $16,000.  Why they are continuing to pursue that claim, as opposed to replacing the property they lost and making an RC claim for the approximately $100,000 estimated difference between their property's ACV and RC, makes no logical sense.

It also suggests a conflict with the class, who may be barred from making their own RC claims or otherwise challenging State Farm's valuation of their lost contents, and barred from seeking other potential relief that Plaintiffs allege in their Complaint but do not mention in their Motion.  (ECF 41, p. 25:23-24) (seeking "consequential, punitive, exemplary, and any other available damages").  While the Ninth Circuit has not squarely addressed the parameters of claim splitting in the class action context, it has contemplated its application.  *Drimmer v. WD-40 Co.*, 343 F. App'x 219, 221 (9th Cir. 2009) (affirming district court's inadequacy finding based on, among other things, the named plaintiff's "inexplicable disinterest in pursuing all remedies available to him").  This District Court and others have too.  *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 643 (N.D. Cal. 2015) (Chen, J.) ("Plaintiffs' failure to address the problem of abandonment of damages claims compels the Court to conclude that they are not adequate representatives in this case."); *Fosmire*, 277 F.R.D. at 634; *W. States Wholesale, Inc. v.*

1    *Synthetic Indus., Inc.*, 206 F.R.D. 271, 277 (C.D. Cal. 2002).  Plaintiffs' failure to address their

2    apparent waiver of their other alleged damages claims in their Motion also renders them

3    inadequate on that basis.[23]

4    **F.    Plaintiffs Offer No Evidence or Argument Supporting their Bare Request for Rule 23(b)(2) Certification, Thereby Waiving the Issue**

5

6        Finally, Plaintiffs claim to seek certification under Rule 23(b)(2).  However, they offer no

7    evidence or argument on this issue.  (*See*, ECF 61).  Accordingly, they have failed to meet their

8    burden on this Motion as to Rule 23(b)(2), *Olean*, 31 F.4th at 663, and the District Court may

9    properly disregard the issue as waived.[24]  *Greisen v. Hanken*, 925 F.3d 1097, 1115 (9th Cir. 2019);

10   *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).  As Plaintiffs offer no argument supporting

11   Rule 23(b)(2) certification, nor specify what relief they may seek under such a class at this stage of

12   the proceedings, State Farm has nothing to respond to at this time.

     **V.    CONCLUSION**

13       For the foregoing reasons, the Court should deny Plaintiffs' Motion, deny class

14   certification, and deny Plaintiffs' counsel's request for appointment as "interim" class counsel.[25]

15   Dated:  February 5, 2025            SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

16                                By    _____/s/ Jennifer M. Hoffman_____

17                                      Attorneys for Defendant
                                        STATE FARM GENERAL INSURANCE COMPANY

18   _____
     [23] Some courts have contemplated that the notice and opt-out procedure required under Rule
19   23(b)(3) mitigates claim splitting concerns. *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 414
     (5th Cir. 2017).  Because Plaintiffs cannot satisfy Rule 23(b)(3) here, those concerns remain.
20   [24] Presumably, Plaintiffs do not brief Rule 23(b)(2) certification because their primary form of
     relief sought is damages under a breach of contract theory, thereby making Rule 23(b)(2)
21   certification inappropriate. *Wal-Mart v. Dukes*, 564 U.S. at 360; *Ellis v. Costco*, 657 F.3d at 986.

22   [25] Plaintiffs offer a Joint Declaration from four counsel of record firms attesting to their attesting
     to their qualifications, and ask that all four firms be appointed as "interim" class counsel. (ECF
23   63).  First, the use of a "Joint Declaration" obscures which firm claims to have done what in
     litigating this case.  Indeed, counsel do not specify what work they have done in pursuing class
24   certification—they provide only generalities about the work they plan to do in the future.  (ECF
     63, ¶¶ 5, 6).  To date, defense counsel have interacted only with the Cotchett firm.  (*See* Hoffman
25   Dec., ¶¶ 11-17).  Similarly, plaintiff Ms. Pitkin has no recollection of any involvement by the
     Louisiana firm.  (Hoffman Dec., ¶ 7, Ex 1, M. Pitkin Dep., p. 88:20-24).  Finally, counsel do not
26   explain what they mean by the "interim co-lead counsel" designation they seek. (ECF No. 63, p.
     3:13).  The appointment of at most two "lead counsel" firms—not "interim"—who can speak on
27   behalf of Plaintiffs and litigate the case economically is preferable to the amorphous, top-heavy
     structure Plaintiffs suggest.  *See In re Seagate Technology LLC Litigation*, 2016 WL 3401989 at
28   *3 (N.D. Cal. June 21, 2016) (declining to make interim appointment because "the court is not
     persuaded that appointment of interim counsel would achieve greater efficiency and clarity).