Pages 1 - 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

MELISSA PITKIN and DAN GROUT, on )
behalf of themselves and all others )
similarly situated, )
)
       Plaintiffs, )
)
  VS. )   **NO. 3:23-CV-00924 WHO**
)
STATE FARM GENERAL INSURANCE )
COMPANY, an Illinois Corporation, )
)
       Defendant. )
_____)

San Francisco, California
Wednesday, June 18, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
        COTCHETT, PITRE & McCARTHY LLP
        San Francisco Airport Office Center
        840 Malcolm Road
        Burlingame, California 94010
    BY:  **TYSON C. REDENBARGER, ATTORNEY AT LAW**
        **MARISSA L. HAUCK, ATTORNEY AT LAW**

For Defendant:
        SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
        Four Embarcadero Center, 17th Floor
        San Francisco, California 94111
    BY:  **ANNA S. McLEAN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
          CSR No. 7445, Official United States Reporter

**APPEARANCES:**  (CONTINUED)

For Defendant Via Zoom:
                    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                    333 South Hope Street, 43rd Floor
                    Los Angeles, California 90071
            BY:   **JENNIFER M. HOFFMAN, ATTORNEY AT LAW**

| | |
|---|---|
| **Wednesday - June 18, 2025** | **2:39 p.m.** |

**P R O C E E D I N G S**

**---o0o---**

**THE COURTROOM DEPUTY:** Calling Civil Matter 23-924, Pitkin versus State Farm General Insurance Company.

Counsel, if you will please come forward and state your appearance.

And please let me know if any of your colleagues who are joining you online also need to address the Court.

**MR. REDENBARGER:** Good afternoon. Tyson Redenbarger of Cotchett, Pitre & McCarthy on behalf of the plaintiffs.

**MS. McLEAN:** Anna McLean for State Farm, Sheppard Mullin.

Ms. Hoffman is appearing via Zoom, and she will be presenting the principal argument.

**THE COURT:** All right. Nice to see you.

**MS. HAUCK:** Marissa Hauck for the plaintiff.

**THE COURT:** Great.

**MR. REDENBARGER:** Marissa may be addressing some of the issues as well today.

**THE COURT:** That's fine. Okay.

So let's get the co-counsel on the screen.

**MS. McLEAN:** I also have hard copies of the demonstratives that Ms. Hoffman will be using, in case the Court would like them.

1          **THE COURT:**  I'll take them right now, Ms. McLean, if

2     you've got them.

3          So I think the way that I want to do this, I've got a

4     tentative here.  I have a couple of questions for the

5     plaintiffs, and then I'll hear from -- because the tentative is

6     going against the defendants, I'll let the defendants go first

7     here.  But let me just tell you what it is, and let me ask you

8     the questions that I've got for you.

9          So, first of all, I do think it's more likely than not

10    that the plaintiff's experts' opinions are relevant and

11    reliable.  The defendant argues that the failure to review the

12    *Ramyead* data makes them deficient; but each of them described a

13    methodology and I think presented a reliable basis for the

14    conclusions that they're not relying on *ipse dixit*.

15         Regan explains how to identify class members who were

16    damaged and how to calculate the damages.  Melzer's methodology

17    relies on the experience that he had at Travelers and seems

18    reasonable.  Peterson understands the functions of Xactimate

19    and XactContents sufficiently, I think, to be helpful.

20         My question for the plaintiff is:  The defense points to

21    the application of sublimits and special limits and advance

22    payments, or lack thereof, by Mr. Regan, and so how does he or

23    you address that issue?

24         **MR. REDENBARGER:**  Sure.  Thank you, Your Honor.

25         The short answer is, that type of information is

1    maintained by State Farm in their database.  State Farm is an

2    insurance company.  They're very aware of limits in terms of

3    how much money they're going to pay claimants.  That

4    information is contained in their database and can be seen in

5    some of the reports, including the *Ramyead* report.

6         So in terms of calculating damages, Mr. Regan can simply

7    look at the column that shows the limit or sublimit, and apply

8    that to the damages calculation to determine -- so taking one

9    step back, stub limits are probably more relevant for whether

10   or not someone is a class member, not damages.

11        If a class member reached their limits and was paid full

12   limits, they're not a class member.  It's for those folks who

13   are under their limits whose payment was depreciated by sales

14   tax, they were underpaid, those individuals would be within the

15   class; and the only analysis that would need to be done was

16   whether or not they've hit limits, simply put.  And that

17   information is maintained by State Farm, which we can -- our

18   experts can review.

