UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MELISSA PITKIN, et al.,

        Plaintiffs,

      v.

STATE FARM FIRE AND CASUALTY
COMPANY,

        Defendant.

Case No. 23-cv-00924-WHO

**ORDER CERTIFYING CLASS**

Re: Dkt. Nos. 61, 75, 87, 89

Plaintiffs Melissa Pitkin and Dan Grout (a married couple, together, "plaintiffs") bring this class action complaint against defendant State Farm General Insurance Company ("State Farm"), alleging that State Farm has a common practice of depreciating sales tax when calculating actual cash value ("ACV") benefits payments to policyholders, which plaintiffs claim violates California Insurance Code section 2051(b). As a result of this uniform practice in California, plaintiffs say that they and the proposed Class (which they estimate to number in the tens of thousands) share a common problem and common claims. They seek class certification under Federal Rules of Civil Procedure 23(a) and 23(b) for all four of their causes of action: declaratory relief, breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq*).

State Farm concedes that its practice is to depreciate sales tax when calculating ACV but insists that the practice is lawful. It opposes class certification, arguing that the plaintiffs' experts' opinions should be disregarded as unreliable and that individual issues predominate over common ones both as to class ascertainability and damages calculations. But the plaintiffs have offered a feasible methodology for calculating damages classwide, have demonstrated that the class is identifiable, and have shown that the common issue of whether State Farm's method of calculating

ACV for personal property insurance policies like those held by the putative Class Members predominates over whatever individualized issues may arise. In short, the plaintiffs have satisfied the Rule 23 requirements for class certification.[1] The motion to certify the class is GRANTED.[2]

## BACKGROUND

### A. The Plaintiffs

Pitkin and Grout own a home together in Healdsburg, California. They hold a homeowner's insurance policy from State Farm, policy number 57-C4-6752-1 (the "Policy"), which covered certain losses to their home and all of its contents.[3] The Policy included the "main policy form" (FP-7955, CA) as well as a "homeowners endorsement form" (FE-3422). Subject to the Policy's terms, conditions, and exclusions, the Policy included "Coverage B – Personal Property" limits of $506,574, and other various special limits.[4] Regarding settlement of Coverage B claims, the Policy provides for settlement of damaged personal property in several ways, including actual cash value ("ACV"), market value, and replacement cost ("RC"). Declaration of

---

[1] The class period will be modified to be consistent with the relevant statutes of limitations associated with the plaintiffs' claims.

[2] State Farm has filed an Administrative Motion to File Under Seal. Dkt. No. 75. It seeks to seal exhibits it previously designated as "confidential," which it has filed provisionally under seal alongside its response to the plaintiffs' Motion. Those documents that State Farm seeks to seal concern nonpublic claim-specific policyholder information. Good cause shown, the motion to seal is GRANTED.

Plaintiffs' Administrative Motion to Consider Whether Another Party's Material Should be Sealed (Dkt. No. 87), to which State Farm properly responded (Dkt. No. 88), is also GRANTED. Accordingly, the portions of the Declaration of Tyson C. Redenbarger and the Declaration of Nabilah Hossain filed in support of the plaintiffs' Reply (Dkt. No. 86), and exhibits attached thereto, shall be sealed in the manner laid out by State Farm in its responsive statement at Dkt. No. 88. Public, redacted versions of these sealed documents already exist on the docket.

[3] State Farm points out that the Policy was issued initially to Mildred Cussins and Bonnie Pitkin, who are Melissa Pitkin's grandmother and mother, respectively. Following receipt of the at-issue Claim, State Farm retroactively added Melissa Pitkin and Dan Grout as named insureds. Oppo. 3, n.2.

[4] State Farm provides that the special limits or sublimits applicable to Coverage B under the Policy include: Jewelry and Furs ($1,500/$2,500); Cash ($200); Business Property ($1,500/$750); Securities and Other Papers ($1,000); Watercraft ($1,500); Trailers ($1,500); Stamps ($2,500); Firearm Theft ($2,500); Silverware and Goldware Theft ($2,500); Electronic Data Processing Equipment ($5,000). *See* State Farm Opposition to Class Certification ("Oppo.") [Dkt. No. 76] 3, n.3; Blazewich Decl., ¶¶ 5-6. The Policy also includes a sublimit of up to 10% of Coverage B where loss occurs away from the insured residence. *Id.*

Donna Blazewich ("Blazewich Decl.") [Dkt. No. 76-5] ¶ 7.

On August 20, 2020, the Walbridge Fire burned down the plaintiffs' home. *See* Declaration of Melissa Pitkin ("Pitkin Decl.") ¶¶ 7-9; Declaration of Dan Grout ("Grout Decl.") ¶¶ 7-9. After losing their home and personal possessions, the plaintiffs tendered a claim to State Farm for their losses under the Policy. State Farm accepted the claim and adjusted their losses pursuant to the Policy's terms, which stated that the plaintiffs are entitled to recover ACV for their personal property losses. On December 16, 2022, and January 24, 2023, the plaintiffs received partial payments from State Farm for their personal property contents losses. State Farm also sent the plaintiffs "loss payment worksheets" that showed their ACV benefits for their personal property. Pitkin Decl. ¶¶ 7-8; Grout Decl. ¶¶ 7-8.

For all items of property where sales tax was applicable, State Farm depreciated sales tax in calculating ACV. Pitkin Decl. ¶ 9; Grout Decl. ¶ 9. That practice is what the plaintiffs challenge in this action.

### B. State Farm's policies and procedures regarding settlement of personal property claims

State Farm describes its process of handling personal property claims like the plaintiffs' as follows. When a claim is reported to State Farm, its claims personnel open a new claim in State Farm's "Enterprise Claims System" ("ECS") and a unique claim number is assigned to the claim. Blazewich Decl. ¶ 3. ECS is a "proprietary relational database" that State Farm uses to store its data in various forms. Declaration of Jay Thorpe ("Thorpe Decl.") ¶¶ 4, 6, 20. After a claim is opened in ECS, State Farm claims personnel "generally" contact the insured or claimant to discuss the claim. Blazewich Decl. ¶ 3. State Farm may settle a covered personal property or contents loss claim during that first contact, or it may not, depending on the circumstances of a particular claim. *Id.* ¶ 14.

According to State Farm, if a claim "involves more than a few items or is not settled during a first contact," at that point the claims personnel may "utilize the XactContents® tool to assist in valuing lost property for claim settlement purposes." *Id.* Third party entity Verisk owns the XactContents® tool. *See* Declaration of Jennifer Hoffman ("Hoffman Decl.") [Dkt. No. 76-1]

United States District Court
Northern District of California

¶¶ 4-5; *id.*, Ex. 2 (Peterson Depo.) at pp. 57-58; *id.* Ex. Ex. 3 (Melzer Depo.) at p. 95.  The XactContents® tool is capable calculating RC and ACV and then generating reports containing RC and ACV calculations for contents "consistent with State Farm's ACV methodology in California"; State Farm concedes that methodology includes depreciating sales tax in the calculation of ACV.  *See* Blazewich Decl. ¶ 15 (explaining that State Farm calculates ACV in California by calculating the RC of an item, including sales tax where applicable, and then subtracting depreciation from the RC); *see also* Class Cert. Mot. Ex. 4 ("Operation Guideline 75-50 Betterment, Depreciation, and Actual Cash Value"); *id.*, Ex. 5 (Defendant State Farm's Response to Plaintiff's Irrog. No. 3).  According to State Farm, while the XactContents® tool can "assist" claims personnel as they make decisions on a claim, ECS records what actually happens on a claim.  Blazewich Decl. ¶¶ 2-3, 17.

Information on ECS is electronically stored.  Thorpe Decl. ¶ 4.  ECS includes fields that record the date and amount of Coverage B payments (like those available under the plaintiffs' Policy).  State Farm notes that ECS does not store information regarding the "nature or basis" of Coverage B payments in a form that can be searched across claims.  Oppo. 4; Thorpe Decl. ¶ 6.  XactContents® Payment Tracker Worksheets or reports may contain ACV and RC calculations for particular items; State Farm points out that such information "reflects a calculation, not a claim payment." Thorpe Decl. ¶¶ 9, 15.  According to State Farm, its ECS database is separate and apart from any database maintained by Verisk, the third party that owns XactContents®, meaning that a query of ECS does not yield data contained in Verisk's XactContents® system.  State Farm distinguishes ECS and XactContents® like this: XactContents® is a tool, and ECS is the claim record.  Oppo. 5; Thorpe Decl. ¶¶ 7-8; Blazewich Decl. ¶¶ 2-3, 14-15.