19             **THE COURT:**  Okay.  All right.  So let me go on here.

20        I didn't -- in what I was just saying, I didn't rely on

21   the rebuttal reports.  I would deny the defendant's motion at

22   the moment as being moot, but the defendant can depose these

23   experts before trial and move to decertify, if appropriate.

24        It seems to me, going to the heart of this, that one issue

25   predominates, which is:  Is State Farm's uniform practice

1  regarding sales tax depreciation, which always reduces class
2  members' ACV benefits, legal?

3      I made a call on this.  I'm a fan of Judge Highberger's.
4  He made a different call.  But I'm sticking with mine so far.
5  But that's a merits question.  And right now, it's just a
6  question of is there a common issue that predominates, and
7  there is, I think.

8      I don't think this case is like *Small*, where the plaintiff
9  cannot just show a statutory violation because some policies
10 lapsed because of the insured intent.  And here, the State Farm
11 policy applied a practice to everyone.  And that's like the
12 *Jama* negotiating class, and it's not like the *Lara* case.  So I
13 do think that that issue predominates.

14     And my second question for the plaintiff is:  Do you agree
15 that there's a four-year statute of limitations?  And you
16 didn't respond to the argument, I didn't see, that the
17 defendant made there.  And so shouldn't the class be limited to
18 2019 going forward?

19     **MR. REDENBARGER:**  That was a point I was going to make
20 today, Your Honor, is, yes, we agree that it should be a
21 four-year statute of limitations; and the class definition
22 should read the starting date being March 1st, 2019, through
23 the present.

24     **THE COURT:**  Okay.  All right.  So I've just plowed a
25 lot of ground for you, Ms. Hoffman, and please take it away.

1          **MS. HOFFMAN:**  Thanks so much, Your Honor.

2     And I appreciate the insight into the Court's thinking and

3     the opportunity to provide argument today.  I'll try to be

4     brief, but there are a few points to cover.

5          **THE COURT:**  Yes.

6          **MS. HOFFMAN:**  The plaintiffs have the burden on this

7     motion.  They failed to meet it in their motion, is our

8     position, and they cannot cure that failure with the new

9     evidence on reply.  And we appreciate the Court saying that

10    the Court's not going to be considering that evidence.

11         But in their motion, what they did was they ignored the

12    data.  They ignored State Farm's data capabilities, which

13    State Farm had disclosed in discovery months before they filed

14    their motion, and they ignored the variances in the data.  They

15    ignored all of that, even after characterizing to this Court

16    that data as critically important to issues of class

17    certification.

18         And as we explain in our opposition, the limitations and

19    the variances in that data show that class membership,

20    liability, and damages all require individualized review, which

21    is antithetical to class certification, especially

22    certification under Rule 23(b)(3) for a breach of contract

23    claim, which is all they seek here.

24         Recent Ninth Circuit authority, including *Small*,

25    underscores that heavy burden and also that a methodology

doesn't support harm, as both *Lara* and even *Jama* recognized.
And I will get to that.

     Plaintiffs don't rebut our evidence on reply.  They still
disregard State Farm's expert Duane Steffey, and they still
disregard State Farm's data analytics employee Jay Thorpe, who
has personal knowledge of State Farm's data and search
capabilities.

     We're not disputing there is data out there.  Our point
is, that data is not searchable in the way that plaintiffs
think it might be, and that data doesn't show plaintiffs what
they think they want to know and what they need to know to
certify this class and establish class membership, liability,
and damages on an objective, feasible basis across the class.
And their expert's most recent reports, which they submitted on
reply, show that they still don't understand the data and its
limitations.

     And what the Court asked about today, and was right to ask
about -- What's the plan for advance payments, for limits, for
sublimits?  How does that work into membership, liability, and
damages? -- their response is they still don't have a plan.
Just trust us.  That's *ipse dixit*.  That's not telling
the Court how they're going to look at that data, how they're
going to apply those numbers and say whether someone has been
harmed and what those damages may be.  We haven't heard that
yet.  That wasn't in their papers, and they haven't provided

1    that answer to the Court today.  And I think that is a very

2    important point here.

3         The other thing that they did, Your Honor, is that they

4    changed the data without disclosing that to the Court in their

5    reply.  And here's what I mean.

6         And I'd like to show this image.  I provided -- we served

7    copies of these on plaintiffs before the hearing.