## C.    Section 2051(b)

Section 2051(b) was added to the California Insurance Code in 2004 as part of the Homeowners Bill of Rights ("HBOR") to standardize the calculation of actual cash recovery under an open policy[5] by insurers in determining ACV under insurance policies.  Section 2051(b) reads:

---

[5] An "open policy" is an insurance policy where value is not set but must be determined in case of loss.

Under an open policy that requires payment of actual cash value, the measure of the actual cash value recovery, in whole or partial settlement of the claim, for either a total or partial loss to the structure or its contents, *shall be the amount it would cost the insured to repair, rebuild, or replace the thing lost or injured less a fair and reasonable deduction for physical depreciation based upon its condition at the time of the injury or the policy limit, whichever is less.* A deduction for physical depreciation shall apply only to components of a structure that are normally subject to repair and replacement during the useful life of that structure. (emphasis added).

Cal. Ins. Code § 2051(b) (emphasis added).

I have already considered this law and its impact.  In 2017, in *Johnson v. Hartford Cas. Ins. Co.*, I held that sales tax was distinct from physical items and not subject to "depreciation" under section 2051(b).  No. 15-CV04138-WHO, 2017 WL 2224828, at *8 (N.D. Cal. May 22, 2017).  I found that physical depreciation refers to wear and tear only, and since sales tax is not subject to wear and tear, the depreciation of sales tax when calculating ACV is not permitted under California law.  *Id.*  Three years later, a federal district court in the Central District of California agreed that "[a] plain reading of [§ 2051(b)] and [corresponding] regulation appears to indicate that any actual cash value payment made under a property insurance policy should not depreciate … expenses that are 'not a component of physical depreciation'—as sales tax … appear[s] to be." *Maison D'Artiste v. Am. Int'l Grp., Inc*., 2020 WL 4037219, at *3 (C.D. Cal. Jan. 23, 2020).  Citing *Johnson* and noting that there is very little other authority on the issue, the court concluded, "at [that] early stage," the plaintiff's factual allegations (that depreciation of payments for sales tax is improper under section 2051) plausibly asserted a UCL violation.  *Id.*

A California state trial court ruled differently.  In 2023, the defendants asked that I stay this litigation pending resolution of an appeal of a California state court decision, *Ramyead v. State Farm General Insurance Co.*, No. 20STCV06274, (Cal. Super. Ct. filed Feb. 19, 2020).  The plaintiffs in *Ramyead* also challenged State Farm's practice of depreciating sales tax when calculating ACV.  That court granted summary judgment in State Farm's favor, finding that: (1) depreciating sales tax in this manner "is legally proper," and (2) the plaintiffs' claims were untimely.[6]  I declined to stay this case, noting that the *Ramayed* appeal was in its "early stages" in

---

[6] The state court order was three pages long and appears to have adopted the proposed order submitted by the defendants in that case.  The court held that it "does not agree with Plaintiffs that the phrase 'physical depreciation' in Section 2051 requires applying depreciation only to the retail

July 2023, and that the court might not even reach the section 2051(b) question.

And that is what happened. The *Ramyead* appeal has since resolved; the state appellate court, in an unpublished decision, affirmed the lower court's decision on the untimeliness issue alone and did not reach the section 2051(b) issue. *See* Statement of Recent Decision, filed by State Farm (Dkt. No. 85) (*Ramyead v. State Farm*, B329614, Los Angeles County Super. Ct. No. 20STCV06274 (filed Apr. 29, 2025)).

### D.    Plaintiffs challenge State Farm's ACV calculation practices

The plaintiffs filed this class action on March 1, 2023, alleging that State Farm violates California law by depreciating sales tax as a component of RC when calculating ACV; they say that State Farm did this when calculating the replacement cost of the plaintiffs' personal property in the context of their Coverage B claim following the fire that destroyed their property, and that it does this "systematically" across the state, "consistently underpaying property insurance claims by depreciating sales tax[.]" Complaint [Dkt. No. 1]. State Farm does not deny that this is its practice—under State Farm's uniform policies, it first calculates the RC of an item, including sales tax where applicable, and then calculates ACV by subtracting depreciation from the RC (ACV = RC – depreciation)—it denies that the practice is unlawful. *See* Declaration of Nabilah Hossain ("Hossain Decl.") [Dkt. No. 62-4] Ex. 4 ("Operation Guideline 75-50 Betterment, Depreciation, and Actual Cash Value"); *id.*, Ex. 5 (Def. State Farm Resp. to Pl's Irrog. No. 3); *id.*, Ex. 7 (Donna Blazewich, Person Most Knowledgeable "PMK", for State Farm General Insurance, Deposition, or "PMK Depo.") at 32:12-23.

The parties agree that State Farm's practice involves a two-step process. First, State Farm's uniform policy is to include sales tax as a component of RC. *See* Hossain Decl. Ex. 8.

---

price of the sofa and ottoman, and not the applicable sales tax." Further, it held that "[t]he legislative history for Section 2051 and the rulemaking file for the 2006 amendments to Title 10 of the California Code of Regulations Section 2695.9 show that the phrase 'physical depreciation' in Section 2051 was intended to communicate that depreciation of labor is not a component of physical depreciation," and "reflect an understanding and intent that depreciation would apply to items of physical property, not the cost components of a physical property item." *Ramyead v. State Farm General Insurance Co.*, No. 20STCV06274 at 3-4. The state court also observed that "[t]he unpublished federal district court cases cited by Plaintiffs on this issue are not persuasive or controlling." *Id.* at 4.

Then State Farm depreciates the entire amount of RC; it does not limit depreciation to the property's wear and tear or components subject to physical depreciation.  The plaintiffs contend that while State Farm's internal "definition" of depreciation aligns with section 2051(b) (insofar as it describes depreciation as a "decrease in the value of the property over a period of time due to wear, tear, and obsolescence," *see id.* Ex. 4 (Operation 75-50 Guide) at 2), in *practice*, it disregards these standards and violates section 2051(b) by depreciating sales tax as part of its ACV calculation.  State Farm's witnesses have admitted to this practice, and plaintiffs say the practice is further evidenced by the written estimate provided to them.  *See* Pitkin Decl. ¶¶ 7-9; Grout Decl. ¶¶ 7-9.

### E.    The proposed class

State Farm included sales tax in the Replacement Cost Value (RCV) of Pitkin and Grout's personal property in California, then depreciated that amount to arrive at the Actual Cash Value (ACV) of that property.  The plaintiffs say that State Farm has done the same to the members of the proposed class.  As such, the plaintiffs seek to certify injunctive and declaratory relief under Rule 23(b)(2), or alternatively, damages claims under Rule 23(b)(3) on behalf of a class defined as:

> All persons who, between January 1, 2015[7] and the present, were or are a named insured under a property insurance policy issued in California by Defendant, who suffered a covered loss to real or personal property for which they received payment of actual cash value (ACV) benefits that were reduced due to depreciation of sales tax, and who were paid or are reasonably certain to be paid benefits in an amount that is less than the applicable policy limits.

The plaintiffs seek class certification on each of their four claims set forth in the Second Amended Complaint ("SAC"): declaratory relief, breach of contract, breach of the implied covenant of good faith and fair dealing, and a claim for violations of California's Unfair Competition Law ("UCL").  *See* Second Amended Complaint ("SAC") [Dkt. No. 41].

### LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs class actions. *See Olean Wholesale Grocery*

---

[7] State Farm contests the time period covered by the class definition.  At oral argument, the parties agreed that the class period should be limited.  I provide the updated class definition later in this Order.

United States District Court
Northern District of California

*Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663–64 (9th Cir. 2022) (en banc). "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis,' " that the requirements of Rule 23 are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) (quoting *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 161 (1982)). "[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." *Olean*, 31 F.4th at 665.