8         So this is a table that plaintiffs say is an excerpt of

9    the *Ramyead* dataset.  In fact, it's no such thing.  The *Ramyead*

10   dataset shows values in dollars and cents, not dollars.  This

11   table cherry-picks seven rows out of more than 40,000 rows to

12   make the data look simple.

13        And let me just go back and step back a moment.  I know

14   that Your Honor is familiar with the papers, but I think it's

15   important to talk about what that *Ramyead* dataset is.  That

16   dataset is something that State Farm produced to plaintiffs in

17   May of 2024 when the parties were discussing State Farm's data

18   and its search capabilities and which plaintiffs ignored

19   entirely in their moving papers filed months later.

20        *Ramyead* is another class action filed in California state

21   court which similarly challenged State Farm's actual cash

22   value, or ACV, methodology.  And I know you're familiar with

23   Judge Highberger and how that resulted.

24        But the point for this motion is not the merits of that

25   decision from Judge Highberger.  It's the data and what we did

in that case to collect it.

And in the *Ramyead* case, we asked -- State Farm asked its
vendor, a third party, Verisk, to provide information regarding
claims that had an XactContents report from 2016 to 2021.
That's within the time frame alleged in the Pitkins' class
definition.  Doesn't cover all of it, but it's within it.

And as Your Honor, I expect, knows, XactContents is an
estimating tool that's developed and maintained by that
third-party vendor, Verisk.  State Farm can request estimates
from the tool in handling and settling property claims, and it
can ask for those estimates on an actual cash value, or ACV,
basis or on a replacement cost, or RC, basis.  State Farm can
also save a PDF of an XactContents report to a claim file.

But State Farm does not maintain Verisk's XactContents
data in a form that can be searched across claims.  That is
key.  Verisk does.

State Farm maintains its claims records and files in its
enterprise claim system.  It can query its enterprise claim
system, but not all information stored in enterprise claim
system, or ECS, can be queried across claims.

So to create the *Ramyead* dataset, State Farm first
received information from Verisk with those parameters, where
there was an XactContents report created from 2016 to 2021, and
then queried its own enterprise claim system, or ECS, where
State Farm houses its records, to pull information and match it

up to those claims.

That *Ramyead* dataset is the only dataset produced in this case to date.  For unknown reasons, the Pitkins' counsel suddenly abandoned the parties' discussions last summer regarding generating a new dataset tailored to this case.

So going back to the table, that's the background that I wanted to share about this table.  And this is a table that they included at the very beginning of their reply brief, and it's pulled out of Mr. Regan's reply report.

But it doesn't actually excerpt the *Ramyead* dataset.  This is what those same columns look like in the *Ramyead* dataset. And you'll notice a few things with this.  You'll notice that it's gone from seven rows to 12 rows, and that is because when Verisk made this query, it created a separate row for each XactContents report generated on a claim.

And this shows how common even those seven cherry-picked claims are, how common it is for the claims in this putative class to have multiple XactContents reports.  And what that means is you have multiple valuations; you have multiple payments.  That's nothing that the plaintiffs have ever addressed or that their experts appear to appreciate.

The other thing you see here is that this -- in blue, this number in blue reflects the original row number out of the *Ramyead* dataset.  And you can see it starts at Row 5,984, and then it jumps ahead to row 6,057.  Then it jumps again to

1    6,068; then 10,120 and so on.

2         The Pitkins and Mr. Regan never mention or explain those

3    gaps or why Mr. Regan chose the claims he chose to include in

4    his table.  Presumably, he chose them because they fit the

5    Pitkins' narrative.  The ACV for those claims matches the

6    indemnity payment or the indemnity payment less the deductible.

7         Looking at their table suggests that the entire dataset

8    looks the same.  It doesn't.  When you look between or even

9    around the rows they selected, you find many other claims that

10   don't fit the Pitkins' narrative.  They show material and

11   unexplained differences between the amount of an ACV estimate

12   in XactContents and the amount actually paid on a claim as

13   shown in State Farm's ECS records.

14        And here's what I mean.  So this chart shows the Pitkins'

15   claims.  The 12 rows for the seven claims that the Pitkins

16   included in their table are shown in green.  Those are the only

17   claims on this table that have no variance between an ACV

18   estimate in XactContents and a cause of loss indemnity payment

19   recorded in State Farm's ECS.

20        That's the other important thing to note about this table.

21   This table is excerpted from about 50 columns of data.

22        On this table, from the *Ramyead* dataset, every column,

23   until you get to this AR column, is a column that is from

24   XactContents.  It is not State Farm's data.  It is Verisk's

25   data maintained in XactContents.