A "plaintiff[ ] must make two showings" to certify its purported class. *Olean*, 31 F.4th at 663. "First, the plaintiffs must establish 'there are questions of law or fact in common to the class,' as well as demonstrate numerosity, typicality, and adequacy of representation." *Id.* (quoting Fed. R. Civ. Proc. 23(a)). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,' " and the "claims must depend upon a common contention." *Wal-Mart*, 564 U.S. at 349–50 (quoting *Falcon*, 457 U.S. at 157).

"Second, the plaintiffs must show that the class fits into one of three categories" as provided in Rule 23(b). *Olean*, 31 F.4th at 663. Here, plaintiffs seek certification under Rule 23(b)(3). Under Rule 23(b)(3), a class may be certified if "questions of law or fact common to class members predominate over the questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Proc. 23(b)(3). In deciding this, courts consider:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

*Id.*

"[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence. In carrying the burden of proving facts necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any admissible evidence." *Olean*, 31 F.4th at 665 (citing *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 454-55 (2016)). While the class-certification analysis "may entail some overlap with the merits of

8

the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (internal citations and quotation marks omitted). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (citation omitted).

In considering a motion for class certification, the substantive allegations of the complaint are accepted as true, but "the court need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through class action." *Hanni v. Am. Airlines*, No. C-08-00732-CW, 2010 WL 289297, at *8 (N.D. Cal. Jan. 15, 2010). The court may also "consider supplemental evidentiary submissions of the parties." *Id.* "[T]he 'manner and degree of evidence required' at the preliminary class certification stage is not the same as 'at the successive stages of the litigation'—*i.e.*, at trial." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

## DISCUSSION

I will first address State Farm's challenge to the reliability of the plaintiffs' experts. Then I turn to the plaintiffs' ability to satisfy the Rule 23(a) and (b) requirements.

## I.   PLAINTIFFS' EXPERTS

State Farm attacks the plaintiffs' experts' opinions on several grounds, arguing that I should disregard all three experts' opinions as speculative and unhelpful.

### A.  Rule 702

Federal Rule of Evidence 702 allows a witness qualified by knowledge, skill, experience, training or education to testify in the form of an opinion if the court finds that it is more likely than not that the expert's specialized knowledge will help the trier of fact understand the evidence or determine a fact, if it is based on sufficient facts or data and is the product of reliable principles and methods, and reflects a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702. State Farm argues that the plaintiffs' experts' opinions are "speculative and inadmissible" and should be excluded pursuant to Rule 702. Opposition to Class Certification ("Oppo.") [Dkt. No. 76] 12-15. I disagree, although I expect that the defendants will raise this

1   issue again at the conclusion of merits discovery.  *See Lytle v. Nutramax Labs*., Inc., 114 F.4th

2   1011, 1030 (9th Cir. 2024) (discussing the divergence in caselaw regarding how defendants may

3   challenge the reliability of an expert's evidence under *Daubert*.).[8]

4       For three experts that the plaintiffs have offered, State Farm argues that their reports

5   contain an "analytical gap" between the data and the expert's opinion.  It contends that because the

6   plaintiffs did not show the "Combined *Ramyead* dataset" (a copy of the data set that State Farm

7   had collected from Verisk and its ECS system in the *Ramyead* Action) to their experts, the experts

8   did not consider critical data in reaching their conclusions, and their opinions are thus unreliable

9   and inadmissible.  This argument is unpersuasive and unsupported by State Farm's proffered

10  authority.

11      State Farm cites *General Elec. Co. v. Joiner* for the rule that "nothing in either *Daubert* or

12  the Federal Rules of Evidence requires a court to admit opinion evidence that is connected to

13  existing data only by the *ipse dixit* of the expert." 522 U.S. 136, 146 (1997).  In that case, Robert

14  Joiner alleged that he contracted cancer as a result of contact he had with hazardous materials

15  manufactured by petitioner General Electric Company ("GE") while he was working for GE.  The

16  district court excluded Joiner's experts' testimony in part because the experts, considering the

17  same data, drew "different conclusions" from one another.  *Joiner*, 522 U.S. at 141 (discussing

18  district court decision).  The Eleventh Circuit reversed, and GE appealed.  The United States

19  Supreme Court agreed with GE that Joiner's experts' statements regarding causation of his cancer

20

21  [8] The court in *Lytle* explained that "whether a 'full' or 'limited' *Daubert* analysis should be
    applied may depend on the timing of the class certification decision."  *Lytle*, 114 F.th at 1031.  For
22  instance, "[i]f discovery has closed and an expert's analysis is complete and her tests fully
    executed, there may be no reason for a district court to delay its assessment of ultimate
23  admissibility at trial." *Id.*  But, "[b]y contrast, where an expert's model has yet to be fully
    developed, a district court is limited at class certification to making a predictive judgment about
24  how likely it is that the expert's analysis will eventually bear fruit," which, the court observed,
    "still requires determining whether the expert's methodology is reliable," but makes a "full-blown
25  *Daubert* assessment of the results of the application of the model," "premature." *Id.*  Here, the
    situation is a hybrid; I have granted an extension of fact discovery and the parties' experts may
26  opine on the *Ramyead* dataset, *see* Dkt. No. 101 (Order Granting Stipulation to Extend Fact
    Discovery).  At this stage, it is more likely than not that plaintiffs' experts' opinions are based on
27  sufficient data, are the product of reliable principles and methods, and reflect a reliable application
    of them to this case.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

were "nothing more than speculation" because the studies that the experts relied on had *no apparent connection* to Joiner's situation.[9]  Joiner never replied to that criticism; instead, he focused on whether animal studies of the type upon which his experts relied can *ever* be a proper foundation for an expert's opinion, which was not the issue.

Here, the plaintiffs' experts did not reach their conclusions based solely on their own authority.  Each of the plaintiffs' experts—Greg Regan, David Melzer, and Eugene Peterson—applied a set methodology and presented reliable bases for their conclusions.  Regan has explained his methodology and why he believes it is capable of calculating damages on a classwide basis.  *See* Expert Class Certification Report of Greg Regan, CPA/CFF, CFE ("Regan Report") [Dkt. No. 62-1].  Meltzer and Peterson demonstrate an understanding of the relevant analytical tools about which they opine, tools that they say may be used to identify the class and calculate damages.  These experts' opinions are connected to existing data by more than their own assertions.

State Farm's argument to the contrary focuses on the completeness of the experts' analysis; it takes umbrage that the plaintiffs' experts did not consider the *Ramyead* dataset in arriving at their initial conclusions.  Neither Rule 702 nor *Joiner* requires that they do; the issue is whether they have relied on sufficient facts to reach reliable opinions.  I find that they have.

With respect to the experts' rebuttal reports, which State Farm seeks to exclude, they all appear to address the same issues as their authors' opening reports and respond to State Farm's allegations that their methodologies are flawed.  They also discuss the dataset that State Farm says created an "analytical gap" in their reasoning, the "Combined *Ramyead* Dataset."[10]  State Farm asks that I strike these rebuttal reports.  I will not strike them, but to the extent they discuss the *Ramyead* dataset I do not rely on them.  State Farm's motion to exclude (Dkt. No. 89) is DENIED

---

[9] *See Joiner*, at 144 (explaining that Joiner's experts had relied on studies involving infant mice that had developed cancer after being exposed to the hazardous chemicals via direct injection into their stomachs, whereas Joiner was an "adult human being whose alleged exposure to [the hazardous chemicals] was far less than the exposure in the animal studies.").

[10] On May 1, 2025, I approved the Parties' Stipulated and [Proposed] Order for Limited Extension of Fact Discovery, Dkt. No. 84, wherein the parties agreed that additional time was needed for the depositions of Donna Blazewich and Jay Thorpe to be taken, and for an "updated version of the *Ramyead* Spreadsheet" to be produced.

United States District Court
Northern District of California

as moot.  State Farm will have the opportunity to challenge the experts' testimony and rebuttal opinions during expert discovery, which, pursuant to the parties' stipulation, will not close until 65 days after the updated *Ramyead* dataset has been provided.[11]  *See* Dkt. No. 101.  If State Farm requires additional time to depose the experts so that it may develop arguments pertaining to their analysis of the *Ramyead* dataset, it is entitled to do so then.