1          And something else notable about these columns:  This ACV

2    column is the total of an actual cash value column in an

3    XactContents report, but it does not total items valued on an

4    ACV basis.  It includes all items, whether they're paid at

5    replacement cost, whether they're valued at cost, or whether

6    they're valued at fair market value.  And I'll show another

7    demonstrative later that gets to that point.

8          You also see here Column U, which is "Payment Amount," in

9    XactContents.  That is a manually entered amount in

10   XactContents.  A claims person has to enter that number and has

11   to enter it right.  In the full *Ramyead* dataset, there's a

12   separate column that has payment amount in ECS.  That column is

13   blank about 9,000 times because there's no payment in

14   State Farm's ECS that matches a payment included in this

15   Column U in XactContents.  Mr. Thorpe detailed that in his

16   declaration.

17         But what this table shows -- so going back, this is the

18   only column from State Farm.  This column is automatically

19   generated when a payment issues on a claim.  So this is the

20   State Farm claim record.

21         This column we added as part of this demonstrative to

22   illustrate the varying -- the variance that you see in many

23   claims in this dataset between an ACV valuation in XactContents

24   and a cause of loss indemnity payment on a claim.

25         So, for example, on the first claim in this row -- I know

1    it's small, I apologize -- you see that the ACV payment was

2    about $1,400 less -- I'm sorry -- that the indemnity payment

3    was about $1,400 less than an ACV value in XactContents.  For

4    the next claim, you see that it was about $9,000 more.  And it

5    goes on.  You see 16,000 variance, 3,000, 45,000.

6        And nothing in the data explains why that is.  Nothing in

7    the data can tell you why those claims were paid those amounts

8    and what those amounts reflect.  You have to go into the claim

9    and look at it and figure that out.  And none of plaintiffs'

10   experts appear to appreciate that fact.

11       And to be clear, these differences are not isolated in the

12   dataset.  State Farm's expert, Dr. Duane Steffey, the only one

13   to analyze the data, explained what he found with these

14   variances, and I'd like to share another demonstrative that

15   shows what he found.

16       He found that payments recorded in State Farm's ECS system

17   equal actual cash value calculations in Verisk's XactContents

18   tool within a dollar for only 23 percent of the claims.  That's

19   it.  He found, for 49 percent of the claims, the payment was

20   less than ACV; but for 28 percent of the claims, the payment

21   exceeded ACV; and for 26 percent of those claims -- or of all

22   claims -- I'm sorry -- the payment exceeded the ACV, plus the

23   sales tax depreciation amount listed in that column.

24       And I want to go back to that column in particular,

25   Your Honor, to give some clarity on what sales tax depreciation

1    is.  This is not a column that appears in an XactContents

2    estimate that's provided to State Farm or that's provided to

3    the Pitkins.  This is a column that was calculated by Verisk

4    and provided to State Farm.  There was no evidence in the

5    record as to how it's populated.  It is simply a number.

6        **THE COURT:**  Ms. Hoffman, I'm having a little trouble

7    thinking about what I think of as the central issue in this

8    case and what you think of as the central issue in the case,

9    and so I want you to untangle that --

10        **MS. HOFFMAN:**  Okay.

11        **THE COURT:**  -- for me.

12    My understanding is that State Farm has a uniform practice

13    regarding sales depreciation and that that always will produce

14    a number.

15        There are many numbers that go into a claim, and they may

16    end up being -- they could be above the policy limit or shove

17    the calculation above the policy limit, but it's always a

18    calculation that is made that would decrease the amount that

19    the insured would be entitled to.

20        And what you've been pointing out is that there are a

21    whole lot of issues in any claim that will end up totaling

22    whatever it totals.  But I'm just looking at this one issue.

23    And so tell me -- untangle those two things for me.

24        **MS. HOFFMAN:**  Sure.  Well, I think, Your Honor, the

25    issue and what that dataset I just showed shows and what

1  Dr. Steffey's report addresses is that simply having an

2  XactContents estimate that has an ACV value in it does not mean

3  that that's what is paid; and it also doesn't mean that what

4  listed in -- what is listed in that ACV column is actually

5  something paid on an ACV, or actual cash value, basis.

6      And I'd like to illustrate that, Your Honor, with excerpts

7  from the Pitkins' own XactContents report, if you'd allow me.