### B.  Greg Regan – Damages Expert

Greg Regan is a partner in the Forensic Consulting Services Group of Hemming Morse, LLC.  He has provided trial and/or deposition testimony in at least nine cases in federal and state court.  Regan Report App'x A at p. 3; Regan Report ¶ 9 (stating that Regan has been retained "to perform these types of damages analyses in matters involving large companies such as Amazon, Avaya, ASML, Beyond Meat, Cisco, Fitbit, Google, Intuit, and PNC Bank," and "as an expert by numerous governmental entities such as the Securities and Exchange Commission, the Consumer Financial Protection Bureau, and Attorneys General for numerous states[]").  He is the plaintiffs' damages expert.

Regan's report provided a methodology to measure the impact on potential Class Members of State Farm's policies and practices of including sales tax in its depreciation calculations to determine ACV.  His proposed methodology employs the sales tax amounts that are identifiable from State Farm's XactContents® tool for items included in the policyholder claim and the amount of sales tax depreciation State Farm withheld from payments made out to the insured, which he says are identifiable in XactContents® and in ECS.  He explains that XactContents® contains a reporting tool called the Payment Tracker Worksheet Report, which he believes will "facilitate access" to the data needed to calculate damages on a classwide basis.  Regan Report ¶ 15.  He further explains that policyholders making a personal property loss claim submit a detailed inventory of items to State Farm, which uses XactContents® to manage inventories of personal property damage claims.  *Id.*  XactContents®, Regan states, can be used to calculate the benefit

---

[11] The parties have stipulated that the updated *Ramyead* spreadsheet, which is the same as the Combined *Ramyead* Dataset except it is limited to the time frame encompassed by the Plaintiffs' class definition, will be provided within 30 days after the court rules on class certification.  Dkt. No. 101.

payable to the policyholder, including consideration of depreciation.  The tool allows State Farm to calculate ACV by subtracting depreciation from RC.  *Id.* ¶ 17.

Regan opines that classwide damages can be calculated based on information presently available with the following formula:

**Sales Tax \* (Item's Depreciation Age ÷ Item's Depreciable Life) = Item-Specific Damage**

State Farm argues that this opinion is unreliable for two reasons.  First, he did not initially consider the *Ramyead* dataset in forming it.[12] Oppo. 12-13.  But as discussed above, he was not required to.  Rule 702 requires that expert testimony be based on sufficient evidence and use reliable principles and methodologies, not that the expert consider all possible relevant data.  The As the Court wrote in *Daubert*, "[v]igorous, cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are sufficient to expose flaws in otherwise proper expert opinion.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).  As I have described, Regan relied on evidence available in State Farm's XactContents® tool and in its ECS database.  State Farm is welcome to question him further about how the *Ramyead* dataset squares with his conclusions, (and, as I noted, *see supra*, n. 12, Regan has already opined on that matter, though I do not consider his rebuttal report today), but his failure to consider that dataset in his original analysis does not render his opinions unreliable.

State Farm also argues that Regan's damages methodology is a "simple formula" that "rests on several flawed assumptions," including that "every putative class member . . . received payment equal to the sum of the ACV column in their XactContents® report." Oppo. 14 (citing Regan Dep. pp. 84-87; 118).  It claims that this assumption is false "even for the Pitkins, who were paid less than the ACV column total due to an applied sublimit."  *Id.* (citing Blazewich Decl. ¶¶ 21, 24).  It protests that since the ACV column in the XactContents® report does not apply sublimits, or account for advance payments or deductibles, Regan's damages formula is flawed.  But Regan described his methodology in detail, and it does not require considering the application

---

[12] Regan submitted a rebuttal report addressing State Farm's arguments about the *Ramyead* dataset and explaining that it is consistent with his determinations.

1  of sublimits to calculate damages. *See* Regan Report 4-7. At oral argument, counsel for plaintiffs

2  explained that information pertaining to applicable sublimits and special limits is available in State

3  Farm's databases, but that aside, whether sublimits or special limits applied to a claim informs

4  whether they are identifiable as a class member, not how their damages are calculated.

5  To that point, with respect to the ascertainability of the class, Regan explains that Class

6  Members are State Farm policyholders in California that only received ACV and did not take the

7  additional step of submitting a receipt to establish proof of replacement. *Id.* at 4 ¶ 14. He states

8  that the information he has reviewed "indicates that members of the Class are ascertainable from

9  State Farm's records," explaining that "XactContents® contains reporting tools including, for

10  example, the Payment Tracker Worksheet Report, which should facilitate access to this data and

11  the ability to analyze that data." *Id.* at 5 ¶ 15. This is backed up by David Melzer's expert report

12  on class identification.

13  **C. David Melzer – Class Identification Expert**

14  Plaintiffs present David Melzer's expert report to support their contention that the

15  members of the class are readily identifiable. Melzer has worked in the insurance industry since

16  2011 in various specialist capacities. Melzer Report ¶¶ 10-17. He worked for Travelers Insurance

17  from 2013 to 2020, where he held positions including adjuster, technical specialist, and claims

18  manager. *Id.* ¶ 4. After working for Travelers, he started his own public adjusting firm, called

19  Property Claims Consultant, Inc., where he handles first and third-party property claims, including

20  personal property claims. *Id.* ¶ 5. He has held the position of President of Property Claims

21  Consultant, Inc. since he started the firm in November 2020. *Id.* He has "significant experience

22  processing and analyzing personal property insurance claims," and "experience working with

23  industry-standard software used to process and track personal property claims, including

24  Xactimate or XactContents." *Id.* ¶ 6.

25  State Farm argues that Mezler's report is not helpful because he does not rely on any

26  specialized knowledge. Oppo. 16. It thinks little of his ten years working in the claims

27  departments for various insurance companies, or his last five years of experience as President of

28  his own public adjusting firm. It claims that he has "no experience working with data analysis,

and no understanding of the principles of data analysis." *Id.* Plaintiffs counter that Melzer has "extensive experience in processing and analyzing personal property insurance claims and working with industry-standard software such as XactContents." Reply 19; *see* Melzer Report ¶¶ 4-7.

Melzer's proposed methodology to estimate the total number of potential class members is as follows. To estimate the total volume of personal property replacement claims for State Farm in California from 2015 to the present, he analyzed the number of claims in a submarket: San Diego. He chose San Diego as a representative example, because claims throughout California would "typically be consistent with personal property claims made in San Diego." Melzer Report ¶ 10, n.2. Melzer sets forth that during his time at Travelers in 2018, in the San Diego territory, a team of eight adjusters would typically handle 20-30 claims per month, amounting to between 1,920 and 2,800 (average of 2,400 a year) claims annually for a population of approximately 3.29 million people. *Id.* ¶ 10. Of those claims, 20% were commercial claims, meaning that on average, a team of eight adjusters working in that submarket processes 1,920 personal property replacement claims per year. *Id.*

Using that data, Melzer estimated the total number of insurance claims in San Diego across *all* insurers by dividing the number of Travelers' claims by its 3.68% market share (a percentage market share that is available on the California Property and Casualty Market Share Report published by the California Department of Insurance). *Id.* ¶ 11. From that number, he divided the number of claims in San Diego by its population, to calculate the number of claims per person in that region. *Id.* ¶ 12 (calculating number of claims per capita in the San Diego submarket in 2018). He then calculated the total number of claims in California as a state by multiplying the state's population to the per capita calculation, and determined that 625,370 claims are submitted in the state annually. *Id.* ¶ 13. This represented an estimate of the total number of residential insurance claims in California each year, "assuming consistency in population, market share, and claim frequency." *Id.* ¶ 14.