8      So looking at -- this is the Pitkins' -- an excerpt from

9  the Pitkins' first XactContents report, and it shows -- this is

10  the first page of that report.

11          **THE COURT:**  Okay.  It's not up yet but --

12          **MS. HOFFMAN:**  I apologize.  Let me try this again.

13      Are you able to view it now, Your Honor?

14          **THE COURT:**  Mm-hmm, yes.

15          **MS. HOFFMAN:**  So this shows the first page of a

16  report.  And when you scroll down, this is the line item

17  detail.  And what you see here is that actual cash value column

18  that we just looked at.  My understanding is that column in the

19  dataset is pulled from this -- the total of this column.

20      And when you look at this column, even the very first

21  items listed here are not contents that are subject to ACV.

22  These are all PODS storage expenses.  So they're listed under

23  the actual cash value line, but there's no depreciation applied

24  to them.  They're paid at cost.

25      And if you scroll down, you see more of this.  You see the

1    next item in the next section, also a vintage cake platter, no

2    depreciation applied, still listed in the actual cash value

3    column.

4         So simply having a number in the actual cash value column

5    doesn't mean there's associated depreciation with it.

6         And then when you look down to the end, when you skip to

7    the end of their report, we -- in the interest of keeping this

8    shorter, we're now down to page 78 of this report, and you see

9    the actual cash value total.  This is the number that was

10   included in the XactContent -- in the *Ramyead* dataset we were

11   just looking at an excerpt of.

12        And you see this number here, $410,503.46.  That is not

13   what the Pitkins were paid.

14        If you go up to the first page again, you see here there's

15   a special limit recap.  There was an amount over a limit of

16   $20.  So the Pitkins ended up getting paid $410,483.46, and

17   that's what was paid on theirs.

18        The Pitkins' parents, as we talked about in the papers,

19   they also had an XactContents estimate.  And their ACV total

20   far exceeded the advance payments that State Farm had made to

21   them.

22        I know there's a lot in the papers, but one of the issues

23   that was raised is the fact that now we have statutory advance

24   payments in certain contexts.

25        And the *Ramyead* -- the Pitkins got an advance pavement and

their parents did as well.  And that advance payment exceeded

the ACV valuation in XactContents.  And what that provides an

example of is someone who had the ACV methodology applied, but

there was no harm.

But that's not the only time that happens.  That also

happens here because you have a replacement cost coverage.  And

I want to talk about this in the context of *Lara* and *Jama* in

particular.

If Your Honor wouldn't mind, I can move to that piece.

**THE COURT:**  Go ahead.

**MS. HOFFMAN:**  *Jama* was an auto case that initially

denied certification of a class of all insureds who had an

Autosource valuation for a totaled vehicle with a negotiation

adjustment.  They received payment pursuant to that valuation

and didn't pursue an appraisal.  That was how the class was

defined in *Jama*.  That's not how the class is defined here, but

that's how they defined it in *Jama*.

And because *Jama* was a total loss auto case, that means it

involved one item of property for each insured that was

unquestionably damaged and an insured entitled to one payment

for that item of property on one basis.

So in contrast to contents coverage under homeowners

policies like we have here, auto policies typically insure just

one piece of property.  They don't have limits, and they don't

have sublimits.  Nor do claims under auto policies typically

1    involve advance payments or additional proof of loss

2    requirements, like ownership and authenticity implicated in the

3    personal property context.

4         So, for example, for the Pitkins, there were many items of

5    property that were listed on a -- on a list of -- a proof of

6    loss list but that didn't have backup documentation supporting

7    it.  So State Farm had to ask.  They went back; they got more.

8    There are thousands of items of property.  In *Jama*, you have

9    one.

10        But the biggest distinction between this situation and

11   what you had in *Jama* is that auto policies don't include

12   replacement cost benefits.  Replacement cost benefits provide

13   that an insured is entitled to the cost to replace property

14   but, until replacement, is entitled to actual cash value.  And

15   in the property context, insureds routinely claim replacement

16   cost benefits, and State Farm routinely makes supplemental

17   payments under that benefit.

18        Even where XactContents is used, on average, as

19   Dr. Steffey found, claims have two XactContents estimates.  And

20   by the way, XactContents is not always used.