He then consulted the California Property and Casualty Market Share Report (the "Market Report") issued by the California Department of Insurance from 2015-2023 and determined that

United States District Court
Northern District of California

State Farm consistently has "over 8.5% of the Property and Casualty Insurance Market in California." *Id.* ¶¶ 11-15.  Based on *that* information, given that State Farm "historically holds roughly 8.5% of the California insurance market," Melzer calculated that State Farm's annual claim volume would be 53,156 claims.  Of those claims, Melzer explains, it is estimated by the Market Report that approximately 40% involve personal property replacement, yielding 21,262 personal property claims for State Farm annually.  *Id.* ¶ 16.  From that annual estimate, Melzer determined that from 2015 to 2023, there were at least 191,362 State Farm claims involving personal property in California.  *Id.* ¶¶ 16-17.[13]

Melzer goes on to explain that based on his familiarity with Xactimate and XactContents®, he believes that "given the detail data that insurance companies maintain and given the flexibility and the power of Xactimate/XactContents, it is [his] opinion that State Farm can create a report, or export the necessary data, that will allow for the identification of all personal property insurance claims where State Farm depreciated the taxes. From that report, Plaintiffs will be able to identify the members of the Class." *Id.* ¶ 24.  He explains that this process will be as straightforward as selecting a checkbox: "[i]n fact, Xactimate/XactContents has a feature where a tax on a personal property claim can be depreciated simply by clicking one box." *Id.* ¶ 21.

State Farm argues that the plaintiffs cannot rely on Melzer's opinions to show that class members are readily ascertainable.  It insists that ECS, not XactContents®, is the "claim record," which means that Melzer cannot rely upon XactContents® data to identify class members; it points out that Melzer admitted at a deposition that the XactContents® "Payment Tracker" report is changed on a weekly basis, *see* Hoffman Decl. ¶ 5, Ex. 3 (Melzer Dep. pp. 49-50), which State Farm contends "suggests a lack of reliability for purposes of forming assumptions across a class based on XactContents® data alone." Oppo. 17.

State Farm overstates how much data is necessary to identify class members.  All that is needed, it would seem, to identify class members, is to identify those insureds for whom State Farm calculated ACV for a Category B personal property claim.  Melzer says he can do that

---

[13] This number can be easily adjusted to account for the modified class period.

United States District Court
Northern District of California

1    through data in XactContents® and State Farm's other records; it is as simple as checking a box

2    and generating a report.  Melzer Report ¶¶ 21, 24.

3        **D.  Eugene Peterson – XactContents® Expert**

4        Plaintiffs offer Eugene Peterson as an expert on State Farm's XactContents® tool.[14]

5    Peterson states in his report that "[u]sing XactContents® and the State Farm database, it is feasible

6    to efficiently determine where depreciation was taken and calculate and prove what damages, if

7    any, specific insureds or groups of insureds are entitled to." Peterson Report [Dkt. No. 62-2] p. 5.

8        State Farm objects to Peterson's expert opinions on three main grounds: first, he is not

9    actually an expert in XactContents® because he mistakenly referred to it as "Xactimate" (an

10   Xactware tool that can estimate building property, rather than personal property) during a

11   deposition; second, he has "no knowledge of State Farm's ECS, the information it stores, or its

12   functionality"; and third, he did not review the *Ramyead* data before opining. Oppo. 18.

13       An expert is considered reliable where he has "a reliable basis in the knowledge and

14   experience of the relevant discipline." *Daubert*, 509 U.S. at 593.  Peterson's testimony is aimed at

15   explaining the function of XactContents®.  He is well positioned to do so.  In his opening report,

16   Peterson explains that he was retained to "[o]pine regarding the ability to utilize XactContents®

17   records to calculate on a class-wide basis the amount of depreciation taken from sales tax from

18   [ACV] loss settlements that were calculated for State Farm in XactContents®." Peterson Report at

19   p. 1.

20       The Xactimate® estimating software is the principal software that 22 of the 25 major

21   insurance companies in the United States use to resolve and settle real property insurance claims,

22   including State Farm, and *XactContents*® is a software tool integrated with Xactimate® for

23   estimating and managing personal property claims.  *Id.*  It focuses on valuation of personal items

24   and allows for depreciation calculations.  *Id.*  Peterson explains that in XactContents®,

25   depreciation can be applied to *any line item, including sales tax. Id.* at p. 2.  He notes that he was a

26

27   _____

28   [14] Peterson was the plaintiffs' Xactimate expert in *Johnson*, where he opined on the "function of Xactimate." *Johnson*, 2017 WL 2224828.  Hartford challenged his testimony there, and I rejected its motion to strike his expert report.

"consultant to the owner and founder of Xactware/Xactimate® until his death[,]" and was authorized by the company to teach its software to contractors and adjusters. *Id.*

Considering Peterson's extensive experience with Xactware and its offerings, State Farm's attempt to discredit him as an XactContents® expert because he at one point mistakenly referred to the name of the software with which it is integrated is borderline disingenuous. As for State Farm's argument about Peterson's failure to consider the *Ramyead* dataset, it fares no better in the context of his report than it did for Regan.

Peterson concludes that "XactContents® software contains global and line-item settings that allow an insurance company to apply depreciation based on one of three methods: 1) percentage, 2) by a fixed dollar amount, and 3) by age with an adjusted condition." *Id.* at p. 3. He opines, "The software allows complete control over how depreciation is calculated, so each insurance company can set its policies for depreciation without needing to customize the software. From the software's perspective, a user can determine what line items are to be depreciated and what is to be depreciated in each line item, e.g., sales tax." *Id.* at p. 4. In reviewing State Farm's estimates, he noted that sales tax depreciation was taken on *all line items* that were depreciated, and "[u]sing XactContents® and the State Farm database, it is feasible to efficiently determine where depreciation was taken and calculate and prove what damages, if any, specific insureds or groups of insureds are entitled to." *Id.* at p. 4. This is particularly true because the XactContents® uses a flexible database management system that allows "key searches, comparisons, filters, etc. to extract the sought after data." *Id.* at p. 3.

Peterson did not need to consult the *Ramyead* dataset to arrive at this conclusion, and he did not need a deep knowledge of State Farm's ECS to arrive at it, either. He reached his conclusions through his understanding of the XactContents® tool and through analysis of State Farm's estimates that were provided to him.

## II.     RULE 23(A) REQUIREMENTS

Rule 23(a) of the Federal Rules of Civil Procedure requires all putative classes to satisfy four requirements: (1) The class must be so numerous that joinder of all members would be impracticable ("numerosity"); (2) there must be questions of law or fact common to the class

United States District Court
Northern District of California

1  ("commonality"); (3) the claims of the named party must be typical of those of the class

2  ("typicality"); and (4) the representatives of the class must be able to fairly and adequately

3  represent the interests of the class ("adequacy").  Fed. R. Civ. P. 23(a).  Plaintiffs meet these

4  requirements.

5      **A.  Numerosity**

6      Federal Rule of Civil Procedure 23(a)(1) requires that the proposed class be "so numerous

7  that joinder of all members is impracticable."  State Farm does not challenge plaintiffs' putative

8  class on this basis.  Plaintiffs estimate a class size of 191,362, *see* Melzer Report ¶¶ 9-17, which

9  clearly satisfies numerosity.  I also find that this class is ascertainable because the plaintiffs have

10  set forth clear and objective criteria by which they can identify class members.

11      State Farm contends that the plaintiffs offer "no facts—only speculation—supporting that

12  their proposed Rule 23(b)(3) class can be readily identified through objective criteria."  Oppo. 29.

13  It contends that the plaintiffs' class identification expert, Melzer, does not specify how members

14  of the class may be identified, he only concludes that they can be.  It argues that determining

15  whether insureds had a "covered loss," received an ACV payment based on RC less depreciation,

16  and are "reasonably certain" to be paid less than "applicable policy limits" would require

17  individual determinations.  *Id.* 29.

18      But, as plaintiffs assert in reply, and as is indicated by Melzer's report, they have shown

19  that: (1) all policyholders can be identified on XactContents®, (2) XactContents® has a

20  depreciation function, and (3) ACV and Remaining RC Benefit are functions of XactContents®.

21  Reply 6.  Plaintiffs' experts have all recognized and endorsed that the individuals comprising the

22  putative class are identifiable and ascertainable via reviews of XactContents® data and State

23  Farm's ECS data.  Supported by the sufficient reliability of their reports, this satisfies the

24  plaintiffs' burden.  *See* discussion *supra* Section I.