21        We had a random sample pulled of 25 claims recorded in

22   State Farm's ECS system that had Coverage B or contents

23   payments in the time frame; and of those 25 claims, five had no

24   XactContents report.  They had Coverage B payments and no

25   XactContents report.

1          But going back to *Jama*, because there is a replacement

2     cost benefit that insureds routinely claim, and the Pitkins can

3     still claim, simply paying ACV, even if the methodology is

4     wrong, which State Farm disputes, doesn't establish damage

5     under *Lara* or *Jama*.  That is because *Jama* recognized *Lara*'s

6     reasoning around injury.

7          If a condition adjustment is applied, even if it was wrong

8     but that plaintiff still got an amount equal to what she would

9     have gotten if the adjustment was not applied, then there was

10    no breach of contract because there was no injury.  And that

11    could have easily happened.  Liberty could have adjusted the

12    value back up, made a higher offer, or the parties could have

13    done appraisals.

14         That is key.  That says that it doesn't matter the moment

15    you make a payment on an ACV.  It recognizes that claims are

16    dynamic, that negotiations happen, and that if that insured

17    ultimately gets paid what they're entitled to get paid under

18    the contract, notwithstanding the initial deduction, there is

19    no injury.

20         And that is why the Pitkins include in their class

21    definition the reasonable certainty prong.  And I'd like to go

22    back to that class definition --

23              **THE COURT:**  Okay.  And --

24              **MS. HOFFMAN:**  -- because there is a lot.

25              **THE COURT:**  I do want you to be cognizant of time,

1    because there's a limited amount.  So, go ahead.

2            **MS. HOFFMAN:**  Thank you, Your Honor.

3            **THE COURT:**  Okay.

4            **MS. HOFFMAN:**  But my point is -- Your Honor is

5    familiar with how they've defined the class going back to 2015.

6    You have to have a covered loss, which also makes it either

7    unmanageable or fail-safe.  You have -- and, by the way, we

8    showed in our papers that the *Ramyead* case, that's not a

9    hypothetical.  The *Ramyead* case had a factual question about

10   whether the property they claimed and State Farm paid before

11   suit was actually damaged.

12        But in addition to those, you have to have the ACV

13   payment, and you have to have reasonable certainty that the

14   insured will not receive the limits of the policy or the RC of

15   the policy.

16        And we don't even know that the Pitkins can say that about

17   themselves.  They have until December of 2025 to make an

18   RC claim.  And they've not offered any way that that prong can

19   be objectively and feasible satisfied here.

20        And that makes this breach of contract claim more like

21   *Small*, where the Court recognized if the insured didn't want a

22   policy, then the termination of the policy didn't cause them

23   harm, even if the termination was done wrongfully.

24        Here, if the insured wants to claim RC and intends to make

25   an RC claim, then the ACV payment doesn't cause them harm.

1  Personal property claims are far more iterative and require far

2  more proof and documentation than an auto claim like in *Lara* or

3  *Jama*.  Insureds are always submitting more documentation.

4        **THE COURT:**  You've said that.

5        **MS. HOFFMAN:**  State Farm --

6        **THE COURT:**  I get that point.

7        **MS. HOFFMAN:**  Okay.  And you have a big bucket of

8  items that you're dealing with, and you have to determine

9  coverage for each item.  You have to determine what it is.  You

10  had coverage questions in the *Ramyead* case.

11        You had a dispute from the Pitkins.  They disputed that

12  some of the items that State Farm initially paid on an ACV

13  basis should be paid on ACV as opposed to fair market.

14  State Farm considered that challenge, reconsidered the claim,

15  and paid them an additional $180,000.

16        Other insureds may want to do the same.  Class

17  certification would prevent that.

18        And you also have advance payments and individualized

19  defenses, like the suit limitation provision in *Ramyead*, and

20  that is separate from the statute of limitations.

21        *Ramyead* didn't resolve deciding the merits question, but

22  *Ramyead* affirmed summary judgment on the individualized suit

23  limitation defense.  And the reason that's individualized is

24  because in California, that defense, the one-year suit

25  provision, starts when the claim occurs, is tolled when the

claim is made, and starts back up again after the insured -- or
after the -- the carrier makes its payment.  And you need to
look at each claim individually to determine whether or not
that applies.

And, again, that is not a hypothetical.  That happened.
That knocked out the *Ramyead* class action.  And that is an
inquiry that every -- that State Farm is entitled to raise as
to every class member's claim.