25      **B.  Commonality**

26      In order to meet the requirement of commonality, plaintiffs must demonstrate that there are

27  questions of law and fact common to the class. Fed. R. Civ. P. 23(a)(2).  A question is common to

28  the class if "determination of its truth or falsity will resolve an issue that is central to the validity

1   of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359

2   (2011). The question need not be answered on the merits in the class's favor, but "must be of such

3   nature that it is capable of class-wide resolution." *Alcantar v. Hobart Servs.*, 800 F.3d 1047, 1053

4   (9th Cir. 2015) (quoting *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 and *Wal-*

5   *Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-350 (2011)).

6           Here, as in *Johnson*, the putative class is framed around the common answer of "the

7   plaintiffs were disadvantaged by State Farm's policies of depreciation of sales tax," to the question

8   "how were the plaintiffs disadvantaged by State Farm?" The causes of action all turn on whether

9   California Insurance Code section 2051(b) prohibits State Farm from depreciating the sales tax in

10  calculating ACV for benefits payments. If that question is answered in the affirmative, questions

11  going to relief will also be common to the class.[15]

12          **C. Typicality**

13          To show typicality, a plaintiff must demonstrate that the "named parties' claims are typical

14  of the class." Fed. R. Civ. P. 23(a)(3). This means that the class representative "possess[es] the

15  same interest and suffer[s] the same injury" as the other class members. *E. Tex. Motor Freight*

16  *Sys. v. Rodriguez*, 431 U.S. 395, 403 (1977).

17          Plaintiffs Pitkin and Grout have suffered the same harm that they allege the putative class

18  has suffered: reduction in ACV payments by unlawful depreciation of sales tax value. *See* Pitkin

19  Decl. ¶¶ 7-9; Grout Decl. ¶¶ 7-9; *see also* Peterson Report, Melzer Report (describing class).

20  They possess the same interest as the other putative class members: they seek recovery of the

21  difference between the payment from State Farm and the ACV without sales tax depreciation. *See*

22  Pitkin Decl. ¶¶ 7-12; Grout Decl. ¶¶ 7-12; Peterson Report; Melzer Report.

23          **D.    Adequacy**

24          Rule 23(a)(4) requires that the named parties be able to "fairly and adequately protect the

25  interests of the class." Fed. R. Civ. P. 23(a)(4). To meet this requirement, the plaintiff must show

26  that (1) the named plaintiffs and their counsel do not have conflicts of interests with other class

27

28  ───────────────
    [15] Plaintiffs point out that absent class members would need to prove "essentially identical legal
    theories and factual issues if they chose to pursue their claims individually." Class Cert. Mot. 11.

United States District Court
Northern District of California

1    members, and (2) the named plaintiffs and their counsel will prosecute the action vigorously on

2    behalf of the class, which includes a showing that class counsel is competent and qualified.

3    *Hanlon v. Chrysler Corp.*, 150 F. 3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by*

4    *Wal-Mart*, 564 U.S. at 338, 131 S.Ct. 2541.

5        State Farm argues that the plaintiffs are not adequate class representatives because of their

6    "inexplicable waiver of their own claim for RC benefits, which far outweighs any damages they

7    could recover under the theory alleged in this action." Oppo. 3, 34. State Farm cites no authority

8    why this would make them inadequate class representatives.

9        Its argument that the waiver "suggests a conflict with the class" also comes up short. State

10   Farm contends that I should find Pitkin and Grout inadequate because they are choosing to

11   abandon significant damages in an attempt to achieve class certification, which the Ninth Circuit

12   looked poorly on in *Drimmer v. WD-40 Co.*, 343 F. App'x 219, 221 (9th Cir. 2009) (affirming

13   district court's inadequacy finding based on, among other things, the named plaintiff's

14   "inexplicable disinterest in pursuing all remedies available to him"). But here, as plaintiffs point

15   out, under their insurance policies they were entitled to accept ACV payments (as they did) rather

16   than replacement costs. Their choice to do so does not render them inadequate or in conflict with

17   other potential class members.

18   **III.    RULE 23(B) REQUIREMENTS**

19       A plaintiff seeking certification of a class must also meet the requirements of Rule 23(b).

20   Under Rule 23(b)(3), a class action may move forward if (1) "questions of law and fact" that are

21   common to the class predominate over those affecting only individual class members

22   ("predominance"), and (2) a class action is "superior" to other available methods ("superiority").

23   The plaintiff seeking to certify the putative class bears the burden of demonstrating that the

24   proposed class meets these requirements. *See Doninger v. Pac. Nw. Bell*, 564 F.2d 1304, 1309

25   (9th Cir. 1977). Again, plaintiffs meet these requirements.

26       **A. Predominance**

27       Under Rule 23(b)(3), the plaintiff must show that "questions of law or fact common to

28   class members predominate over any questions affecting only individual members." Fed. R. Civ.

United States District Court
Northern District of California

P. 23(b)(3). An "individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454, 136 S.Ct. 1036, 1045 (2016) (internal quotation marks omitted). State Farm argues that individual issues necessary to resolving each proposed class member's claims will predominate over individual ones. I disagree.

The plaintiffs' claims revolve around what they allege is State Farm's failure to pay the amount it owes under its contracts to the insured because of its unlawful practice of depreciating the value of the sales tax in calculating ACV. These questions pertain to every class member and can be resolved through the interpretation of one statute, Cal. Ins. Code § 2051. This was true in *Johnson* and it is true here.

State Farm insists that the plaintiffs wrongly "focus on a single issue" in their Motion, whether State Farm's ACV methodology comports with section 2051, while "ignor[ing] that resolution of that issue does not determine liability on any claim, because there is no private right of action for violation of Section 2051." Oppo. 20-21. It contends that since there is no private action for violation of section 2051, the plaintiffs must still establish that the elements of breach of contract are resolvable on a classwide basis, something it insists is impossible. *See* Oppo. 20 (discussing Ninth Circuit caselaw that provides there is no private right of action for violation of section 2051(b)). State Farm relies on the Ninth Circuit's decisions in *Small v. Allianz Life Ins. Co.*, 122 F.4th 1182 (2024) and *Lara v. First Nat'l Ins. Co.*, 25 F.4th 1134 (9th Cir. 2022) for this conclusion; it says those cases foreclose my conclusion in *Johnson* that a class much like the one the plaintiffs propose today could proceed. Again, I disagree.

### 1. The nature of the plaintiffs' claims

As a preliminary matter, the plaintiffs are not seeking to certify a class under a private right of action arising out of section 2051—they are seeking to certify a class that asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, a UCL violation, and declaratory relief that State Farm's challenged practice is unlawful. The question is whether

1   those four claims can be resolved commonly to the class, or whether individual questions on the

2   merits of each of those four claims will predominate.

3       Putting aside for now that I disagree with State Farm's conclusion that individual questions

4   as to the putative class members' breach of contract claims will predominate over common ones,

5   State Farm entirely ignores the plaintiffs' other three claims.  Even if causation issues did make it

6   such that each class member's breach of contract claim had to be assessed on a claim-by-claim

7   basis to ascertain whether State Farm's challenged ACV calculation practice caused their

8   damages, the same would not necessarily be true for the plaintiffs' UCL claim, breach of implied

9   covenant claim, or plea for declaratory relief.  As the plaintiffs point out in Reply, the common

10  question of whether section 2051 prohibits the depreciation of sales tax "flows through and is at

11  the heart of each of the four causes of action asserted," and "applies to both the Plaintiffs and the

12  proposed Class Members identically." Reply 3-4.  At the hearing, State Farm claimed that it

13  focused exclusively on the plaintiffs' breach of contract claim because it is the only claim for

14  which the plaintiffs seek class certification.  But as is evident from the Motion, that is not true.

15  *See* Class Cert. Mot. 8 (stating that "Plaintiffs seek class certification on each claim set forth in the

16  [SAC]").

17              **2.   Common issues predominate**

18      The Ninth Circuit's recent decisions in *Lara* and *Small* do not contradict my analysis in

19  *Johnson*, where I explained that even for plaintiffs whose property was repaired, damages

20  attributable to the unlawful depreciation of sales tax were still calculable on a classwide basis.