All of these individualized questions weren't present in
*Lara* or in *Jama* or in the auto context.  And our position,
Your Honor, is you may have a common question regarding what
Section 2051 requires in an ACV methodology, but that doesn't
get you to a common answer on who's in the class, on whether
State Farm has liability to the class, whether -- how will you
determine whether someone was paid on an ACV basis, they've not
shown; how you can answer whether or not a payment made on an
ACV basis actually caused harm, particularly where you have an
RC benefit that can be claimed; or what the damages would be,
particularly where you have advanced payments, sublimits, and
limits.

THE COURT:  And so would your argument be the same for
the UCL claim, for example?

MS. HOFFMAN:  Well, Your Honor, they -- respectfully,
they did not seek certification under that claim.  They sought
certification under their breach of contract claim.

1        **THE COURT:**  Okay.

2        **MS. HOFFMAN:**  They have not offered a damages

3   methodology either that would align with a UCL, restitution, or

4   injunctive relief claim.  Their damages methodology is only

5   limited to what they say is the difference between the sales

6   tax that was paid and the sales tax that should have been paid.

7        And that also reflects, Your Honor, our position on

8   injury.  They are not claiming a lost opportunity cost or a

9   lost time value of money.  They are simply claiming the

10  difference between what they say the contract should have been

11  paid versus what they received under an ACV methodology.

12       But because they aren't making that temporal claim,

13  because they've offered no way of identifying folks or

14  calculating damages on that basis, the injury analysis in *Jama*

15  and *Lara* applies with force here.

16       **THE COURT:**  All right.  Thank you.

17  So how do you respond?

18       **MR. REDENBARGER:**  I'll keep it brief.

19       I'd like to point out, first of all, that State Farm

20  doesn't deny that it is applying this depreciation to sales

21  tax; that it applies that across-the-board to everyone who

22  makes a claim.  So it is a policy, and we think because it's a

23  policy that applies to everyone equally, this case is perfectly

24  suited for class certification.

25       They like to point to a lot of this data, that data;

1    something could be amiss here; don't trust our data.  I think

2    all of that is essentially misdirection.  We've never taken the

3    position that every claim in the *Ramyead* dataset is a class

4    member.  It's not.  Those are all claims made during a time

5    period.

6        Certain people within that data set are class members,

7    people who have had their ultimate payment depreciated via this

8    policy.  And they can be identified.  Ms. Hoffman said you

9    can't identify the class, but their expert, Mr. Steffey, did

10   exactly that.  He's -- two of his findings say 23 percent of

11   all of the claimants in *Ramyead* are people who fall within the

12   class.  He's identified them.  He says another 49 percent of

13   the claimants within the spreadsheet were paid even less than

14   ACV.  So those people were paid even less and maybe, in

15   addition to that, had their sales tax depreciated.

16       So I don't agree that the class isn't identifiable.

17   It's -- both experts agree that you can identify the people who

18   were subjected to this policy.

19       I think the Court is completely correct on its tentative

20   as it relates to the cases.  And the arguments that you heard

21   today, those are the same arguments that are in the brief.  I

22   don't need to go over them again.

23       I do want to point out just briefly that at the top of the

24   argument, Ms. Hoffman argued that the excerpt that our expert

25   put into his report and that we put into the reply, she

1  suggested that it was manipulated or incorrect.

2       Well, what happened here was our expert just rounded the

3  numbers.  So as you can see, the first number in our expert's

4  excerpt -- which he clearly calls it an excerpt -- says $76.

5  Ms. Hoffman likes to point to her spreadsheet that shows

6  $75.70.  I mean, it's a difference of 30 cents.

7       All that happened here was the spreadsheet rounded up or

8  down.  And there is no improper manipulation.  It's just a

9  simplified excerpt.  Some of these are, $88.82 was rounded up

10  to $89 for simplicity.

11       So to suggest that that was somehow improper or an attempt

12  to mislead the Court is, frankly, not well-taken.

13       With that, I feel like I have to point out again that the

14  *Ramyead* case is an unpublished decision.  It doesn't have any

15  precedential effect here.  They spend a lot of time relying on

16  what happened in that case, but frankly, it's an unpublished

17  decision from state court.  And the appellate court in that

18  case didn't even get to the issue of whether this code section

19  is legal or not.  That hasn't been decided.

20       And so with that, we would -- I'd submit on that, unless

21  the Court has any questions, and ask that the Court grant the

22  motion.

23            **THE COURT:**  Okay.  Ms. Hoffman, I'll give you --

24            **MS. HOFFMAN:**  Your Honor --

25            **THE COURT:**  -- the last word.

1          **MS. HOFFMAN:**  Yes.  Thank you, Your Honor.