21  Plaintiff Johnson, who also lost his insured property in a fire, alleged, as plaintiffs do here, that the

22  defendant insurance company, Hartford, was underpaying him and the class by depreciating the

23  value of the sales tax when calculating ACV; in its policy payouts to class members following

24  claims, Hartford was reimbursing the amount of sales tax as applied to the estimated cost of lost,

25  depreciated items rather than the amount of sales tax as applied to the estimated cost of

26  replacement with new items.  *Johnson*, 2017 WL 2224828, at *2-3.  Johnson alleged, as plaintiffs

27  do here today, that this violated section 2051(b).  Hartford argued that "because proving breach of

28  contract requires proving actual damage, individual questions predominate."  *Id.*  I rejected that

United States District Court
Northern District of California

argument, concluding that since "[t]he measure of damages is not the difference between the amount of money spent on repairs and what was paid out, but rather the difference between what Hartford paid out and what it should have paid out if not for its purportedly unlawful practice of depreciation[,]" different payouts to different class members did not defeat predominance. The same is true here.

State Farm says *Small* and *Lara* require a different result than in *Johnson*. *Small* was a different case, and *Lara*'s holding is not inconsistent with *Johnson*, as explained in *Jama v. State Farm Mut. Auto. Ins. Co.*, 113 F.4th 924 (9th Cir. 2024), and does not disfavor certification here.

In *Small v. Allianz Life Ins. Co*., a purported beneficiary and insured of Allianz brought a putative class action against the life insurance company, claiming breach of contract and violations of California's Unfair Competition Law on allegations that the company had failed to comply with statutory notice requirements under California Insurance Code before terminating the plaintiff and other class members' life insurance policies for nonpayment of premiums. 122 F.4th 1182 (9th Cir. 2024). At class certification, plaintiffs had contended that they only needed to show that Allianz violated the statutory notice provisions identified in the complaint, not that those violations were the cause of the plaintiffs' injuries. Allianz disagreed, pointing out that it was not unusual for insured parties to voluntarily terminate life insurance policies by ceasing to pay their premiums. In some cases, then, policies lapsed, but the lapses were not caused by a lack of notice, (which was the target of the plaintiffs' claims), but rather by the intent of the insured party not to pay the premium. The district court certified two subclasses, and Allianz took interlocutory appeal. The Ninth Circuit reversed in part, vacated in part, and remanded.

The Ninth Circuit considered whether a plaintiff alleging a violation of Cal. Ins. Code sections 10113.71 and 10113.72 "need only show the insurance company violated the notice requirement(s), or, whether the plaintiff must also show that the violation caused them harm." *Small*, at 1187-1188. The court found the latter to be correct. It determined that the plaintiffs had to show causation for the class given that the California Insurance Code lacked a private cause of action, and "nothing in California law convinces us that a breach of contract claim in this context should operate any differently than it usually would," which is to say, by "requiring a breach that

24

1    caused the plaintiff's injury."  It held that "because Plaintiffs must not only establish a violation

2    but that the violation caused them harm, common questions do not predominate because causation

3    cannot be determined on a class-wide basis." *Small*, at 1197-1198.

4          This case is different.  State Farm concedes that it calculates ACV in the manner that the

5    plaintiffs allege is unlawful for each personal property policy at issue in the proposed class.  In

6    other words, it concedes that as a matter of practice in California, it engages in the conduct that

7    plaintiffs identify as a breach of their insurance contracts.  Unlike in *Small*, there is no regular or

8    even sporadic decision by insureds to voluntarily terminate their coverage by not paying a

9    premium, such that the defendant's conduct—lawful or otherwise—becomes disconnected from

10   the putative class members' injuries.

11         State Farm tries to compare itself to Allianz, arguing that it "could have adjusted the report

12   value, or settled the claim for more than the report, or the claimant could make a[] [Replacement

13   Cost] claim." Oppo. 21.  Alternatively, it argues, it "may have requested an XactContents[] report,

14   but already paid an insured more than the ACV calculation in that report," meaning that even if

15   members of the class were subject to State Farm's challenged ACV calculation methodology,

16   some members were not injured by its employment.  *Id.*  In so arguing, State Farm is ignoring the

17   crux of the plaintiffs' claims.  The plaintiffs are challenging an ACV calculation policy used to

18   calculate the putative class members' benefits that State Farm admits it employs uniformly.  If, as

19   the plaintiffs contend, the depreciation of sales tax is prohibited by section 2051, then the plaintiffs

20   and the putative Class Members are entitled to relief under all four pending causes of action

21   awarding damages for the improper reduction of ACV benefits, and to declaratory relief enjoining

22   State Farm from continuing to calculate ACV in a manner that violates section 2051 going

23   forward.  Unlike in *Small*, where the insurer's challenged practice was not uniform to the class

24   because some putative class members voluntarily terminated their coverage by ceasing to pay their

25   premiums, creating causation problem, here, State Farm *admits* that its challenged practice is

26   uniform to the class; it *always* reduces their ACV benefits from what they might otherwise be,

27   *regardless* of whether those ACV benefits are later, varyingly increased or decreased by other

28   sublimits or special limits in the Class Members' policies.

United States District Court
Northern District of California

United States District Court
Northern District of California

In its discussion of *Small*, State Farm flags potential problems that will arise as it tries to prove its affirmative defenses (i.e. that policy sublimits and special limits sometimes apply and change an insured's ACV calculation). Those are not the plaintiffs' concern at class certification. To certify a class based on plaintiffs' breach of contract claim (upon which the parties focus),[16] the plaintiffs must meet their burden of showing potential breach of contract and damages arising out of that breach. They have done so. They are not required to address affirmative defenses now.

*Lara v. First Nat'l Ins. Co.*, 25 F.4th 1134 (9th Cir. 2022), is more applicable to this case than *Small*, but it does not disfavor certification of the proposed class as State Farm argues it does. In *Lara*, the district court declined to certify a proposed damages class in an auto insurance suit because (1) individual questions predominated over common ones and (2) individualized trials were superior to a class action. *See Lara*, 25 F.4th 1134. The Ninth Circuit affirmed both holdings.

The case concerned how auto insurance companies valued totaled vehicles. When a car is declared "totaled," insurance companies endeavor to value the car as it was before the accident. The defendant in *Lara*, Liberty, used a vendor that provided a listing of comparable vehicles from used car dealerships, and then raised or lowered the value based on the condition of the subject car. Because the average used car at a dealership is generally in better condition than the average car on the street, Liberty's vendor adjusted the value downward before sending its reports to Liberty. Upon receiving the reports, Liberty would make corresponding adjustments to the vehicles' values during negotiations with the insured. Plaintiff insureds filed a putative class action, claiming that Liberty violated a Washington state statute that required the insurer to itemize deductions or additions made to the vehicle's value and ensure that the adjustments were appropriate. *Lara*, at 1137.

Because the state statute at issue in *Lara* did not create a private right of action (as is also true for section 2051(b)), the plaintiffs could not sue for its breach directly, so they sued for breach of contract and unfair trade practices. *Id.* The district court found that while the named plaintiffs

---

[16] *Small* is similarly inapplicable to answer the question of predominance with respect to the plaintiffs' other claims besides breach of contract, which State Farm does not address.

were typical, individualized issues predominated and class treatment was not superior. *Id.* This is because each vehicle valuation was *usually*, *but not always*, based on the vendor's report. The insurer could make other adjustments independent from the vendor's report, including making a higher offer based on "goodwill," or choose to disregard it entirely. *Id.* at 1138. The district court explained that this variation across the class in what might have led to the change in value during negotiations defeated predominance and would necessitate dozens of mini trials. In affirming, the Ninth Circuit explained: "[In *Lara*] figuring out whether each individual putative class member was harmed would involve an inquiry specific to that person. More particularly, it would involve looking into the actual pre-accident value of the car and then comparing that with what each person was offered, to see if the offer was less than the actual value. Because this would be an involved inquiry for each person, common questions do not predominate." *Lara*, 25 F.4th at 1139.