2      And we do dispute that there is an ACV methodology applied

3  across-the-board to every claim.

4      We have in evidence, there's 25 randomly sampled claims.

5  Five of those claims did not have an XactContents report.  And

6  during deposition, they went over, they weren't -- they also

7  didn't have the ACV methodology applied to those.

8          **MR. REDENBARGER:**  May I respond?

9          **MS. HOFFMAN:**  And I'd like to add one more -- one more

10 point, Your Honor.

11         **THE COURT:**  Okay.

12         **MS. HOFFMAN:**  And I want to -- I'd like to go back to

13 the questions Your Honor had and point out the questions that

14 their expert still has.

15     So in their reply report -- I appreciate Your Honor's not

16 going to consider it but -- their expert did one thing

17 incredibly notable.  He claimed that State Farm's random sample

18 of 25 claims wasn't sufficient to support anything across the

19 class.

20     That is very ironic because he is basing his opinions on

21 the Pitkins' sole claim on the XactContents report that he saw

22 in the Pitkins' claim.  And he's also saying that you can

23 figure all this out based on the ACV column total.

24     But, Your Honor, that does not match up with his damages

25 methodology, which is simply an arithmetic formula.  We haven't

1   seen any data that would show how you can apply that across the

2   class.

3        Keep in mind, we've got thousands of items on particular

4   claims.  We don't know how those items are paid until you look

5   in the claim file.  Simply having a valuation in XactContents

6   does not translate to a claim payment.  That is the big issue

7   that the plaintiffs' experts gloss over.  Simply having a

8   calculation that a claims person can consider in making a

9   payment doesn't translate to a claim payment.

10       And that's what Duane Steffey showed by showing the

11  variances between the valuation column total and the actual

12  payments on a claim.  And that is what requires you to go into

13  a claim and look, on an individual basis, to find out what was

14  paid on what basis and why, and if that insured has any injury.

15  It may not even be shown from the claim because you don't

16  know --

17            **THE COURT:**  Okay.

18            **MS. HOFFMAN:**  -- if that claim was --

19            **THE COURT:**  Yes.

20            **MS. HOFFMAN:**  -- RC claim.

21            **THE COURT:**  Gotcha.  Thank you.

22            **MS. HOFFMAN:**  Thank you, Your Honor.

23            **THE COURT:**  Did you want to say one more thing?

24            **MR. REDENBARGER:**  Just to point out that the defense

25  likes to point to all types of claims in this spreadsheet that

1  may have not been subject to this policy.  We're not disputing

2  that.

3      She pointed to an example where the Pitkins were

4  reimbursed for a POD storage.  You don't apply depreciation to

5  the rental of a -- there's no depreciation involved.  So the

6  fact that their policy, which we allege is illegal, didn't

7  apply to that one claim is meaningless.  It's outside of the

8  class, frankly.

9      And just one last point on damages.  We do -- we did have

10 a proposed model which is within the XactContents program that

11 State Farm uses.  There's a button.  There's literally one

12 button that you can click to turn on sales tax depreciation or

13 turn it off.  That's where this number came from.

14     Ms. Hoffman said she doesn't know where this data came

15 from.  It's from clicking that button.

16     So one damages model which we propose would be to unclick

17 the button and compare the two numbers.  It can be as simple as

18 that.

19     **THE COURT:**  All right.  Thank you both for your

20 argument.  I'm going to dig back through this, and then I'll

21 get an order out as soon as I can.

22     **MS. HOFFMAN:**  Thank you, Your Honor.

23     **THE COURT:**  Thank you.

24     And then with respect to the case schedule, let's see how

25 long it takes for me to get the order out.

1          We've got -- at the moment, there's probably enough time

2     maybe to keep the schedule the way it is, but it may take me

3     longer to do this, and so we'll have to see.  And if the

4     schedule seems unworkable, I'm open to moving things around.

5              **MR. REDENBARGER:**  Okay.

6              **THE COURT:**  All right.  Thank you.

7              **MS. HOFFMAN:**  Thank you, Your Honor.

8                   (Proceedings adjourned at 3:23 p.m.)

9                          ---o0o---

10

11                    <u>**CERTIFICATE OF REPORTER**</u>

12          I certify that the foregoing is a correct transcript

13     from the record of proceedings in the above-entitled matter.

14

15     DATE:  Sunday, July 6, 2025

16

17

18

19                   _(signature: Ana Dub)_

20     _____

21           Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

22        CSR No. 7445, Official United States Reporter

23

24

25