Here, unlike *Lara*, State Farm's admitted practice is to calculate ACV by reducing sales tax through depreciation; the plaintiffs argue that this practice is prohibited by section 2051(b), and results in every class member having the ACV of their personal property improperly reduced in calculating their benefits. As the plaintiffs put it in their Reply, unlike in *Lara*, here "[t]he existence of damage is not at issue, just the amount." Reply 15. And the amount, as discussed, can feasibly be calculated classwide. *See* discussion *supra* Section I.

The Ninth Circuit in *Jama* clarified how *Lara* should be applied. In *Jama*, plaintiffs— insured parties who lived in Washington state—sought certification of two subclasses of insureds who had "totaled" their vehicles. Under the State of Washington's insurance regulations, an insurer owed an insured the "actual cash value" of a totaled car. *Jama*, 113 F.4th at 927 (citing Wash. Admin. Code § 284-30-391). The district court initially certified both subclasses, the "condition" class and the "negotiation" class. The "negotiation subclass" alleged that State Farm improperly compensated them following the crashes that totaled their vehicles by applying a "negotiation discount" when calculating their vehicles' ACV. The plaintiffs alleged that this practice was not permitted under Washington law. After the district court certified the subclasses, the Ninth Circuit decided *Lara*, and the district court, at State Farm's request, decertified both subclasses and granted State Farm summary judgment.

27

On appeal, the Ninth Circuit reversed decertification of the *Jama* "negotiation" subclass, and upheld decertification of the "condition" subclass. The court explained the distinctions between the putative *Jama* negotiation subclass (which was certifiable), the *Lara* subclass (which was not), and the putative *Jama* "condition" subclass (which was also not) as follows:

> As to [the negotiation] class, [the plaintiffs'] theory is not that State Farm failed to follow the correct procedure for making permissible adjustments [as the plaintiffs in *Lara* alleged defendant Liberty did], but rather that Washington law *does not permit State Farm to apply a discount for typical negotiation at all.* . . . Accordingly, Plaintiffs' challenge to the negotiation class here is materially distinguishable from the challenge in *Lara*: A class member in *Lara* might have been subject to the challenged condition deduction but been uninjured by it because a greater or equal condition addition could *also* have been *lawfully applied*. This would lead a class member to receive the actual cash value of their vehicle or more. All members of the negotiation class in this case, however, received less than they were owed in the exact amount of the impermissible negotiation deduction. As to the proposed negotiation class in this case, we therefore conclude that class members could measure their injuries on a class-wide basis by adding back to the value of their vehicles as calculated in the Autosource reports the amount of the unlawful negotiation discount.

*Jama*, 113 F.4th at 934 (emphasis added).

Plaintiffs' theory of liability here is more akin to that of the *Jama* negotiation subclass than that of the rejected *Lara* class, or the decertified *Jama* condition subclass. The plaintiffs' theory is not that State Farm failed to follow the correct procedure when fulfilling their claims, but rather that California law *does not permit* State Farm to depreciate sales tax when calculating ACV, meaning that every time State Farm depreciated sales tax in calculating ACV—*which happened to every putative class member*—the calculation yielded a too-low ACV, which was used to fulfill their claim. So even if some of the Class Members ultimately are shown to have received a payout that is *more* than the calculated ACV of their personal property because of the application of a policy sublimit or special limit (something State Farm asserts as an affirmative defense, and is welcome to develop), they still all received less than they otherwise would have had State Farm not depreciated sales tax in the calculation and, through that depreciation, lowered ACV. Putative class members in this case can measure their injuries on a classwide basis by adding back to the ACV of their personal property as calculated by State Farm the amount of the putatively unlawful depreciated sales tax.

Regardless of whether State Farm applies sublimits or special limits or other modifications

United States District Court
Northern District of California

1    to putative class members' claims, there is no modification that could accurately price the ACV of

2    their property if plaintiffs are correct that including depreciated sales tax in the calculation of ACV

3    is *always* unlawful.  *See Jama*, at 934 (distinguishing the negotiation subclass from the rejected

4    condition class in *Lara*, observing that in *Lara*, "an un-itemized condition adjustment could

5    nevertheless have accurately reflected the condition of the car for some class members," but in the

6    case of the *Jama* negotiation subclass, "there is no negotiation adjustment that could accurately

7    price the negotiation discount . . . if Plaintiffs are correct that the adjustment is *always* unlawful,

8    regardless of the amount.").

9        The measure of damages, as the plaintiffs' experts explain, is the deduction to the value of

10    their personal property arising from that depreciation of sales tax.  This is measurable on a

11    classwide basis, as I discussed above.  *See* discussion *supra*, Section I.

12        **B.    Superiority**

13        To proceed with a class action under Rule 23(b)(3), a plaintiff must also show that a class

14    action is a "superior" means of adjudicating the claims.  Fed. R. Civ. P. 23(b)(3).  In making this

15    determination, a court may take into consideration: (1) "class members' interests in individually

16    controlling the prosecution or defense of separate actions," (2) "the extent and nature of any

17    litigation" regarding the "same controversy"; (3) the "desirability or undesirability" of litigating all

18    claims in the same forum; and (4) the "likely difficulties in managing a class action." Fed. R. Civ.

19    P. 23(b)(3)(A)-(D).  I find that these factors favor certification.

20        The first factor, which considers the class members' interest in pursuing individual actions,

21    weighs in favor of certification. "Where damages suffered by each putative class member are not

22    large, this factor weighs in favor of certifying a class action." *Zinser v. Accufix Research Inst.,*

23    *Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001).  In *Zinser*, plaintiffs sought to certify a class alleging

24    minimum damages of $50,000 per class member. The court denied certification because, while "a

25    party with a claim of $50,000 might have a difficult time alone pursuing a complex products

26    liability case," the fact that $50,000 was the *minimum* amount alleged did not support certification.

27    *Id.* at 1191.  Here, as the plaintiffs point out, the damages at issue here are relatively small per

28    putative class member.  Moreover, anyone who wants to opt out of the class may do so.

United States District Court
Northern District of California

The other factors also support the superiority of a class action in this case. While a similar class was certified and a similar issue was litigated in this court in 2017, I know of no other similar action now proceeding in the Northern District or in the Ninth Circuit.[17] There is a significant benefit to litigating all claims pertaining to the legality of State Farm's California-wide practice of depreciating sales tax when calculating ACV in one forum. If the putative class members were to pursue their claims in different courts around the state, or around the Ninth Circuit, courts could reach piecemeal and inconsistent rulings on what is otherwise a straightforward legal question. And this case presents no known difficulties in managing it as a class action; the records pertaining to class membership, breach, and damages are available in State Farm's records, *see* discussion *supra*, Section I, and the questions of whether State Farm is liable for UCL violations, or the class is entitled to declaratory relief are well-suited to class treatment.

## IV.    CLASS PERIOD

State Farm mentions in its opposition that the class definition is impermissibly broad in time. Oppo. 31. The plaintiffs filed this lawsuit in 2023; they allege causes of action that have, at most, a four-year statute of limitations. *Id.* (citing Cal. Code Civ. Proc. § 337(a) (breach of contract); *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1144 n.4 (Ct. App. 1990) (bad faith); Cal. Bus. & Prof. Code § 17208 (UCL); *North Star Reins. Corp. v. Sup. Ct.*, 10 Cal. App. 4th 1815, 1822 (1992) (declaratory relief). At oral argument, the plaintiffs agreed that the class definition should be modified such that the starting date is March 1, 2019, through the present.

### CONCLUSION

For the foregoing reasons, Pitkin's motion for class certification is GRANTED. The following class is certified:

> All persons who, between March 1, 2019, and the present, were or are a named insured under a property insurance policy issued in California by Defendant, who suffered a covered loss to real or personal property for which they received payment of actual cash

---

[17] The resolution of the *Ramyead* appeal in State Farm's favor does not weigh against class certification because the state appellate court, in upholding summary judgment in State Farm's favor, did not reach the question of whether its sales tax depreciation practice violated section 2051(b).

value (ACV) benefits that were reduced due to depreciation of sales tax, and who were paid or are reasonably certain to be paid benefits in an amount that is less than the applicable policy limits.

The motion to strike portions of plaintiff's reply and new expert reports is denied as moot.

**IT IS SO ORDERED.**

Dated: July 15, 2025



William H. Orrick
United States District Judge

United States District Court
Northern District of California