UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELISSA PITKIN, et al.,<br><br>                   Plaintiffs,<br><br>          v.<br><br>STATE FARM FIRE AND CASUALTY<br>COMPANY,<br><br>                   Defendant. | Case No.  23-cv-00924-WHO<br><br>**ORDER ON MOTION FOR SUMMARY<br>JUDGMENT AND MOTIONS TO<br>EXCLUDE**<br><br>Re: Dkt. No. 120–127, 131–133, 136–141,<br><br>144, 146–151, 156–164, 166–171 |

Before me are cross-motions for summary judgment and motions to exclude filed by plaintiffs Melissa Pitkin and Dan Grout (hereinafter "plaintiffs" on behalf of the class) and defendant State Farm Insurance, Inc. ("State Farm") that require resolution of a central legal question: whether Section 2051(b) of the California Insurance Code allows insurers to depreciate sales tax when calculating the actual cash value ("ACV") of contents subject to wildfire insurance. It does not.  The plain text of Section 2051(b), along with the legislative history, shows that ACV depreciation calculations are limited to only "physical depreciation," a term that cannot reasonably apply to sales tax.  Accordingly, plaintiffs are entitled to summary judgment on plaintiffs' cause of action for declaratory relief and may accordingly be entitled to an injunction under the Unfair Competition Law ("UCL") cause of action.

But the remainder of plaintiffs' motion is DENIED.  While it seems clear that at least some members of plaintiffs' identified class have suffered common damage because of State Farm's depreciation of sales tax in ACV claims, there is a dispute concerning who has been injured, whether and to whom the suit limitations provision in State Farm's policy applies, and whether some class members have already released claims.  I also GRANT State Farm's motion on both the implied covenant of good faith and fair dealing and punitive damages claims.  Although I do

not think its interpretation of the statute is reasonable, it was upheld by one court.  Accordingly, I cannot conclude that its conduct and practice has been unreasonable.

Finally, I DENY the parties' motions to exclude, as each request raises issues of credibility—a question reserved for the factfinder—instead of admissibility.  Each expert is sufficiently reliable to assist the factfinder in resolving questions about injury and damages at trial.

## BACKGROUND

Many of the facts in this case have been previously identified in my order granting class certification.  *See* Order Certifying Class [Dkt. No. 102].  Because these motions turn on a legal question—whether Section 2051(b) allows for depreciation of sales tax when calculating ACV—many of the underlying facts remain undisputed.  I repeat those facts below.

### A.      The Plaintiffs

Pitkin and Grout own a home together in Healdsburg, California.  They hold a homeowner's insurance policy from State Farm, policy number 57-C4-6752-1 (the "Policy"), which covered certain losses to their home and all of its contents.  The Policy included the "main policy form" (FP-7955, CA) as well as a "homeowners endorsement form" (FE-3422). Subject to the Policy's terms, conditions, and exclusions, the Policy included "Coverage B – Personal Property" limits of $506,574, and other various special limits.  Regarding settlement of Coverage B claims, the Policy provides for settlement of damaged personal property in several ways, including actual cash value ("ACV"), market value, and replacement cost ("RC"). Declaration of Donna Blazewich ("Blazewich Decl.") [Dkt. No. 76-5] ¶ 7.

On August 20, 2020, the Walbridge Fire burned down the plaintiffs' home.  *See* Declaration of Melissa Pitkin ("Pitkin Decl.") ¶¶ 7-9; Declaration of Dan Grout ("Grout Decl.") ¶¶ 7-9.  Having lost their home and personal possessions, the plaintiffs tendered a claim to State Farm for their losses under the Policy.  State Farm accepted the claim and adjusted their losses pursuant to the Policy's terms, which stated that the plaintiffs are entitled to recover ACV for their personal property losses.  On December 16, 2022, and January 24, 2023, the plaintiffs received partial payments from State Farm for their personal property contents losses.  State Farm also sent the plaintiffs "loss payment worksheets" that showed their ACV benefits for their personal

United States District Court
Northern District of California

property. Pitkin Decl. ¶¶ 7-8; Grout Decl. ¶¶ 7-8.

For all items of property where sales tax was applicable, State Farm depreciated sales tax in calculating ACV.  Pitkin Decl. ¶ 9; Grout Decl. ¶ 9.  That practice is what the plaintiffs challenge in this action.

**B.    State Farm's Policies and Procedures Regarding Settlement of Personal Property Claims**

State Farm describes its process of handling personal property claims like the plaintiffs' as follows. When a claim is reported to State Farm, its claims personnel open a new claim in State Farm's "Enterprise Claims System" ("ECS") and a unique claim number is assigned to the claim. Blazewich Decl. ¶ 3.  ECS is a "proprietary relational database" that State Farm uses to store its data in various forms.  Declaration of Jay Thorpe ("Thorpe Decl.") ¶¶ 4, 6, 20.  After a claim is opened in ECS, State Farm claims personnel "generally" contact the insured or claimant to discuss the claim. Blazewich Decl. ¶ 3.  State Farm may settle a covered personal property or contents loss claim during that first contact or it may not, depending on the circumstances of a particular claim.  *Id.* ¶ 14.

If a claim "involves more than a few items or is not settled during a first contact" the claims personnel may "utilize the XactContents® tool to assist in valuing lost property for claim settlement purposes."  *Id.*  Third party entity Verisk owns the XactContents® tool. *See* Declaration of Jennifer Hoffman ("Hoffman Decl.") [Dkt. No. 76-1] ¶¶ 4-5; *id.*, Ex. 2 (Peterson Depo.) at pp. 57-58; *id.* Ex. Ex. 3 (Melzer Depo.) at p. 95. The XactContents® tool is capable calculating RC and ACV and then generating reports containing RC and ACV calculations for contents "consistent with State Farm's ACV methodology in California"; that methodology includes depreciating sales tax in the calculation of ACV.  *See* Blazewich Decl. ¶ 15 (explaining that State Farm calculates ACV in California by calculating the RC of an item, including sales tax where applicable, and then subtracting depreciation from the RC); *see also* Class Cert. Mot. Ex. 4 ("Operation Guideline 75-50 Betterment, Depreciation, and Actual Cash Value"); *id.*, Ex. 5 (Defendant State Farm's Response to Plaintiff's Irrog. No. 3).  According to State Farm, while the XactContents® tool can "assist" claims personnel as they make decisions on a claim, ECS records

3

what actually happens on a claim.  Blazewich Decl. ¶¶ 2-3, 17.

Information on ECS is electronically stored. Thorpe Decl. ¶ 4.  ECS includes fields that record the date and amount of Coverage B payments (like those available under the plaintiffs' Policy).  State Farm notes that ECS does not store information regarding the "nature or basis" of Coverage B payments in a form that can be searched across claims.  Oppo. 4; Thorpe Decl. ¶ 6. XactContents® Payment Tracker Worksheets or reports may contain ACV and RC calculations for particular items; State Farm points out that such information "reflects a calculation, not a claim payment." Thorpe Decl. ¶¶ 9, 15.  According to State Farm, its ECS database is separate and apart from any database maintained by Verisk, the third party that owns XactContents®, meaning that a query of ECS does not yield data contained in Verisk's XactContents® system. State Farm distinguishes ECS and XactContents® like this: XactContents® is a tool, and ECS is the claim record. Oppo. 5; Thorpe Decl. ¶¶ 7-8; Blazewich Decl. ¶¶ 2-3, 14-15.

### C.   Plaintiffs Challenge State Farm's ACV Calculation Practices

The plaintiffs filed this class action on March 1, 2023, alleging that State Farm violates California law by depreciating sales tax as a component of RC when calculating ACV; they say that State Farm did this when calculating the replacement cost of the plaintiffs' personal property in the context of their Coverage B claim following the fire that destroyed their property, and that it does this "systematically" across the state, "consistently underpaying property insurance claims by depreciating sales tax[.]" Complaint [Dkt. No. 1]. State Farm does not deny that this is its practice—under State Farm's uniform policies, it first calculates the RC of an item, including sales tax where applicable, and then calculates ACV by subtracting depreciation from the RC (ACV = RC – depreciation).  It denies that the practice is unlawful. *See* Declaration of Nabilah Hossain ("Hossain Decl.") [Dkt. No. 62-4] Ex. 4 ("Operation Guideline 75-50 Betterment, Depreciation, and Actual Cash Value"); *id.*, Ex. 5 (Def. State Farm Resp. to Pl's Irrog. No. 3); *id.*, Ex. 7 (Donna Blazewich, Person Most Knowledgeable "PMK", for State Farm General Insurance, Deposition, or "PMK Depo.") at 32:12-23).

The parties agree that State Farm's practice involves a two-step process. First, State Farm's uniform policy is to include sales tax as a component of RC. *See* Hossain Decl. Ex. 8. Then State

4

Farm depreciates the entire amount of RC; it does not limit depreciation to the property's wear and tear or components subject to physical depreciation. The plaintiffs contend that while State Farm's internal "definition" of depreciation aligns with Section 2051(b) (insofar as it describes depreciation as a "decrease in the value of the property over a period of time due to wear, tear, and obsolescence," *see id.* Ex. 4 (Operation 75-50 Guide) at 2), in *practice* it disregards these standards and violates Section 2051(b) by depreciating sales tax as part of its ACV calculation. State Farm's witnesses have admitted to this practice, and plaintiffs say the practice is further evidenced by the written estimate provided to them. *See* Pitkin Decl. ¶¶ 7-9; Grout Decl. ¶¶ 7-9.

On July 15, 2025, I granted class certification for the following class:

> All persons who, between March 1, 2019, and the present, were or are a named insured under a property insurance policy issued in California by Defendant, who suffered a covered loss to personal property for which they received payment of actual cash value (ACV) benefits that were reduced due to depreciation of sales tax, and who were paid or are reasonably certain to be paid benefits in an amount that is less than the applicable policy limits.

Order Certifying Class.[1]  The parties then moved for summary judgment, as well as to exclude each parties' expert witnesses.  I heard oral argument on June 10, 2026.

## LEGAL STANDARD

**Summary Judgment**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify

---

[1] The original class definition covered those "who suffered a covered loss to *real or* personal property . . ." *See* Order Certifying Class.  On December 5, 2025, the parties submitted a joint stipulation that amended the class definition to only cover those who suffered a covered loss to personal property.  *See* Stipulation and Order to Amend Class Definition [Dkt. No. 135].  That class definition remains in effect today.

"specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the Court must draw all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* But conclusory and speculative testimony does not raise a genuine issue of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**Motion to Exclude**

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not" that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 was amended, effective December 1, 2023, "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 Advisory Committee's note to 2023 amendment.

Expert testimony is admissible under Rule 702 if it is both relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Whether expert testimony is admissible is a matter within the Court's discretion, *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999), and "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue," *Daubert*, 509 U.S. at 592–93. This "basic gatekeeping obligation" applies to all expert testimony, not just scientific testimony.

United States District Court
Northern District of California

*Kumho*, 526 U.S. at 147.  The Court's inquiry is a flexible one, and "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153.  The proponent of expert testimony bears the burden of proving admissibility. *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 Advisory Committee's note to 2000 amendment.

# DISCUSSION

## I.    Summary Judgment

The parties both independently move for summary judgment.  Plaintiffs move on each of their claims.  State Farm bases its motion on a single "legal, statutory interpretation issue: that Plaintiffs cannot establish a material element of their claims because State Farm estimates [ACV] for personal property items consistent with California Insurance Code section 2051."  Pitkin MSJ Oppo. at 2.  "[W]hen parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits.'" *Fair Housing Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting William W. Schwarzer, et. al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 499 (Feb. 1992)).  Courts must "rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id.* (internal quotation and citation omitted).  But "where the cross-motions overlap, the court may address the legal arguments together." *Hattrup v. Deng*, 433 F. Supp. 3d 1246, 1257 (D. Kan. 2020).  Because the parties agree that I need to address the question of law—whether sales tax may be depreciated when calculating ACV under Section 2051(b) of the California Insurance Code—I do that first.

### A.    Section 2051(b)—Declaratory Relief

Section 2051(b) of the California Insurance Code reads:

> Under an open policy that requires payment of actual cash value, the measure of the actual cash value recovery, in whole or partial settlement of the claim, for either a total or partial loss to the structure or its contents, shall be the amount it would cost the insured to repair, rebuild, or replace the thing lost or injured less a fair and reasonable deduction for physical depreciation based upon its condition at the time of the injury or the policy limit, whichever is less.  A deduction for physical depreciation shall apply only to components of a structure that are normally subject to repair and replacement during the useful life of that structure.

United States District Court
Northern District of California

7

Cal. Ins. Code § 2051(b). Plaintiffs contend that they are entitled to declaratory relief because the plain language of the statute limits depreciation to "only wear-and-tear of tangible components," which does not include sales tax. Pitkin MSJ Mot. at 7. State Farm urges me to look at the legislative history of the statute, which it believes shows that "'physical depreciation' should not apply to both the retail price and sales tax components of RC for personal property items." State Farm MSJ Mot. at 2. I address each argument in turn.

### 1.    Principles of Statutory Interpretation

Jurisdiction in this case is based on diversity, and neither party disputes that the construction of the statute is governed by California law. *See Integon Nat'l Ins. Co. v. Reece*, 423 F. Supp. 3d 831, 840 (E.D. Cal. 2019). California courts "construe insurance statutes to ascertain and effectuate legislative intent, looking first to the statutes' words." *Cal. Fair Plan Ass'n v. Garnes*, 11 Cal. App. 5th 1276, 1287 (2017) (internal quotations omitted). "If those words are clear, there is no need for construction." *Id.* But when the language is "susceptible of more than one reasonable interpretation," courts may "look to a variety of extrinsic aids, including the object to be achieved, the evil to be remedied, public policy, the statutory scheme of which the statute is a part, and legislative history." *Id.* (internal quotations omitted). In doing so, courts strive to "ascertain the intent of the lawmakers so as to effectuate the purpose of the law." *City & Cnty. of S.F. v. Jen*, 135 Cal. App. 4th 305, 310 (2005); *Prudential-LMI Com. Ins. v. Superior Ct.*, 51 Cal.3d 674, 684 (1990) (insurance provisions authorized by statute "must be construed to implement the intent of the Legislature").

### 2.    Text

I first address the text of the statute. Plaintiffs assert that Section 2051(b) "codifies a two-step ACV calculation for open policies of insurance: (1) determine 'the amount it would cost the insured to repair, rebuild, or replace the thing lost or injured,' which includes applicable sales tax; and then (2) subtract a 'fair and reasonable' deduction for *physical* depreciation based on the condition of the property at the time of loss." Pitkin MSJ Mot. at 7 (quoting Cal. Ins. Code § 2051) (emphasis added). In their view, "only wear-and-tear of tangible components may be depreciated," as sales tax "is not physical and is not a tangible component subject to wear and

8

tear." *Id.*

State Farm takes issue with this approach, arguing that it "does not account for the fact that *retail price is also intangible*." State Farm MSJ Mot. at 14 (emphasis in original). In its view, "retail price is not 'the thing lost,'" as mentioned in the statute; instead, "retail price is part of the cost to 'replace the thing lost,' which cost also includes applicable sales tax." *Id.* (quoting Cal. Ins. Code § 2051(b)). Because Section 2051(b) "does not distinguish between retail price and applicable sales tax for purposes of 'physical depreciation,'" it concludes that depreciation is proper. *See id.* To read otherwise would require State Farm to "appl[y] depreciation only to the *retail price* component of RC for the item, and *not* to the applicable sales tax, and then combine[] the depreciated retail price with local sales tax on the non-depreciated retail price to estimate ACV," a conclusion State Farm believes does not follow from the statute. *Id.* at 13 (emphasis in original).

Plaintiffs rely on three cases. First, in *Johnson v. Hartford Casualty Insurance Company*, I addressed Section 2051(b) as it applied to an insurance coverage claim involving the loss of a commercial building in San Francisco. No. 15-cv-04138-WHO, 2017 WL 2224828, at *1 (N.D. Cal. May 22, 2017) (Orrick, J.). On the question of depreciation, I found that "sales tax is distinct from the physical items and not subject to 'depreciation' or deduction." *Id.* at *8. "Including the sales tax with the ACV payments comports with the overall purpose of ACV," I concluded, as "[c]alculating the sales tax by reference to the value of the items lost vindicates the point of the insurance, rather than producing a windfall for the insured." *Id.*

Later, in *Maison D'Artiste v. American International Group, Inc.*, a court in the Central District of California reaffirmed that a "plain reading of [Section 2051(b)] appears to indicate that any actual cash value payment made under a property insurance policy should not depreciate labor costs, or other expenses that are 'not a component of physical depreciation'—as sales tax, overhead, and profit all appear to be." No. 2:19-cv-07574-SVW-E, 2020 WL 4037219, at *3 (C.D. Cal. Jan. 23, 2020). While the court acknowledged the "limited" caselaw on this issue, it ultimately held that "at [the motion to dismiss] stage that Plaintiff's factual allegations ma[d]e it plausible that Defendant's alleged conduct was 'unlawful' for purposes of the UCL." *Id.*

9

United States District Court
Northern District of California

Finally, in *California Fair Plan Association v. Garnes*, a California Court of Appeals panel held that Section 2051(b) establishes a "mandatory minimum coverage" that insurers may not contract around. 11 Cal. App. 5th at 1308–09. In light of these cases, plaintiffs conclude that "any contrary policy term or illegal claims-handling process (like depreciating sales tax) is unenforceable." Pitkin MSJ Mot. at 8.

State Farm responds that these cases are not persuasive considering the legislative history and purpose of Section 2051(b). While it acknowledges that *Garnes* squarely addressed Section 2051, State Farm argues that "*Garnes* focused on legislative history in interpreting Section 2051 on *another issue*," and that plaintiffs "cite no legislative history supporting their interpretation here." Pitkin MSJ Oppo. at 4 (emphasis added); *see Garnes*, 11 Cal. App. 5th at 1287, 1295–1300. Similarly, it maintains that *Johnson* does not apply because it "pre-dated *Garnes*, involved building property (not contents), and did not consider Section 2051's legislative history in resolving the narrow statutory interpretation issue presented here in a different context." Pitkin MSJ Oppo. at 4; *see also* State Farm MSJ Mot. at 16–19 (distinguishing *Johnson*).

State Farm's argument is not well taken. As it acknowledges in its motion for summary judgment, California courts generally resort to legislative history only when a statute is "susceptible [to] more than one reasonable interpretation." *Garnes*, 11 Cal. App. 5th at 1287. Plaintiffs' failure to cite any legislative history therefore does not support State Farm's position unless it can first demonstrate ambiguity in Section 2051(b). I accordingly begin with the text of the statute.

The text supports plaintiffs' interpretation of Section 2051(b). Neither party disputes that Section 2051(b) establishes a two-step calculation. First, an insurer must determine "the amount it would cost" to repair, rebuild, or replace the damaged property. Second, the insurer must subtract "a fair and reasonable deduction for physical depreciation." The dispositive question is how "physical depreciation" should be understood. The ordinary meaning of "depreciation" is a "decrease in the value of something (as due to deterioration or obsolescence)." *Depreciation*, Merriam-Webster, https://www.merriam-webster.com/dictionary/depreciation (last accessed June 5, 2026). The use of "physical" as a modifier of "depreciation" further narrows that concept,

10

United States District Court
Northern District of California

limiting depreciation to loss in value arising from the physical condition of property.  By directing that depreciation be based upon the property's "condition at the time of the injury," a plain reading of the statute confirms that the relevant inquiry concerns the state of damaged property.

Sales tax does not fit within that definition.  A sales tax is a "tax . . . separately stated and collected on a transaction-by-transaction basis from the consumer; although the economic burden of the sales tax falls upon the consumer, the seller has the statutory duty to collect the tax for the taxing jurisdiction."  68 Am. Jr. 2d *Sales and Use Tax* § 1, at 11 (1993).  Sales tax is a charge imposed on a retail transaction.  It does not deteriorate with age.  Nor does it possess a physical condition capable of deterioration.

"[C]ourts must strive to give meaning to every word in a statute and to avoid constructions that render words, phrases, or clauses superfluous."  *Klein v. United States of America*, 50 Cal.4th 68, 80 (2010).  To read Section 2051(b) as State Farm suggests would effectively read the word "physical" out of the statute, despite serving as a clear modifier of "depreciation."  I decline to interpret the plain meaning of the statute in such a constrained way.  Sales tax cannot be measured for purposes of "physical" depreciation.

That Section 2051(b) "does not distinguish between retail price and applicable sales tax for purposes of 'physical depreciation'" does not help State Farm.  State Farm MSJ Mot. at 14.  It reasons that because "retail price is . . . intangible" and used in calculating every ACV, plaintiffs cannot read "physical depreciation" to "refer to sales tax" just because it is "intangible and thus 'distinct from physical items.'"  *Id.* at 13–14.  True, retail price is "intangible."  But retail price measures the value of property being replaced and forms the basis for calculating RC.  Sales tax, by contrast, is a charge imposed on the replacement *transaction* itself.  These are two different inquiries; the latter bears no relationship to the property's physical condition.  Considering sales tax cannot physically depreciate or suffer wear and tear damage, the plain text of the statute does not support State Farm's interpretation.

### 3.    Legislative History

Because the text of the statute is clear, it is unnecessary to consider the legislative history in great detail.  Nevertheless, since State Farm relies heavily on the statute's legislative history in

light of *Garnes*, I address that history and conclude again that plaintiffs' interpretation is correct. *See* State Farm MSJ at 16–18.

The California State Legislature enacted AB 2962 in 2004, which amended Section 2051 to "specify, for the first time, how insurers must calculate ACV under a fire insurance policy like Plaintiffs' policy." State Farm MSJ Mot. at 9; *see Garnes*, 11 Cal. App. 5th at 1295–96. "The purpose of Assembly Bill 2692" was to address the "lack of clarity in insurance policies and inconsistent practices by insurers regarding the determination of 'actual cash value' in adjusting claims under residential fire insurance policies." *Garnes*, 11 Cal. App. 5th at 1295–96. At the time, "insurers were using a variety of different measures of 'actual cash value' when adjusting claims . . ., only one of which was replacement cost minus depreciation, and . . . disagreements about how to measure the recovery under fire insurance policies were a source of continuing conflict between insurers and policyholders." *Id.* at 1296.

In authoring the bill, the California Insurance Commissioner indicated that the purpose of the statute was to "explain and provide consistency for how claims will be adjusted and prohibit insurance companies from deducting the cost of labor in settlements." State Farm RJN, Ex. 1 at SFG 000240–44; *accord Garnes*, 11 Cal. App. 5th at 1296–98.[2] To accomplish these goals, AB 2962 provided two formulas to calculate ACV, based on the type of loss. It stated:

> (1) In case of a total loss to the structure, the policy limit or the fair market value of the structure, whichever is less.
> (2) In case of a partial loss to the structure, or loss to its components, the amount it would cost the insured to repair, rebuild, or replace the thing lost or injured less a fair and reasonable deduction for physical depreciation based upon its condition at the time of the injury or the policy limit, whichever is less. In case of a partial loss to the structure, a deduction for physical depreciation shall apply only to components of a structure that are normally subject to repair and replacement during the useful life of that structure.

Former Cal. Ins. Code § 2051 (effective until Dec. 31, 2019).

Shortly after enacting AB 2962, the Insurance Commissioner proposed amendments and additions to Title 10, Section 2695.9 of the California Code of Regulations to "clarif[y] that,

---

[2] State Farm's request for judicial notice is GRANTED, as the exhibits meet the requirements of Fed. R. Evid. 201. Dkt. No. 158-3.

although property may depreciate, the cost of labor used to replace that property is not subject to depreciation." State Farm MSJ Mot. at 11; RJN, Ex. 2, at SFG 000280. The Commissioner explained:

> Insurance Code Section 2051 sets out the measure of recovery on property losses as being "the amount it would cost the insured to repair, rebuild, or replace the thing lost or injured less a fair and reasonable deduction for physical depreciation . . ." *This subsection is designed to clarify what is meant by physical depreciation and how physical depreciation is deducted from a claim.*

RJN, Ex. 2, at SFG 000291 (emphasis added). With respect to new additions to Section 2695.9(f), the Commissioner added:

> This newly adopted subsection specifies that "the cost of labor is not subject to depreciation." … Under Insurance Code Section 2051, the insurer is obligated to pay the full expense of repairing, rebuilding or replacing the damaged property "less a fair and reasonable deduction for physical depreciation." Some insurers take the position that the cost of labor is depreciable, which has resulted in consumers being paid less than a fair and reasonable amount to repair or rebuild the damaged property. This leaves the insured with significant out-of-pocket expenses not contemplated or expected. The Department has taken the position that the expense of labor is not depreciable as only the physical property can be depreciated. *The language of this new subsection is necessary in order to interpret the term 'physical depreciation' and to clarify that depreciation of labor is not a component of physical depreciation.*

*Id.* (emphasis added). Finally, the Commissioner noted:

> [Section 2695.9(f)] has been amended to make it clear that the Commissioner *never intended to disallow depreciation of the labor costs inherent to the manufacture o[f] goods or materials such as a sofa*. Rather, *labor costs that are incurred in order to repair, rebuild or replace covered first party residential or commercial property are not subject to depreciation* as, pursuant to Insurance Code Section 2051, only the physical property itself can be depreciated.

*Id.* at SFG 000295–96.

As a result of these amendments, Section 2695.9(f) of the California Code of Regulations reads:

> (f) When the amount claimed is adjusted because of betterment, depreciation, or salvage, all justification for the adjustment shall be contained in the claim file. Any adjustments shall be discernable, measurable, itemized, and specified as to dollar amount, and shall accurately reflect the value of the betterment, depreciation, or salvage. Any adjustments for betterment or depreciation shall reflect a measurable difference in market value attributable to the condition and age of the property and apply only to property normally subject to repair and replacement during the useful life of the property. …
>
> (1) Under a policy, subject to California Insurance Code Section

13

> 2071, where the insurer is required to pay the expense of repairing, rebuilding or replacing the property destroyed or damaged with other of like kind and quality, the measure of recovery is determined by the actual cash value of the damaged or destroyed property, as set forth in California Insurance Code Section 2051. *Except for the intrinsic labor costs that are included in the cost of manufactured materials or goods, the expense of labor necessary to repair, rebuild or replace covered property is not a component of physical depreciation and shall not be subject to depreciation or betterment.*

10 Cal. Code Regs. § 2695.9(f)–(f)(1) (emphasis added).

State Farm reads this legislative history to "show that the phrase 'physical depreciation' in Section 2051 was intended to communicate that 'depreciation of labor is not a component of physical depreciation.'" State Farm MSJ Mot. at 14 (citing RJN, Ex. 2, at SFG 000291–92, 280, 295–96; Ex. 1, at SFG 000240–41, 243, 258; Ex. 3, at SFG 000305, 312–13). In its view, "[t]hat the Insurance Commissioner explicitly excepted intrinsic labor costs included in the RC of an item reflects that the Insurance Commissioner never intended to require insurers to parse out the components that make up the RC of an item in estimating ACV for contents losses." *Id.* at 15. Instead, insurers only need to "consider the RC of a physical item separately from the labor involved in repairing building structural losses, and apply depreciation only to the RC of physical items, not the labor involved in installing those items in the repaired or rebuilt building." *Id.*

State Farm further contends that the legislative history of Section 2051 "reflects an understanding and intent that depreciation would apply to *items* of physical property, *not* the cost components of those physical property items." *Id.* (emphasis in original). It believes that the statute reflects such an intent by "providing that physical depreciation deductions apply 'only to *components* of a structure that are normally subject to repair and replacement.'" *Id.* at 15–16 (quoting Cal. Ins. Code § 2051 (emphasis added)). Nothing in the legislative history "reflects an intent that insurers parse out the various cost components that make up the RC of a physical property item, and apply depreciation to certain cost components and not others." *Id.* at 16. Because of this, State Farm concludes that *Johnson*'s "tangible versus intangible" or "separate versus independent' dichotomy is inapposite. *Id.*[3]

---

[3] State Farm also cites numerous cases outside of California that "decided how to consider sales tax in an RC less depreciation ACV methodology." State Farm MSJ Mot. at 17; *see Gee v. State*

State Farm's interpretation is strained. True, the legislative history does not discuss sales tax, and nothing in the record instructs insurers to separate sales tax from other RC components when calculating ACV. State Farm also correctly points to places in the legislative history that suggest the phrase "physical depreciation" was intended solely to prohibit depreciation of labor costs associated with repairing structures. The legislative history similarly shows concern with depreciation of labor costs. But it does not follow that *every* non-property component of RC is depreciable. Instead, the legislative history repeatedly emphasizes that "only the physical property can be depreciated." RJN, Ex. 2 at 000291–92. And while the legislative history arose from disputes over labor depreciation, the rationale repeatedly articulated by the Commissioner was broader: depreciation is limited to changes in the value of "physical property." As explained above, sales tax, like labor, does not reasonably fall within the definition of "physical depreciation." The legislative history therefore confirms that sales tax is not subject to "physical depreciation" when calculating ACV. I GRANT summary judgment in favor of plaintiffs' interpretation, which entitles them to declaratory relief.

## B.    Injury and Damages—Breach of Contract

The other battleground for these motions is the extent to which plaintiffs have established their injury and damages resulting from State Farm's depreciation of sales tax, which are squarely presented in consideration of plaintiffs' second cause of action for breach of contract. State Farm attacks the opinions of plaintiffs' experts and contends that they have not shown that the certified class has standing to proceed, let alone proved that they are entitled to summary judgment on any claim. I find that the class has standing at this stage but disputes of material fact preclude

*Farm Fire & Cas. Co.*, No. 11-cv-250, 2013 WL 8284483 (N.D. Ill. Sept. 23, 2023); *Papurello v. State Farm Fire & Cas. Co.*, 144 F. Supp. 3d 746 (W.D. Pa. 2015); *Tolar v. Allstate Tex. Lloyd's Co.*, 772 F. Supp. 2d 825 (N.D. Tex. 2011); *Mills v. Foremost Ins. Co.*, 511 F.3d 1300 (11th Cir. 2008). I previously addressed these cases in *Johnson*, finding them unpersuasive considering that each case involved different state statutes. 2017 WL 2224828, at *8. State Farm now argues that these state laws all rely on the same principle as California of "placing the property owner in a financial position equivalent to that he would have occupied had his loss not occurred." State Farm MSJ Mot. at 18 (citing *Johnson*, 2017 WL 2224828, at *8 (discussing *Gee*)). As stated earlier, cases directly interpreting Section 2051(b) have come out the other way. *See Johnson*, 2017 WL 2224828, at *8; *Maison D'Artiste*, 2020 WL 4037219, at *3; *Garnes*, 11 Cal. App. 5th at 1308–09.

summary judgment on plaintiffs' breach of contract cause of action.

Because "justiciability is a threshold issue to be addressed before reaching the merits of a case," I address the jurisdictional arguments first. *Hanson v. Wyatt*, 552 F.3d 1148, 1169 n.5 (10th Cir. 2008) (Gorsuch, J., concurring) (referencing the Supreme Court's holding in *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). A party has standing under Article III of the United States Constitution if (1) it has suffered an injury-in-fact or face an imminent injury; (2) its injury is fairly traceable to the defendant's conduct; and (3) a favorable decision would likely redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury-in-fact must be concrete, particularized, and imminent. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). An injury is concrete when it has a "close relationship" to a harm "traditionally" recognized as providing a basis for suit. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021). An injury is particularized if it affects the plaintiff in a "personal and individual way." *Spokeo*, 578 U.S. at 339 (internal citation omitted). And an injury is actual or imminent if it has already occurred or there is a substantial risk that it will occur. *See Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983). Plaintiffs must make a separate showing for each form of relief requested. *Id.* at 111.

State Farm contends that plaintiffs have not established standing as applied to each of the 41,153 class members they claim are in the class. Pitkin MSJ Oppo. at 6–9. Because there are facts in dispute concerning whether plaintiffs can meet their burden of proof to show that the entire class has suffered damage, and because damages are an element for the breach of contract cause of action and to the UCL claim, summary judgment is unavailable on any issue other than the interpretation of Section 2051(b).

### 1.      Burden of Proof

Plaintiffs assert that "[w]here, as here, the material facts are undisputed, and the dispute is legal – (scope of permissible depreciation under California Insurance Code § 2051(b)) – Rule 56 is the appropriate vehicle to resolve liability on a class-wide basis." Pitkin MSJ Mot. at 6 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52 (1986)). "When the movant meets this burden," plaintiffs contend, "the party opposing summary judgment must then present affirmative evidence from which a jury could

United States District Court
Northern District of California

return a verdict in that party's favor." *Id.* (citing *Gomez v. New Championship Promotions, LLC*, No. 23-cv-06608-WHO, 2026 WL 673788, at *3 (N.D. Cal. Mar. 10, 2026) (Orrick, J.)). State Farm believes that plaintiffs have misstated their burden. It argues that as the "party moving for summary judgment and bearing the burden of proof at trial, Plaintiffs bear the initial evidentiary burden here." Pitkin MSJ Oppo. at 4; Fed. R. Civ. P. 56(c). In its view, "[u]nder controlling authority, Plaintiffs must offer admissible evidence demonstrating the *absence* of any genuine factual dispute as to *every* element of their damages claims and standing for *each class member*." *Id.* (emphasis in original).

State Farm relies on *Healy v. Millman, Inc.*, 164 F.4th 701 (9th Cir. 2026). In *Healy*, a Ninth Circuit panel determined that "following class certification, both named and unnamed class members in a money damages suit must present evidence of standing at summary judgment." *Id.* at 703. It reasoned that *TransUnion v. Ramirez*, 594 U.S. 413 (2021), requires unnamed class members to "demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* at 708 (quoting 594 U.S. at 431). At the same time, however, *Healy* recognized that "unnamed class members 'need not establish that they in fact have standing'" at summary judgment. *Id.* (quoting *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002). Instead, they must demonstrate "that there is a genuine question of material fact as to the standing elements." *Id.*

State Farm invokes *Healy* to claim that "Plaintiffs and the class bear the burden of producing enough evidence to 'establish beyond controversy every essential element' of each of their claims," including an "*absence* of a genuine factual question as to standing, liability and damages *as to each member of the class*." Pitkin MSJ Oppo. at 5 (citing Fed. R. Civ. P. 56(c) (emphasis in original); *Healy*, 164 F.4th at 710; *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1191 (9th Cir. 2024); *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 474, 479 (9th Cir. 2023). "Only if Plaintiffs meet that evidentiary burden may the burden shift to State Farm," it concludes. *Id.*

In response, plaintiffs assert that *Healy* "did not abrogate all previous decisional case law on summary judgment," and instead "held that: (1) unnamed class members must 'demonstrate

17

evidence of standing' for summary judgment on a damages claim . . . and (2) such evidence need only demonstrate a genuine question of material fact as to standing." Pitkin MSJ Repl. at 3–4 (citing 164 F.4th at 709). Moreover, plaintiffs highlight that *Healy* "specifically incorporates the traditional summary judgment standard in framing its holding," *id.* at 4, and that plaintiffs must only "demonstrate that there is a genuine question of material fact as to the standing elements," *Healy*, 174 F.4th at 708.

As the moving party seeking judgment on liability, plaintiffs bear the initial evidentiary burden and cannot simply rely on the *absence* of evidence. To prevail on their own motion for summary judgment, therefore, plaintiffs must come forward with evidence sufficient to establish standing under Rule 56. *Healy*, 174 F.4th at 709 (internal quotations and citation omitted). But to survive a standing *challenge* at summary judgment, plaintiffs need only present evidence that creates a "genuine question of material fact as to the standing elements." Pitkin MSJ Oppo. at 5; *Healy*, 174 F.4th at 709 (internal quotations and citation omitted). I address the parties' burdens in detail below.

### 2.    Standing, Liability, and Damages

Plaintiffs identify Regan's supplemental report and damages model, which rely on information in the Combined *Pitkin* Dataset that State Farm produced after class certification, as evidence that each class member has suffered economic loss as a result of State Farm's depreciation methodology. State Farm disputes the reliability of the Combined *Pitkin* Dataset and highlights that numerous plaintiffs *currently alleged to be in* the class have claims that have settled outside policy limits or were not paid based on ACV estimates. These disputes make summary judgment untenable.

Plaintiffs' standing is based on the work of their experts, including Regan, who identified 41,153 insureds that now comprise the class in this case. *See id.* Despite acknowledging that "those 41,153 claims are merely '*potential* class members,'" *see* Proposal for Class Dissemination Notice [Dkt. No. 119] at 3, plaintiffs "move for summary judgment on behalf of *all* 41,153 *potential* class members on both liability and damages," Pitkin MSJ Oppo. at 7 (emphasis in original).

Plaintiffs argue that they have "clearly established economic injury on behalf of the class." Pitkin MSJ Repl. at 5. They contend that Regan's Supplemental Report "demonstrate[s] that . . . class members were systematically underpaid on their claims." *Id.* They rely on Regan's Schedule of Damages, which "calculates damages for each class member," as evidence that they have shown enough to shift the burden of proof to State Farm. *Id.* at 5–6 (citing Declaration of Tyson Redenbarger in Support of Plaintiffs' MSJ ("Redenbarger Decl.") [Dkt. No. 167-1] Ex. 10). They assert that "State Farm insists that the data it provided in the Combined Pitkin Dataset and utilized in claim calculations and payments in the course of its business is not useful in calculating damages" despite "inconsistently [relying] on the same information to show 'anecdotal' instances that purportedly challenge Mr. Regan." *Id.* at 6. While State Farm "makes theoretical arguments about the eligibility of certain claimants or provides 'anecdotal' examples of limitations on certain class members' damages . . . it critically does not dispute that certain class members were harmed or that damages can be determined." *Id.* at 6–7.[4]

State Farm argues that proving both a breach of contract claim and liability requires evidence of economic injury, something plaintiffs have not definitively proven through the Combined *Pitkin* Dataset. Pitkin MSJ Oppo. at 6 (citing *Dinerstein v. Google, LLC*, 73 F.4th 502, 519–20 (7th Cir. 2023) (contract standing); *Small*, 122 F.4th at 1191 ("And for breach of contract, there must be damages *caused by* the breach.") (emphasis in original)). The Combined *Pitkin* Dataset "contain[s] data related to more than 70,000 claims with XactContents® ACV estimates generated at some point in the life of the claim." *Id.* at 7. Because "merely creating an XactContents® ACV estimate claim does *not* mean State Farm settled that claim based on the estimate or on ACV at all," the "existence of an ACV estimate does *not* establish injury or damage as a result of State Farm's approach to estimating ACV," State Farm concludes. *Id.* at 8.

State Farm further claims that Regan's use and analysis of the Combined *Pitkin* Dataset is problematic for several reasons. First, "the top five damages claims identified by Mr. Regan"

---

[4] Plaintiffs argue in the alternative that "if State Farm has created a material issue of fact as to the claims from 'Group 3,' the Court should view State Farm's failure to rebut the class-wide damages as to Group 1 and Group 2 as a concession, and enter summary judgment as to liability and damages for [those] class members." Pitkin MSJ Repl. at 7.

United States District Court
Northern District of California

United States District Court
Northern District of California

suffered no damage from the sales tax depreciation. *Id.* at 8. Although Regan maintains that these claims suffered economic injury, "State Farm's evidence demonstrates that three of those claims settled at applicable limits and the other two had only advance payments under California Insurance Code section 10103.7." *Id.* (citing Declaration of Donna Blazewich in Support of State Farm's Opposition to Plaintiffs' MSJ ("Blazewich Decl.") [Dkt. No. 164] ¶ 7). In other words, although "State Farm *generated* an ACV estimate for each of those claims, it did not *fulfill* any of them based on ACV during the class period." *Id.* (emphasis in original). Accordingly, State Farm maintains "none were injured, had damage, or have standing even under Plaintiffs' liability theory." *Id.*

State Farm also claims that two of its affirmative defenses defeat plaintiffs' motion. First, it points out that "all homeowners' and businessowners' policy forms during the class period[] include a suit limitations provision which requires claimants to file suit for policy benefits within one or two years of a loss." *Id.* at 21; *see* Blazewich Decl. ¶ 37; Moore Decl. ¶ 3; Sharp Decl. ¶ 4. Because its "expert evidence supports more than half of the class claims (or 56%) implicate the suit limitations defense," State Farm concludes that it has "met its burden of showing at least a triable issue on whether a suit limitations defense bars liability on most class claims." *Id.*

Second, State Farm asserts settlement and release as an affirmative defense. *Id.* at 21–22; *see In re Cellular 101, Inc.*, 539 F.3d 1150, 1155 (9th Cir. 2008); *Ladd v. Warner Bros Ent., Inc.*, 184 Cal. App. 4th 1298, 1309 (2010). State Farm points out that "some class members have already settled and released their claims against State Farm," including "releases that Plaintiffs' own counsel signed." *Id.* (citing Blazewich Decl. ¶ 39). Given its concerns about the reliability of the Combined Pitkin Dataset, State Farm also maintains that "settlement cannot be determined based on [the Dataset] alone, because fields that might suggest pending litigation are not reliable." *Id.* at 22 (citing Thorpe Decl. ¶ 5).

Plaintiffs do not respond substantively to State Farm's arguments. Instead, they note that State Farm bears the burden to prove its affirmative defenses, and that it "offers nothing more than a statistical *estimate* derived from its own self-serving 'expert' and a handful of 'anecdotal' closing letters." Pitkin MSJ Repl. at 11 (emphasis in original). "At most," plaintiffs argue, "this

20

suggests a potential defense that may implicate the claims process, or reduce the scope of damages for some class members at the remedies phase; but it does not create a genuine dispute of material fact on the threshold question of whether State Farm's practice of depreciating sales tax violates Section 2051(b) or whether the class was damaged." *Id.* (emphasis in original). Moreover, because the defense is "irrelevant to the liability question before the Court," as the application of Section 2051(b) is "common to every class member," plaintiffs argue the existence of this affirmative defense "does not negate the fact that the underlying conduct is unlawful." *Id.*

The class definition requires that class members were paid benefits in an amount less than the applicable policy limits. Regan's reports and damages schedules present substantial evidence that many, if not all, of the 41,153 insureds he has identified as the class appear to have suffered underpayments resulting from State Farm's depreciation methodology. But who among them has actually suffered economic damage is hotly in dispute, and plaintiffs have not shown yet how they will meet all of State Farm's challenges to Regan's methodology or the affirmative defenses, discussed further below. The question remains whether plaintiffs can establish as a matter of law who in the certified class has suffered economic injury attributable to the challenged conduct. State Farm points to claims included within plaintiffs' damages model that allegedly settled at policy limits or were not paid based on ACV estimates. If proven, these insureds that plaintiffs are calling class members would not have suffered an economic loss resulting from the depreciation methodology challenged in this case.

The evidence presented by the parties suggests that there is, at a minimum, a question of material fact regarding the standing of the unnamed class members. Under the logic of *Healy*, this would be sufficient to establish standing at summary judgment but not liability and damages. To prevail on a breach of contract claim under California law, plaintiffs must allege "(1) the [existence of a] contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Reichert v. Gen. Ins. Co. of Am.*, 68 Cal.2d 822, 830 (1968). To obtain judgment as a matter of law, plaintiffs must show that there is no genuine dispute of material fact for their claim. Although plaintiffs' interpretation of Section 2051(b) is correct, who has suffered *damages* as a *result* of the breach is a question in dispute.

The record is insufficient to resolve this question at this stage.  Because a material disputed fact persists concerning damages for the certified class discussed above, plaintiffs' motion for summary judgment for breach of contract is DENIED.

### C.      Implied Covenant of Good Faith and Fair Dealing

Both parties move for summary judgment on plaintiffs' implied covenant of good faith and fair dealing claim.  "Under California law, a breach of the implied covenant of good faith and fair dealing in the insurance context has two elements: '(1) benefits due under the policy must have been withheld and (2) the reason for withholding benefits must have been unreasonable or without proper cause.'"  *Kunde Enters., Inc. v. Nat'l Sur. Corp.*, 608 F. Supp. 3d 883, 900 (N.D. Cal. 2022) (White, J.) (quoting *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151 (1990)).

The parties focus on the application of the second element.  Plaintiffs argue that "[n]o reasonable insurer could conclude, either now or even in 2019, that California law permits depreciating sales tax in ACV payments for open policies."  State Farm MSJ Oppo. at 11.  State Farm counters by arguing that "the statutory interpretation question amounted to a 'genuine dispute' barring extracontractual liability."  State Farm MSJ Mot. at 19.

"[A] mere difference or a mere mistake in judgment is not bad faith.  People disagree all the time. A mistake, a difference of opinion, a different judgment that an individual might have, that isn't bad faith; there has to be something more. The conduct has to be so unreasonable, so without reason, that it is bad faith."  *Notrica v. State Comp. Ins. Fund*, 70 Cal. App. 4th 911, 931 n.12 (1999).  While plaintiffs cite three cases that support their interpretation of Section 2051(b), at least one state court has agreed with State Farm.  *See Ramyead v. State Farm Gen. Ins. Co.*, No. 20STCV06274, (Cal. Super. Ct. filed Feb. 19, 2020); *cf. Johnson*, 2017 WL 2224828; *Maison D'Artiste*, 2020 WL 4037219.  Given that there is no controlling authority on the issue, State Farm did not act in bad faith by adopting an interpretation of Section 2051(b) that I hold is incorrect.  Accordingly, State Farm's motion for summary judgment on the implied covenant claim is GRANTED and plaintiffs' motion is DENIED.

### D.      Unfair Competition Law

Plaintiffs also move for summary judgment on their California Unfair Competition Law

22

("UCL") claim.  The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.  "Each prong of the UCL is a separate and distinct theory of liability" and must be analyzed independently.  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009).  Plaintiffs allege violations of the unlawful and unfair prongs.

### 1.     Unlawful

The "unlawful" prong of the UCL "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (cleaned up).  Here, because depreciating sales tax violates Section 2051(b), State Farm's practice of depreciating sales tax is "unlawful" under the UCL.  *See* Cal. Bus. & Prof. Code § 17200.[5]

### 2.     Unfair

The "unfair" prong of the UCL creates a cause of action for a "business practice that is unfair even if not proscribed by some other law." *In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d 1197, 1225 (N.D. Cal. 2014) (Koh, J.) (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003)).  This prong is "intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive." *Cel-Tech Commc'ns, Inc.*, 20 Cal. 4th at 181 (internal quotations omitted).  As a result, courts have applied two tests to analyze "unfair" UCL claims: (1) a balancing test, and (2) a tether test.  *Prince-Weithorn v. GMAC Mortg., LLC*, No. CV 11-00816 SJO (PLAx), 2011 WL 11651984, at *7 (C.D. Cal. May 5, 2011).[6]  These tests are not mutually exclusive, and plaintiffs assert that their claim satisfies both.  *Epic Games, Inc. v. Apple, Inc.*, 67

---

[5] Plaintiffs also argue that the Fair Claims Settlement Practices Regulations, Cal. Code Regs. tit. 10, § 2695.9(f), provides an independent basis for finding an "unlawful" violation of the UCL. Pitkin MSJ Mot. at 11.  In their view, under this statute, "deductions must reflect physical depreciation and apply only to property 'normally subject to repair or replacement,' with Section 2051 governing ACV. Depreciating non-physical costs, such as sales tax, contravenes these standards." *Id.*  Because I find the violation of Section 2051(b) sufficient to sustain the unlawful UCL claim, I decline to address this argument.

[6] Courts also apply a third "FTC test" to the UCL, looking at Section 5 of the Federal Trade Commission Act as "guidance." *See Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007).  The Ninth Circuit has rejected applying the FTC test to consumer cases. *See id.*

23

F.4th 946, 1000 (9th Cir. 2023).

Under the "balancing" test, courts consider whether the challenged business practice is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010). Plaintiffs maintain that their claim satisfies the balancing test because "State Farm's practice causes substantial injury (systematic underpayment of the sales-tax portion of ACV), offers no countervailing 'balancing' benefits to consumers or competitors, and is not reasonably avoidable (depreciation of sales tax is embedded in State Farm's calculations and the process is opaque to insureds)." Pitkin MSJ Mot. at 12. I agree. As discussed above, State Farm mandates that sales tax be depreciated in making ACV calculations. *See* State Farm Operation Guide 75-05 ("Sales tax, where applicable, *should be included* as part of the replacement cost calculation."). This presents a "substantial injury" for claimants, who are then unable to recover the value of the contents to which they are legally entitled. Plaintiffs are entitled to summary judgment under the balancing test.

Plaintiffs also prevail under the "tethering" test. That prong requires plaintiffs to show that State Farm's conduct is "comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d at 1226 (cleaned up). Because State Farm's practice of depreciating sales tax when calculating ACV conflicts with the text of Section 2051(b), it is a "violation of the law." *See id.*

### 3.    UCL Remedies

Finding that the conduct is both unlawful and unfair, plaintiffs maintain that "appropriate equitable relief" for a UCL violation in this case would "include[] an injunction (prohibiting depreciation of sales tax in ACV payments) and restitution[7] (restoring unlawfully withheld sales-tax amounts)." Pitkin MSJ Mot. at 12 (citing *Korea Supply Co.*, 29 Cal. 4th at 1144–45 (2003) (UCL remedies are equitable); *Johnson*, 2017 WL 2224828, at *10–11 (injunctive-relief standing

---

[7] Plaintiffs' restitution claims rely on the damages calculations produced by Mr. Regan, which are discussed at length below. Pitkin MSJ Mot. at 12; *see* Section II.A.1, *supra*.

in analogous context)).  State Farm claims this relief is inappropriate.  I find that plaintiffs will not be entitled to restitution, but they will be able to obtain injunctive relief if they establish injury and damage as discussed above.

"In order to entertain a request for equitable relief, a district court must have equitable jurisdiction, which can only exist under federal common law if the plaintiff has no adequate legal remedy."  *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1313–14 (9th Cir. 2022); *see Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).  "[I]f the plaintiff cannot show a lack of adequate remedies at law, the court lacks equitable jurisdiction over the UCL claim."  *Guthrie v. Transam. Life Ins. Co.*, 561 F. Supp. 3d 869, 875 (N.D. Cal. 2021) (Orrick, J.).  Numerous courts have concluded that insureds asserting underpayment on an insurance claim "have an adequate legal remedy, specifically, an award of damages available under their contract claims."  *Cook v. State Farm Gen. Ins. Co.*, No. 21-cv-02458-MMC, 2022 WL 16839495, at *2 (N.D. Cal. Nov. 9, 2022) (Chesney, J.); *PDF Print Commc'ns, Inc. v. Federated Mut. Ins. Co.*, No. CV 21-9896-MWF (AGRx), 2022 WL 2189631, at *4 (C.D. Cal. Mar. 29, 2022); *Benn*, 569 F. Supp. 3d at 1032–35; *see also Jarvis v. State Farm Gen. Ins. Co.*, No. EDCV24-1141 JGB (SPx), 2024 WL 4003319, at *6 (C.D. Cal. July 26, 2024) ("Plaintiffs fail to allege any irreparable injury which cannot be remedied through money damages; they allege only the potential harm of future breaches of contract. That is insufficient."); *Momtazee v. Fed. Ins. Co.*, No. 2:25-cv-03899-JLS-AJR, 2026 WL 127915, at *4–5 (C.D. Cal. Jan. 5, 2026) (dismissing insured's UCL claim finding, inter alia, existence of an adequate remedy at law, namely money damages "for any ongoing breach of contract and associated bad faith practices"); *Park v. AXA Equitable Life Ins. Co.*, No. 8:22-cv-00761-SPG-DFM, 2023 WL 1931373 (C.D. Cal. Jan. 11, 2023) (granting summary judgment on UCL claim), *aff'd*, 2026 WL 701090 (9th Cir. Mar. 12, 2026).

"The essential conditions of a claim for restitution under § 17200 are that (1) the defendant obtained something to which it was not entitled and (2) the plaintiff gave up something which he or she was entitled to keep."  *Boobuli's v. State Farm Gen. Ins. Co.*, 712 F. Supp. 3d 1300, 1315 (N.D. Cal. 2024) (Orrick, J.) (citation omitted).  Plaintiffs' complaint seeks "restitution based on wrongfully withheld policy benefits and/or Plaintiffs' and Class Members' overpayment of policy

25

premiums." Compl. ¶ 80. But since granting class certification, plaintiffs have not identified facts supporting a claim for restitution. Moreover, as State Farm points out, claims for policy benefits fall under the category of compensatory damages, not restitution. *M&F Fishing, Inc. v. Sea-Pac Ins. Mgrs., Inc.*, 202 Cal. App. 4th 1509, 1527 (2012). To potentially recover both damages and restitution in this case would be an impermissible second "bite at the apple."

But plaintiffs will be entitled to injunctive relief to prevent the ongoing "systematic underpayments of ACV benefits" by State Farm. State Farm MSJ Oppo. at 14–15. Plaintiffs seek "multiple orders to prevent future harms, including":

> (1) enjoining Defendant from enforcing any terms on the face of a California property insurance policy that purport to allow Defendant to depreciate sales tax in calculating ACV benefits payments, or that otherwise purport to allow Defendant to pay ACV benefits that are less favorable to the insured than what is required under § 2051;
> (2) enjoining Defendant from omitting sales tax on goods and services that the insured would reasonably need to purchase to repair, rebuild, or replace the thing lost or injured from Defendant's calculation of "the amount it would cost the insured to repair, rebuild, or replace the thing lost or injured" under § 2051(b); [and] (3) enjoining Defendant from depreciating sales tax on such goods and services in calculating ACV benefits payable to the insured[.]

Am. Complaint [Dkt. No. 41] Prayer C. They point out the "numerous ways in which both Plaintiffs and Class Members remain realistically threatened with future harm given State Farm's policy and practice of depreciating sales tax in ACV calculation." State Farm MSJ Oppo. at 15. These include:

> (1) some class claims remain open, and additional ACV payments remain possible, from which State Farm could depreciate sales tax in ACV calculation; ECF 41 ¶ 40; and
> (2) Plaintiffs and other Class Members remain insured by State Farm, *id.* ¶ 39; enabling State Farm to potentially and wrongfully depreciate sales tax on any future unfiled claims. *Id.* ¶ 41.

As long as State Farm intends to persist in depreciating sales tax in ACV payments, plaintiffs will be entitled to injunctive relief if they establish injury and damages. I will address this issue further after trial.

### E.    Punitive Damages

Plaintiffs finally seek punitive damages. "Punitive damages are not available under California law for mere breaches of contract, no matter how gross or willful." *Consol. Data*

*Terminals v. Applied Digital Data Sys., Inc.*, 708 F.2d 385, 399 (9th Cir. 1983). To establish punitive damages, plaintiffs must meet a showing that is higher than bad faith. *See Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 909–10 (2000) ("[T]he evidence required to support an award of punitive damages for breach of the implied covenant of good faith and fair dealing is 'of a different dimension' from that needed to support a finding of bad faith.") (quoting *Tomaselli v. Transam. Ins. Co.*, 25 Cal. App. 4th 1269, 1286 (1994)). As explained in Section I.C., *supra*, plaintiffs have not established and cannot establish that State Farm acted in bad faith by depreciating sales tax when calculating the ACV under Section 2051(b). Accordingly, State Farm is entitled to summary judgment on this issue and plaintiffs' prayer for punitive damages is struck.

## II.    Motions to Exclude

### A.    State Farm's Motions

#### 1.    Greg Regan

State Farm moves to exclude the opinions of accountant Greg Regan ("Regan"), plaintiffs' primary expert. Regan is a partner in the Forensic Consulting Services Group of Hemming Morse, LLC, and is a licensed CPA in California. Declaration of Nabilah A. Hossain in Support of Motion to Certify Class [Dkt. 62] Ex. 1 (Expert Class Certification Report of Greg J. Regan ("Regan Rep.")) ¶ 7. He has provided trial and/or deposition testimony in at least nine cases in federal and state court. Regan Rep. App'x A at p. 3; *id.* ¶ 9 (stating that Regan has been retained "to perform these types of damages analyses in matters involving large companies such as Amazon, Avaya, ASML, Beyond Meat, Cisco, Fitbit, Google, Intuit, and PNC Bank," and "as an expert by numerous governmental entities such as the Securities and Exchange Commission, the Consumer Financial Protection Bureau . . ., and Attorneys General for numerous states[ ]"). Because Regan is qualified to opine on the issues of damages, and because his testimony will assist a factfinder in determining whether damages can be calculated on a classwide basis in this case, I decline to exclude his opinions under Rule 702.

##### a.    Methodology

In his first report in October 2024, Regan indicated that he was "asked to provide a

methodology to calculate available classwide damages." *Id.* at ¶ 20.  To this end, he posited the following formula:

$$\text{Item-Specific Damage} = \text{Sales Tax} * (\text{Item's Depreciation Age} \div \text{Item's Depreciable Life})$$

*Id.* ¶¶ 5, 20.  Regan clarified that this formula was "based on existing information in State Farm's XactContents database," and that the methodology "may be applied to each item of any potential Class Members' claim and totaled."  *Id.* ¶¶ 20, 22.

In July 2025, I granted class certification.  *See* ECF No. 102.  The next month, State Farm produced an Excel file known as the "Combined *Pitkin* Dataset."  Declaration of Jennifer Hoffman [Dkt. No. 124-1] ¶ 2.  State Farm described the Combined *Pitkin* Dataset's construction as follows:

> To create the Combined Pitkin Dataset for this litigation, third-party Verisk first created a report containing data regarding personal property claims during the class period with an XactContents® actual cash value estimate. (Ex. H, 22:4-16; 23:7- 14). The Verisk report included data from XactContents® displayed on a payment level, meaning a separate row of data for each payment (not property item) entered into the tool and associated with a personal property claim. 4 (Ex. I, 36:12-21; 39:11-40:2). The Verisk report contained more than 170,000 rows and, on average, two rows per claim, reflecting that State Farm commonly made multiple payments on personal property claims. (Ex. D, p. 6). The report did not display estimates or reconcile claim payments by item, or reflect which items in an estimate were paid at actual cash value (at any time). (See Exs. A & C, 249:7-251:1). The Verisk report included about 25 columns of data, including estimated values labeled "RC Total," "ACV," and "Sales Tax Depreciation."  (ECF 76-4, ¶¶ 11-14; Ex. H, 22:4-16; Ex. A). All of those values related to total values generated in connection with a claim (i.e. they were on a claim level, not an item level). Those values were also "static," meaning they did not change based on payments actually made on claims (and manually entered into the tool) as claims evolved. (Ex. I, 39:4-50:15; 42:3-13; Ex. C, 303:7-304:2).
>
> To complete the Combined Pitkin Dataset, State Farm then added about 25 more columns of data from its own claims database known as ECS to the same rows in the Verisk report. (Ex. H, 22:4-16; 23:7-14; Ex. A). The State Farm/ECS portion of the Combined Pitkin Dataset did not include estimate or depreciation information (because ECS does not generate that type of information). (ECF 76-4, ¶¶ 8-9, 20). Rather, claim payment data in the State Farm/ECS portion of the dataset was limited to payment amount, date, and coverage type. (Id., ¶ 6; Ex. H, 32:18-33:8; 53:24-54:10; Ex. A). Unlike XactContents® payment data, which is manually entered (and subject to human error), ECS payment data is automatically generated when a payment issues. (ECF 76-4, ¶¶, 4-15). For that and other reasons, ECS, not

28

United States District Court
Northern District of California

XactContents®, serves as the claim record. (Id.). Regan Exclude Mot. at 6–7.

Regan submitted a supplemental report on September 25, 2025. *See* Index and Compendium of Exhibits in Support of State Farm's Motions to Exclude ("Exclude Comp.") [Dkt. No. 127] Ex. B (Regan Supplemental Report ("Regan Supp.")). The supplemental report first excluded "claims with any of the following attributes":

| No. | Exclusion | No. of Claims |
|---|---|---|
| 1 | Claims unrelated to State Farm General Insurance Company. | 1,303 |
| 2 | Claims where sales tax depreciation does not appear to have been deducted. | 2,287 |
| 3 | Claims where all payments were made prior to March 1, 2019. | 15,718 |
| 4 | Claims where there are no limits remaining in ECS. | 3,394 |
| 5 | Claim payments equaled or exceeded replacement cost. | 18,855 |
| 6 | Claims without ECS payment data. | 1,621 |
| 7 | Claims where payments commenced after July 15, 2025. | 179 |
| | Unique Claims Excluded. | 32,534 |

*Id.* ¶ 9. Regan then categorized the remaining claims into three groups "to reflect circumstances associated with the claims in the Combined Pitkin Dataset." *Id.* ¶¶ 5, 10–15. Group 1, containing 31,393 class claims, included those where "ECS and Verisk show the claim was paid on an ACV basis." *Id.* ¶ 5. Group 2, containing 6,692 claims, consisted of claims "consistent with Group 1 but may develop further." *Id.* Finally, Group 3, consisting of 3,068 claims, represented instances where the "ECS data shows the claim was paid at least partially on an ACV basis but [where] the Verisk data is limited." *Id.*

After explaining his categorization, Regan clarified that while his "methodology to calculate damages" was laid out in his initial report, the supplemental report was meant to apply the methodology to the Combined *Pitkin* Dataset. *Id.* ¶ 16. Regan then proposes two alternative "scenarios" for calculating damages. *See id.* Under the first scenario, damages would equal the amount of Sales Tax Depreciation applied to a claim, capped by any RC benefits available under the policy. *Id.* ¶ 18. Under the second scenario, Regan allocates Sales Tax Depreciation proportionally by comparing the claimant's remaining RC benefits to the total recoverable depreciation and then applying that percentage to the amount of Sales Tax Depreciation. *Id.* ¶¶ 20–22.

United States District Court
Northern District of California

When questioned by defendant's counsel at his deposition, Regan acknowledged that he was not sure which "scenario" value would ultimately be utilized by a factfinder. Regan Dep. at 345:3–348:1; 348:11–25; 350:5–14. He recognized that "Sales Tax Depreciation" was a "static number" based on the initial cash value estimate that did not necessarily account for payment activity on a claim. *Id.* at 303:7–304:2. Moreover, his scenarios all relied on the "Sales Tax Depreciation" column in the XactContents® portion of the Combined *Pitkin* Dataset. Regan Rep. ¶¶ 18, 20. Nevertheless, Regan maintained that the two scenarios reflected outcomes a factfinder could find plausible, and that each scenario was independently testable and reliable.

Regan's supplemental report was met with criticism by defendant's experts. State Farm's rebuttal expert, Dr. Duane Steffey, critiqued Regan's methodology for failing to "explain how he would determine whether a loss is covered and whether an insured person is reasonably certain to be paid benefits in an amount that is less than the applicable policy limits," as required by the class definition. Steffey Reb. Rep. at 1, 6. He also noted that while thousands of claims in the dataset were referred to State Farm's investigative unit for potential fraud, Regan nonetheless incorporated them into his methodology. *Id.* at 6. Dr. Steffey also critiqued Regan's damages scenarios, finding the approach "overly simplistic, does not account for relevant claim characteristics, involves unsupported assumptions, and therefore lacks reasonable certainty." *Id.* at 2. He explained:

> [W]e're in a position now where Mr. Regan has developed two different methodologies for estimating damages and applying them to individual claims in the Pitkin database, and sometimes those two methods yield the same result but that happens less than half the time. An in – and these estimates can differ greatly. In my review, I found that they could differ sometimes by a factor of 10 or more … and Mr. Regan isn't offering an opinion about how to resolve those differences when they exist. And so I think that … methodology is not accurate. It's neither reliable nor valid in all cases.

Steffey Dep. at 60:25–61:15. Dr. Steffey also criticized how Regan's scenarios produced different damages calculations, as the first scenario estimated total damages at $27.5 million, and the second scenario at $17 million. Steffey Reb. Rep. at 7–8. Finally, Dr. Steffey took issue with Regan's assumption that the XactContents® data reliably documented what happened in each claim. *Id.* at 10.

Other experts agreed with Dr. Steffey's conclusion that the XactContents® dataset is unreliable. State Farm's claims handling expert, Lola Hogan, noted that Regan incorrectly assumes that "a claim payment necessarily means a covered loss" in the Combined *Pitkin* Dataset. Exclude Comp. Ex. P ("Hogan Reb. Rep.") at 3. Hogan believed that Regan "did not consider that both ACV and replacement cost are essentially estimates" that are "subject to revision during the claim." *Id.* at 7. Plaintiffs' claims handling expert, David Melzer, similarly agreed with Hogan that claims may develop or be settled on a basis other than ACV. Melzer Dep. at 54:17–57:23, 71:25–72:16, 42:20–47:17. When questioned about the Combined *Pitkin* Dataset, Melzer noted:

A: . . . I do have concerns about the integrity of the data.

Q: Which data do you have concerns about?

A: That it is up to date and current on a basis of the settlement of the claims at that current time, and that there was no other settlements or agreements issued to an insured outside of it being updated in XactContents.

Q: What prompted that concern on your part?

A: My personal experience in the field.

*Id.* at 91:13–92:5. Finally, plaintiffs' XactContents® expert, Eugene Peterson, agreed that XactContents® is an estimating tool. Peterson Dep. at 181:21–182:18, 188:16–189:7. He noted that XactContents® "will accumulate whatever data is inputted. It's like garbage in, garbage out. If the adjuster doesn't put it in, then the adjuster doesn't put it in." *Id.* at 186:21–25.

#### b.      Previous Determinations

Plaintiffs urge me to adopt my previous findings at the class certification stage regarding the admissibility of Regan's expert testimony. Regan Exclude Oppo. at 4–6. But the class certification analysis did not consider the Combined *Pitkin* Dataset, which is central to the concerns raised by State Farm. It is therefore necessary to grapple with each experts' ability to establish how (or how not) the Dataset could properly identify class members and damages.

#### c.      Reliability

The crux of State Farm's motion to exclude concerns the reliability of Regan's opinions. Specifically, State Farm claims Regan's opinion hinges on (1) unreliable data, (2) unreliable

31

identification of class members, and (3) incompatible and unreliable damages "scenarios." Regan Exclude Mot. at 15–24. I address each issue below.

### i.    Unreliable Data

State Farm first argues Regan's reliance on the Combined *Pitkin* Dataset lacks the "foundation" necessary to survive a *Daubert* motion. *Id.* at 15–18; *see Engilis v. Monsanto Co.*, 151 F.4th 1040, 1051 (9th Cir. 2025). It maintains that Regan "assumes that the Combined Pitkin *Dataset* reliably reflects all data necessary to determine how personal property items involved in a claim were paid" in this case. *Id.* at 16. But "[e]very other expert in this case disagrees with or at least has doubts regarding the reliability of that data." *Id.* Further, "[n]either Mr. Regan nor any of Plaintiffs' other experts did any testing or validation to confirm how much of the XactContents® data in the Combined *Pitkin* Dataset actually aligned with what happened [in a] particular claim." *Id.* This stands in contrast to State Farm's expert, Dr. Steffey, who "highlighted both material differences among the two data sources (XactContents® and ECS) and differences between the data and the claim file documentation, in his reports and during his deposition." *Id.*

Plaintiffs counter by arguing that State Farm's Claim Team Manager "confirm[ed] that State Farm's claims handling process is not spurious or riddled with errors." Regan Exclude Oppo. at 7. Moreover, "Regan took qualitative and quantitative steps to ensure the Combined Pitkin Dataset's reliability and accuracy," including conducting "validation exercises," "extensive testing," and "adopt[ing] the more conservative input for purposes of measuring damages" when a disagreement in the data arose. *Id.* (citing Regan Dep. at 288:5–14). "He also compared the data to the only claim file State Farm provided: the Pitkin claim file." *Id.* (citing Regan Dep. at 230:23–231:5). Plaintiffs further highlight that Regan "relied on State Farm's 2024 Impact Report, available on their website, to determine that State Farm had 'internal controls that operated effectively' to produce a reliable dataset." *Id.* at 7–8 (citing Regan Dep. at 266:19–267:12). Finally, Regan "relied on [State Farm Team Manager Donna] Blazewich's statements in her deposition asserting the reliability and validity of the XactContents data." *Id.* at 8 (citing Regan Dep. at 374:4–20).

Taken together, plaintiffs assert that Regan validated the Combined *Pitkin* Dataset and

United States District Court
Northern District of California

produced opinions shown in the dataset. *Id.* State Farm's belief that "the potential for 'claim development' makes the underlying data 'unreliable' is also incorrect," according to plaintiffs, as "being 'subject to development' is not an argument about the reliability or accuracy of the underlying data at the time it was produced." *Id.* "Nor does this argument address the reliability of Mr. Regan's methodology or opinions," plaintiffs conclude. *Id.*

State Farm' says that plaintiffs "miss the point" of their argument. Regan Exclude Repl. at 3. "The data is not wrong," it argues; instead, "Regan's *assumptions* regarding the data are wrong and unsupported." *Id.* (emphasis in original). State Farm identifies the "fundamental reliability issues" as four-fold: "(1) that XactContents® *estimates* are just that, and do not align with payments most of the time; (2) that Mr. Regan does not account for sublimits; (3) that Mr. Regan did nothing to validate the estimate-derived data in the Combined *Pitkin* Dataset against independent facts (such as claim file documents), and instead blindly relied on it notwithstanding its acknowledged shortcomings; and (4) that Mr. Regan attempts to compensate for these shortcomings by characterizing the approach as 'conservative' when it is not." *Id.* at 3–4 (emphasis in original).

State Farm's challenge is best understood as an attack on the assumptions underlying Regan's analysis—mainly, that XactContents® is an accurate tool for measuring damages in this case. The question at the Rule 702 stage is whether the expert applies a reliable "reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Rodman*, 564 F. Supp. 3d at 886 (internal quotations omitted). In other words, experts need not be perfect; instead, the party offering the expert must offer "any indicia of reliability sufficient to pass the gatekeeping threshold of *Daubert* and Rule 702." *Blain v. Liberty Mut. Fire Ins. Co.*, No. 22-cv-00970-AJB-MMP, 2025 WL 886966, at *9 (S.D. Cal. Mar. 21, 2025).

Plaintiffs have met their burden. While State Farm maintains that XactContents® estimates and ECS payments frequently diverge, and that Regan cannot explain how his methodology relates to ACV payments, the record does not show Regan engaged in unsupported speculation. Instead, Regan indicates he relied on State Farm's own records, testimony from State

United States District Court
Northern District of California

Farm employees, "validation exercises," "extensive testing," and "adopt[ing] the more conservative input for purposes of measuring damages" when a disagreement in the data arose. *Id.* (citing Regan Dep. at 288:5–14). While State Farm disputes the adequacy of such efforts, disputes regarding the sufficiency of an expert's validation of data goes to weight, not admissibility. *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) ("Disputes as to . . . faults in [an expert's] use of a particular methodology . . . go to the weight, not admissibility, of his testimony.") (internal formatting omitted) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

The same is true of State Farm's concerns regarding sublimits and claim development. State Farm identifies instances where Regan's methodology may overstate damages due to the Combined *Pitkin* Dataset's failure to consider all information relevant to a claim, including where sublimits are applicable. Those concerns may be persuasive to a factfinder. But they do not show that Regan's methodology is unsound. Nor do they show that Regan's opinions rest on nothing more than speculation. I conclude that Regan has established by a preponderance of the evidence that his opinion is reliable and admissible, subject to cross-examination and presentation of contrary expert testimony.

### ii.    Class Identification

In my order certifying plaintiffs' class, I noted that class membership in this case requires that members "(1) 'suffered a covered loss,' (2) received actual cash value benefits 'that were reduced due to depreciation of sales tax,' and (3) 'were paid or are reasonably certain to be paid benefits in an amount that is less than the applicable policy limits.'" Regan Exclude Mot. at 18 (citing Order Certifying Class at 30–31). State Farm now moves to exclude Regan's decision to divide the class members' claims into three groups "to reflect circumstances associated with the claims in the Combined Pitkin Dataset." Regan Supp. Rep. ¶¶ 5, 10–15. In their view, Regan's "three new groupings of purported class members (not reflected in the class definition or his prior opinions) produce unreliable and patently incorrect results." Regan Exclude Mot. at 18. "Because Mr. Regan limits his groupings to data included in the Combined *Pitkin* Dataset, and not the facts of a particular loss," State Farm argues that such groupings "do not address the first threshold and

fact-specific question: whether coverage for a loss or item initially settled on an actual cash value basis exists." *Id.* Instead, State Farm believes that Regan "assume[s] coverage based simply on a claim payment, which not only lacks factual support but is contrary to California law." *Id.* (citing *State Farm Fire & Cas. Co. v. Superior Ct.*, 206 Cal. App. 3d 1428, 1431 (1988); *Costa v. Travelers Commer. Ins. Co.*, No. CR 12-3312 SI, 2012 WL 3670653, at *2 n.2 (N.D. Cal. Aug. 24, 2012) (Illston, J.)).

State Farm also asserts that Regan's three groupings misclassify claims, including those from the named plaintiffs. *Id.* at 18–19. It believes such errors highlight how Regan's approach does not reliably identify class members and ignores crucial policy limit and sublimit information not found in the Combined *Pitkin* Dataset. *See id.* at 20. Finally, it argues that Regan misidentified approximately 20% of his exemplar claims and included claims with insufficient data in the Combined *Pitkin* Dataset, demonstrating that his methodology is unsound and should be excluded. *See id.* at 20–21.

Plaintiffs respond by arguing State Farm's assertions are "nothing more than a distraction from the purpose of this litigation: to recover wrongfully withheld money from claim payments that illegally depreciated sales tax on actual cash value payments." Regan Exclude Oppo. at 9. Regan's class "groupings" were "specifically designed to address the 'reasonable certainty' element of the Court's approved class definition," they maintain. *Id.* Indeed, plaintiffs claim the groupings are "highly objective" and "based upon express rules" expressed in the Regan Report and Supplemental Reports, *id.* at 10 (quoting Regan Dep. at 314:3–7), was "tested rigorously to ensure that 'claims fit within the groups articulated,'" *id.* and that the "'primary' reason for organizing class members into groups [was] to 'provide information to the trier of fact [Mr. Regan] thought was useful[,]" *id.* (quoting Regan Dep. at 274:9–11). They urge me to not employ an "overly technical" reading of the class definition, as they believe State Farm is doing. *Id.* at 9.

State Farm replies by focusing on the "covered loss" element of the class definition, claiming that Regan "assumes coverage for all claims *and* all items claimed across his three class groups, without explaining why." Regan Exclude Repl. at 12. It also invokes plaintiffs' burden at the stage, arguing that it "need only show the *fact* of an unaddressed assumption" to exclude an

35

expert's opinion. *Id.* at 12–13 (emphasis in original) (citing *In re Apple Iphone Antitrust Litig.*, No. 4:11-cv-6714-YGR, 2025 WL 3124160, at *9 & n.10).

Plaintiffs have the stronger argument. As indicated above, Regan "organized [his] damage calculations in [three] groups to reflect the different circumstances of those groups." Regan Supp. Rep. ¶ 10. While each group may present different factual circumstances, Regan "applied the same methodology to calculate damages across all groups." *Id.* State Farm characterizes these groupings as an attempt to redefine the class definition, but the record does not support such a conclusion. Instead, the groupings reflect a methodology that focuses on identifying whether individuals were "reasonably certain to be paid benefits in an amount that is less than the applicable policy limits." Order Certifying Class at 30–31. On this basis, Regan concluded that the three groupings were helpful to reach those conclusions, as well as to explain his results to a factfinder. At this juncture, plaintiffs have sufficiently proven that Regan's groupings to help identify potential class members are, by a preponderance of the evidence, admissible.

### iii.    Damages

State Farm finally challenges Regan's two damages scenarios as unreliable and invalid. Regan Exclude Mot. at 21. It first argues that the fact Regan's damages scenarios "diverge proves both their invalidity and unreliability." *Id.* (citing *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 477–78, 486 (S.D.N.Y. 2018)). State Farm notes that while Regan acknowledges both "scenarios" are meant to calculate the same type of withheld depreciation, the two methodologies "produce drastically different results" on both an individual and collective level. *Id.* (noting that the collective models differ by $10.5 million, or "about 40%"). Since "Regan does not provide any guidance on the merits of each scenario or when one scenario should apply over the other," State Farm concludes that the methodology is unreliable and must be excluded. *Id.* at 22.

Plaintiffs call State Farm's argument "overly simplistic and misleading." Regan Exclude Oppo. at 10. They maintain that Regan's reports "present[] alternate damages scenarios to assist the trier of fact in calculating damages depending on the facts ultimately found by that trier of fact." *Id.* at 11. The "scenarios" highlighted by State Farm are "really two steps within the same

calculation," according to Regan. *Id.* (citing Regan Dep. at 345:12–13). He described the scenarios as "two different approaches to make the calculation of how much sales tax depreciation was deducted from the payment to a policy holder . . ." *Id.*; Regan Dep. at 347:19–25. He also explained in his deposition that both scenarios "follow logical and reasonable methodologies and can be explained to the trier of fact, who will make a judgment." *Id.* at 12; Regan Dep. at 356:17–19. Plaintiffs therefore posit that the "correct 'scenario' merely depends on what a jury concludes is the most equitable way to calculate the damages in this case based on the cause of action a[t] issue." Regan Exclude Oppo. at 12.

As with the three groupings, I agree with plaintiffs that exclusion is not warranted. Regan sufficiently explains in his Report and Supplemental Report the reason for having two damages "scenarios," how he reached those scenarios, and the methodological basis for each. *See, e.g.*, Regan Dep. at 345:12–20 ("[The two scenarios are] really two steps within the same calculation. And the reason that I bifurcated them the way I did was after reading the class certification order. And I thought that the way that the class certification order was framed made it clear to me that it would be useful to the trier of fact to have an articulation of damages that set forth ranges provided by these two scenarios."); *id.* at 347:4–10 ("Differences arise when the minimum of ECS remaining benefits or RC benefits remaining in XactContents are less than the amount of recoverable depreciation, which means that some payments to the policyholder were made on an RC basis. And so, on that reason, there is an apportionment."); *id.* 347:19–348:1 ("[The scenarios are] two different approaches to make the calculation of how much sales tax depreciation was deducted from the payment to a policyholder, and I thought that both calculations would be informative to the trier of fact and the trier of fact would make a determination as to which methodology is most suitable to determine the harm to the policyholder.").

Regan also submitted with his Supplemental Report an appendix illustrating how to calculate damages under both scenarios. Regan Supp. Rep. Appendix C. Both scenarios can accordingly be tested and applied to the Combined *Pitkin* Dataset. Any questions about the credibility of these two scenarios are best resolved through cross-examination, not exclusion.

### d.    Untimely Opinions

37

State Farm argues in the alternative that Regan's opinions in the Supplemental Report should be excluded as untimely and improper new opinions. Regan Exclude Mot. at 24. "A party who fails to disclose expert testimony in compliance with Rule 26 'is not allowed to use that . . . witness to supply evidence . . . unless the failure was substantially justified or is harmless.'" *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1072–73 (9th Cir. 2022) (quoting Fed. R. Civ. P. 37(c)(1)). "The Ninth Circuit has noted that Rule 26(e)(1) is not intended to 'create[] a loophole through which a party who submits partial expert witness disclosures can add to them to its advantage after the court's deadline for doing so has passed.'" *Beatbox Music Pty, Ltd. v. Labrador Ent., Inc.*, No. CV 17-6108-MWF (JPRx), 2023 WL 2922828, at *2 (C.D. Cal. Feb. 16, 2023) (quoting *MRO Commc'ns, Inc. v. Am. Tel. & Tel. Co.*, 205 F.3d 1351 (9th Cir. 1999)).

Regan's Supplemental Report was disclosed two months after the Rule 26 disclosure deadline and less than one month before the rebuttal deadline. Regan Exclude Mot. at 24. Because its own expert, Dr. Steffey, opined that the Supplemental Report "substantially revised Mr. Regan's opinions," State Farm urges that I find his "new" opinions as untimely under Rule 702. *Id.* Plaintiffs respond by pointing out that the parties jointly agreed to extend fact discovery and adjust the pretrial schedule to allow for State Farm to produce the Combined *Pitkin* Dataset. Regan Exclude Oppo. at 12. As a result, Regan produced his Supplemental Report on September 25, 2025—a date agreed upon by the parties in their joint request to adjust the pretrial schedule. *Id.* This timing was reasonable given the timing of the production of the Combined *Pitkin* Dataset.

In sum, I will not exclude Regan's opinions and State Farm's motion is DENIED.

### 2.    David Melzer

#### a.    Methodology

David Melzer is plaintiffs' class identification expert to "support their contention that the members of the class are readily identifiable." Melzer Exclude Mot. at 2; *see* Exclude Comp. Ex. J (Expert Report of David Melzer ("Melzer Rep.")). Melzer indicates that he was "hired to provide opinions on . . . the frequency of personal property claims with State Farm, the

38

United States District Court
Northern District of California

ascertainability of these claims through available databases, and whether the claims of plaintiffs Mrs. Pitkin and Mr. Grout fall within the proposed class." Melzer Rep. ¶ 1.

Melzer has worked in the insurance industry since 2011 in various specialist capacities. Melzer Report ¶¶ 4–10. He worked for Travelers Insurance from 2013 to 2020, where he held positions including adjuster, technical specialist, and claims manager. *Id.* ¶ 4. After that, he started his own public adjusting firm, called Property Claims Consultant, Inc., where he handles first and third-party property claims, including personal property claims. *Id.* ¶ 5. He has held the position of President of Property Claims Consultant, Inc. since he started the firm in November 2020. *Id.* He has "significant experience in processing and analyzing personal property insurance claims" and "experience working with industry-standard software used to process and track personal property claims, including Xactimate or XactContents." *Id.* ¶ 6.

Melzer's proposed methodology to estimate the total number of potential class members is as follows. To estimate the total volume of personal property replacement claims for State Farm in California from 2015 to the present, he analyzed the number of claims in a submarket: San Diego. He chose San Diego as a representative example because claims throughout California would "typically be consistent with personal property claims made in San Diego." Melzer Rep. ¶ 17 n.3. He says that during his time at Travelers in 2018, in the San Diego territory, a team of– eight adjusters would typically handle 20-30 claims per month, amounting to between 1,920 and 2,880 (average of 2,400) claims annually for a population of approximately 3.29 million people. *Id.* Of those claims, 20% were commercial claims, meaning that on average, a team of eight adjusters working in that submarket processed 1,920 personal property replacement claims per year. *Id.*

Using that data, Melzer estimated the total number of insurance claims in San Diego across all insurers by dividing the number of Travelers' claims by its 3.68% market share (a percentage market share that is available on the California Property and Casualty Market Share Report published by the California Department of Insurance). *Id.* ¶ 18. From that number, he divided the number of claims in San Diego by its population, to calculate the number of claims per person in that region. *Id.* ¶ 19 (calculating number of claims per capita in the San Diego

submarket in 2018). He then calculated the total number of claims in California as a state by multiplying the state's population to the per capita calculation, and determined that 625,370 claims are submitted in the state annually. *Id.* ¶ 20. This represented an estimate of the total number of residential insurance claims in California each year, "assuming consistency in population, market share, and claim frequency." *Id.* ¶ 21.

He then consulted the California Property and Casualty Market Share Report (the "Market Report") issued by the California Department of Insurance from 2015-2023 and determined that State Farm consistently has "over 8.5% of the Property and Casualty Insurance Market in California." *Id.* ¶¶ 22–24. Based on that information, given that State Farm "historically holds roughly 8.5% of the California insurance market," Melzer calculated that State Farm's annual claim volume would be 53,156 claims. *Id.* ¶ 22. Of those claims, Melzer explains, it is estimated by the Market Report that approximately 40% involve personal property replacement, yielding 21,262 personal property claims for State Farm annually. *Id.* ¶ 23. From that annual estimate, Melzer determined that from 2015 to 2023, there were at least 191,362 State Farm claims involving personal property in California. *Id.* ¶ 24.

Melzer goes on to explain that based on his familiarity with Xactimate and XactContents®, he believes that "given the detailed data that insurance companies maintain and given the flexibility and power of Xactimate/XactContents, it is [his] opinion that State Farm can create a report, or export the necessary data, that will allow for the identification of all personal property insurance claims where State Farm depreciated the taxes. From that report, Plaintiffs will be able to identify the members of the Class." *Id.* ¶ 31. He explains that this process will be as straightforward as selecting a checkbox: "[i]n fact, Xactimate/XactContents has a feature where a tax on a personal property claim can be depreciated simply by clicking one box." *Id.* ¶ 28.

After I granted class certification, plaintiffs provided Melzer's supplemental report on September 25, 2025. *See* Exclude Comp. Ex. K (Supplemental Report of David Melzer ("Melzer Supp.")). That report indicated that Melzer reviewed the Combined *Pitkin* Dataset and found his "conclusions remain consistent." Melzer Supp. ¶ 4. Specifically, he noted that the dataset "clearly lists all claims impacted by the application of depreciation to sales tax," that the "total number of

United States District Court
Northern District of California

40

impacted claims can be readily derived from the available data," and "[p]rovided that the integrity of the data is reliable, we can determine the precise damages for each individual insured party." *Id.* He also concluded that the Combined *Pitkin* Dataset "reaffirm[ed] [his] initial opinion that a large number of claims are subject to the depreciation sales tax issue, and that the Pitkins' claim is indeed part of this broader class." *Id.* ¶ 5. Melzer identified ECS and XactContents® as "two trusted platforms that host critical claims-related data." *Id.* ¶ 7. Finally, he indicated that the "clarity and consistency of the data make it possible to accurately identify these claims with minimal ambiguity" and "with minimal manual effort." *Id.* ¶¶ 6–7.

On November 3, 2025, State Farm deposed Melzer. *See* Exclude Comp. Ex. L (Deposition of David Melzer) ("Melzer Dep."). There, he indicated that he had not "been tasked to do a thorough review of the data to determine the depreciation of sales tax." Melzer Dep. at 68:19–22. Instead, he "assum[ed] that the integrity of the data was accurate." *Id.* at 78:13–16. He noted that roughly "10 percent or less" of all the claims in the dataset could involve an "event" that would require "additional clarification," which State Farm characterizes as a "claim-by-claim review to determine the threshold question of class membership." *Id.* at 53:3–56:21; Melzer Exclude Mot. at 5.

### b.    Class Member Identification

State Farm maintains that I must exclude any class identification opinion from Melzer, as he "has not purported to identify class members" and instead "conjectures that someone else can." Melzer Exclude Mot. at 8 (citing Melzer Supp. ¶¶ 4, 6–8; Melzer Dep. at 79:14–80:15 (Q: "[B]eyond doing the extrapolation work that appears in your earlier report . . . you haven't done any further work to more specifically identify any class in this case. Is that a fair statement?" A: "That is a fair statement.")). It similarly urges that Melzer's "conjecture that someone else can reliably and feasibly identify specific class members based solely on the Combined *Pitkin* Dataset also lacks sufficient foundation, conflicts with Mr. Melzer's other admissions, and is therefore inadmissible." *Id.* (citing Fed. R. Evid. 702(b)–(d); Melzer Dep. at 78:13–16; *see also Reyes v. Apple, Inc.*, No. 3:22-cv-02900-JSC, 2025 WL 1223550, at *4–8 (N.D. Cal. Apr. 28, 2025) (Corley, J.) (excluding expert opinion where expert did not engage or analyze data). State Farm

41

United States District Court
Northern District of California

United States District Court
Northern District of California

emphasizes that the "assumption in Mr. Melzer's written report" about the reliability of the Combined *Pitkin* Dataset "conflicts with [his] own deposition testimony acknowledging 'concerns' about the reliability of the XactContents® data." *Id.* at 8–9 (citing Melzer Dep. at 91:13–93:2, 78:13–16) (Q: "And do you have any opinions concerning the reliability of the ECS data . . . versus the XactContents data? Did you reach any conclusions about their relative accuracy or reliability?" A: "I did not come to any conclusions, but I do have concerns about the integrity of the data[,] [including whether the data is] up to date and current on a basis of settlement of the claims at that current time, and that there was no other settlements or agreements issued to an insured outside of it being updated in XactContents.").

Moreover, State Farm takes issue with Melzer's opinion that the Combined *Pitkin* Dataset "make[s] it possible to identify [class] claims with minimal ambiguity" and "manual effort," *see* Melzer Rep. at ¶¶ 6–7, without specifying "what 'ambiguity' in claims would require 'manual' review," Melzer Exclude Mot. at 9. It chalks up this failure to Melzer's decision "not [to] do a thorough analysis of the Combined Pitkin data sheet." *Id.* (citing Melzer Dep. at 51:18-52:17; 53:3–54:16; 75:12–16; 76:20–77:1). Despite this lack of analysis, Melzer concludes that about "10 percent or less" of the claims in the Combined *Pitkin* Dataset may involve an "event" requiring "additional clarification." *Id.* at 10 (citing Melzer Dep. at 51:18–52:17; 53:3–13). State Farm also posits that Melzer's estimates "conflict[] with Greg Regan's opinion, which excludes about *half* of the approximately 74,000 claims in the Combined *Pitkin* Dataset from the class," as well as his *own* recognition "of the myriad of ways that a claim may develop, and how that development may impact class membership, injury and damage." Melzer Exclude Mot. at 10. Taken together, State Farm asks: "if 10% of the claims in the Combined *Pitkin* Dataset require manual review to determine whether the claim falls within the class, and you don't know how to identify that 10%, how can you resolve the class membership question as to anyone?" *Id.* at 11. Considering these purported failures, State Farm urges me to exclude Melzer's testimony. *See id.*

Plaintiffs respond by highlighting Melzer's credentials, including that he has "more than a decade of experience regarding the adjustment of insurance claims, including first- and third-party contents claims." Melzer Exclude Oppo. at 9 (citing Melzer Rep. ¶¶ 4–5). Based on this

experience, plaintiffs believe Melzer is "qualified to offer opinions as to the industry standard for adjustment of contents insurance claims." *Id.* And while "State Farm may disagree with Mr. Melzer's opinions . . . that is not a sufficient basis to exclude that testimony under Rule 702." *Id.* at 10 (citing *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022)).

Plaintiffs also contend that Melzer *did*, in fact, "analyze the capabilities of the Combined Pitkin Dataset to ascertain the members of the class." *Id.* They highlight that Melzer provided a "detailed analysis of the capabilities of XactWare products, including XactContents," and concluded:

> Given the detailed data that insurance companies maintain and given the flexibility and power of Xactimate/XactContents, it is my opinion that State Farm can create a report, or export the necessary data, that will allow for the identification of all personal property insurance claims where State Farm depreciated the taxes. From that report, Plaintiffs will be able to identify the members of the Class.

*Id.*; Melzer Rep. ¶ 31. "While State Farm may disagree" with this analysis, plaintiffs conclude, "that is not a basis for the Court to exclude Mr. Melzer's conclusions based on his extensive experience." Melzer Exclude Oppo. at 10. I agree. Melzer's opinions go to weight, not admissibility. While Melzer assumed the validity of the Combined *Pitkin* Dataset, those assumptions affect the persuasiveness of his conclusions, not the admissibility of his methodology. State Farm is entitled to challenge his methodology through cross-examination. Plaintiffs have established that his methodology and opinions are admissible.

### c.     Depreciation Standard Industry Practices

State Farm similarly moves to exclude Melzer's opinions on "sales tax depreciation practices for the insurance industry as a whole." Melzer Exclude Mot. at 13. It believes his opinions "rest on unsupported generalizations and speculative assertions, and constitute an improper attempt to introduce a legal statutory interpretation opinion." *Id.* (citing *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (striking expert reports because "an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law.")). It takes issue with the fact that, apart from his previous employment with Farmers and Travelers, Melzer "has not demonstrated any personal involvement with, or direct knowledge of the current policies and procedures of other insurers." *Id.*; *see* Melzer Dep. at 24:4–

8. It also points out that Melzer "assumes that State Farm is the only insurer in California that applies depreciation to replacement cost . . . in estimating actual cash value," despite this conclusion being "simply wrong." Melzer Exclude Mot. at 13. Because Melzer admitted to having "never seen the internal documents of any insurance company other than Travelers that address how to consider sales tax in estimating actual cash value," State Farm concludes his opinion lacks foundation, is inaccurate, and must be excluded. *Id.* at 13–14.

Plaintiffs respond by highlighting Melzer's "more than a decade of experience regarding the adjustment of insurance claims," including working for Farmers, Travelers, and during his "nearly five years as a public adjuster working with multiple insurers from 2020 to the present." Melzer Exclude Oppo. at 9. Much of that time was spent working with XactWare products, including XactContents®, which plaintiffs believe render him qualified to "offer opinions as to the industry standard for adjustment of contents insurance claims." *Id.* (citing Melzer Rep. at ¶¶ 6–7). While State Farm may disagree with his opinions, plaintiffs contend that that is not a sufficient basis to exclude under Rule 702. *See id.* at 10.

In its reply, State Farm notes that experience is just one part of the Rule 702 admissibility test. Melzer Exclude Repl. at 3. Plaintiffs must show it is more likely than not that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert [has reliably applied] the principles and methods to the facts of the case." Fed. R. Evid. 702. Applying this standard, State Farm argues that plaintiffs have not met their evidentiary burden. Melzer Exclude Repl. at 3; *see Engilis*, 151 F.4th at 1048–49 (Rule 702 requires proponent of expert testimony to meet all four admissibility requirements).

As with his other opinions, I find that it is more likely than not that Melzer meets the four requirements. While a fact finder may conclude that State Farm's sales tax depreciation practices are not what Melzer claims them to be, that does not render his opinion and testimony inadmissible. State Farm can cross-examine him at trial to expose how his opinion or credibility should be questioned by the jury.

44

####        d.        Rule 26 Testimony

State Farm finally urges me to preclude plaintiffs from introducing any previously undisclosed expert opinions under Rule 26.  Melzer Exclude Mot. at 14; *see Unicolors, Inc.*, 52 F.4th at 1072–73.  It points out that I set an October 16, 2025 deadline to disclose rebuttal experts in this case, *see* Dkt. No. 111, and that plaintiffs failed to identify any expert rebuttal witness, *see* Melzer Exclude Mot. at 14.  Because the expert disclosure deadlines have passed, State Farm argues that "any disagreement that [Melzer] may have with [State Farm's] witnesses"—including their claims handling rebuttal expert, Lola Hogan—should be excluded.  *Id.* (citing *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1105–07 (9th Cir. 2001); *Engilis*, 151 F.4th at 1051–52).

Plaintiffs acknowledge that "they, and State Farm, are precluded from offering undisclosed expert opinions."  Melzer Exclude Oppo. at 10.  But they maintain that "Melzer's opinions as to the typicality of insurers *not* depreciating sales tax were explicitly disclosed in his report," thus setting up a dispute with the testimony of Hogan.  *Id.* at 10–11; *see* Melzer Rep. ¶ 5 ("In my tenure working for insurance companies as well as my own public adjusting company, we have never applied depreciation towards taxes."); Melzer Dep. at 81:3–12 ("Q: Is there anything that you can recall about the report that you believe you disagree with, something that Ms. Hogan stated that you believe is an incorrect statement?" "A: I would have to read the report again to see every item, but there was the first item that she had commented stating that in her experience, she had depreciated sales tax when settling first-party contents claims, and I do disagree with that position.").

No party may offer undisclosed expert opinions at trial.  The example in the preceding paragraph was disclosed and would not be excluded.  I will address others if they arise at trial.  I deny State Farm's motion to exclude Melzer's testimony.

####        3.        Eugene Peterson

#####        a.        Methodology

Plaintiffs offer Eugene Peterson ("Peterson") as an expert on State Farm's XactContents® tool.  Peterson was a "consultant to the owner and founder of Xactware/Xactimate® until his

death[,]" and was authorized by the company to teach its software to contractors and adjusters. Hossain Decl. Ex. 2 ("Peterson Rep.") at 2. He states in his report that "[u]sing XactContents® and the State Farm database, it is feasible to efficiently determine where depreciation was taken and calculate and prove what damages, if any, specific insureds or groups of insureds are entitled to." *Id.* at 4. The Xactimate® estimating software is the principal software that 22 of the 25 major insurance companies in the United States use to resolve and settle real property insurance claims, including State Farm, and *XactContents®* is a software tool integrated with Xactimate® for estimating and managing personal property claims. *Id.* at 1. Peterson particularly focuses in his report on valuation of personal items and allows for depreciation calculations. *Id.* He explains that in XactContents®, depreciation can be applied to *any line item, including sales tax. Id.* at 2.

Peterson concludes that "XactContents® software contains global and line-item settings that allow an insurance company to apply depreciation based on one of three methods: 1) percentage, 2) by a fixed dollar amount, and 3) by age with an adjusted condition." *Id.* at 3. He opines, "The software allows complete control over how depreciation is calculated, so each insurance company can set its policies for depreciation without needing to customize the software. From the software's perspective, a user can determine what line items are to be depreciated and what is to be depreciated in each line item, e.g., sales tax." *Id.* at 3–4. In reviewing State Farm's estimates, he noted that sales tax depreciation was taken on *all line items* that were depreciated, and "[u]sing XactContents® and the State Farm database, it is feasible to efficiently determine where depreciation was taken and calculate and prove what damages, if any, specific insureds or groups of insureds are entitled to." *Id.* at 4. This is particularly true because the XactContents® uses a flexible database management system that allows "key searches, comparisons, filters, etc., to extract the sought after data." *Id.* at 3.

After I granted class certification, Peterson submitted a supplemental report that considered the "functionality and use" of the Combined *Pitkin* Dataset. Exclude Comp. Ex. M (Peterson Supp. Report) at 2. Peterson noted that reviewing the Combined *Pitkin* Dataset "confirm[ed] his understanding of the available database information from both State Farm and Verisk," and that

his "opinions . . . in [his] previous reports remain consistent with the documents now reviewed." *Id.* He also indicated that while the "database management is flexible and allows key searches, comparisons, filters, etc., to retrieve the desired data," a "skilled and knowledgeable computer programmer can filter and sort the needed data." *Id.*

### b. Opinions on XactContents® Data Extraction

State Farm "does not dispute Mr. Peterson's ability to testify regarding what the XactContents® tool is and how it may be used." Peterson Exclude Mot. at 1. Instead, it seeks to exclude Peterson's "feasibility opinion—that the Combined *Pitkin* Dataset in this matter can be used by someone else to reliably identify class members or calculate damages." *Id.* State Farm notes that Peterson's supplemental report is "untethered to any actual analysis of the Combined *Pitkin* Dataset," and that it "does not specify the information or data referred to or needed" to analyze the database. *Id.* at 7. In other words, because the Combined *Pitkin* Dataset is "unique to this case, and Mr. Peterson did nothing to analyze whether *this* data could actually be used to reliably and validly identify class members and calculate damages under Plaintiffs' theory," State Farm concludes exclusion is warranted under Rule 702 and *Daubert*. *Id.* at 1–2.

Plaintiffs counter that Peterson's supplemental report confirmed that he "received and reviewed the Combined Pitkin Dataset." Peterson Exclude Oppo. at 9. Peterson found:

a. State Farm has provided two different formatted data worksheets;

b. The two files, Verisk and State Farm, each contain different data elements;

c. As explained in my earlier reports and demonstrated with two different formatted data documents, specific information can be extracted and organized to generate data for this class action;

d. The data documents produced by Verisk and State Farm confirm my previous opinion that database management is flexible and allows key searches, comparisons, filters, etc. to retrieve the desired data.

. . .

f. The presented documents confirm that the software has a built-in ability to sort and filter records, making it easy to access information such as the depreciation taken in a specific estimate or group of estimates.

Peterson Supp. Report at 2.

47

State Farm's reply acknowledges that Peterson reviewed the Combined *Pitkin* Dataset. Peterson Exclude Repl. at 3. But it does not find this review helpful, as Peterson never "tested the data, validated the data, or worked with the data in any scientifically recognized way to reliably establish anything about it." *Id.* It notes that Peterson's work the Combined *Pitkin* Dataset indicated that he "sort[ed] one column 'to see if it worked'" and nothing more. *Id.* at 3–5. And because Peterson claimed that a "computer programmer" can use the Combined *Pitkin* Dataset to identify class members or damages "without any analysis of the data itself," State Farm concludes that Rule 702 has not been satisfied. *Id.* at 5 (citing *Reyes*, 2025 WL 1223550, at *4–8).

I find that Peterson seeks to offer a relatively narrow opinion with respect to the structure and abilities of XactContents® to assist plaintiffs in calculating damages in this case. He has significant experience working with XactContents®. He may testify to the conclusions above. I deny State Farm's motion to exclude.

### B. Plaintiff

#### 1. Dr. Steffey

Plaintiffs move to exclude the opinions of State Farm's primary expert witness, Dr. Duane Steffey ("Dr. Steffey"). I deny their motion.

##### a. Methodology

State Farm originally disclosed Dr. Steffey as its expert witness after he prepared an initial report in February 2025. Steffey holds a Bachelor of Science in history and mathematics, a masters in statistics, and a Ph.D. in statistics from Carnegie Mellon University. Declaration of Duane Steffey in Support of State Farm's Opposition to Class Certification ("Steffey Decl.") [Dkt. No. 76-2] at 2. He has served as a consulting statistician for over thirty years, with a "breadth of applications in engineering, health, environmental science, and civil justice." *Id.* He is an elected Fellow of the American Statistical Association since 2009, as well as an Elected Member of the International Statistical Institute since 2015. *Id.*

Steffey was hired by State Farm to "evaluate the basis and foundation for Mr. Regan's, Mr. Melzer's, and Mr. Peterson's opinions" at class certification. *Id.* at 4. After I granted class certification, State Farm also disclosed Dr. Steffey as a rebuttal expert to Regan's supplemental

United States District Court
Northern District of California

48

report.  *See* Exclude Comp. Ex. E ("Steffey Reb. Rep.").  His rebuttal report made numerous critiques of Regan's methodology:

> *Substantial revisions to Mr. Regan's previous methodology:* Although Mr. Regan characterizes his supplemental report as an update of his previous report, incorporating new information contained in a database of claim records included in State Farm's supplemental production in this matter, he has also made substantial changes to his methodology for identifying class members and measuring potential damages. Mr. Regan's current report defines and applies criteria for excluding claims, divides putative class claims into groups based on certain characteristics, and implements two different approaches (scenarios) to the calculation of potential damages. Mr. Regan's two prior reports and original declaration did not apply any of these criteria.
>
> *Unaddressed deficiencies in the identification of class members.* Mr. Regan's methodology, though substantially revised, does not enable the accurate and transparent identification of class members. The exclusion criteria applied in his supplemental report are not congruent with the class definition. Mr. Regan fails to explain how he would determine whether a loss is covered and whether an insured person is reasonably certain to be paid benefits in an amount that is less than the applicable policy limits.
>
> *Unaddressed deficiencies in the calculation of potential damages.* Mr. Regan's methodology, though substantially revised, does not enable the valid and reliable calculation of potential damages. Specifically, his methodology does not accurately account for sublimits, as demonstrated in the exemplar claims cited by Mr. Regan. Review of a random sample of 100 claims indicates at least 20% of State Farm General Coverage B claims, or approximately 14,000 claims, may involve sublimits not documented in the records included in State Farm's supplemental production. Furthermore, Mr. Regan's methodology continues to rely heavily on XactContents data, and not Enterprise Claim System data, notwithstanding that measures developed using only XactContents data can yield values differing from those obtained from comparable measures using Enterprise Claim System data.
>
> *Unsupported and inaccurate interpretations of XactContents data.* The accuracy of descriptions listed by Mr. Regan for certain data fields obtained from XactContents has not been corroborated by anyone with the requisite knowledge of that information system. Mr. Thorpe, a technology analyst at State Farm, testified that he could not confirm the meaning of data fields from XactContents, and I have not seen any supporting documentation from Verisk, the software vendor for XactContents. Furthermore, at least one of the descriptions listed in Mr. Regan's report is inaccurate: the column labeled "ACV" in the produced database typically does not correspond to the actual cash value of an item or set of items calculated in XactContents for a claim.

*Id.* at 1–2.

United States District Court
Northern District of California

49

Steffey was later deposed by counsel for plaintiff.  *See* Steffey Exclude Mot. Ex. 2 ("Steffey Dep.").  There, Steffey indicated that his opinion does not "speak[] to the accuracy of Mr. Regan's damages calculations," and that he saw no "additional value [in] attempting to make a judgment about the accuracy of an estimate . . . for any particular claim."  *Id.* at 69:21–24, 71:15–20.  Dr. Steffey did not "undertake an assignment . . . to identify specific class members," and did not have any "particular expertise in the handling of [insurance] claims."  *Id.* at 55:11–21, 22:17–23:25.  Instead, "all [he] did was point out that there are some claims that have been referred for special investigation," which raised concerns to him about the validity and reliability of Regan's damages methodology.  *Id.* at 88:22–25.  And while Dr. Steffey similarly criticized Regan's two "scenarios" methodology as inconsistent and unreliable, he ultimately "didn't attempt to quantify . . . [whether the two] estimates were correct or not."  *Id.* at 97:19–24, 117:11–12.

### b.    Class Membership

Plaintiffs take issue with how Dr. Steffey criticized Regan's identification of 41,153 class members in his Supplemental Report.  Steffey Exclude Mot. at 8–10.  In their view, "Dr. Steffey's 'opinion' amounts to the following assertion – there *could* be information that was unavailable to Mr. Regan that *potentially could* impact class membership; thus Mr. Regan's opinions are *potentially* unreliable."  *Id.* at 9 (emphasis in original).  Yet Dr. Steffey "fails to identify any specific information that was missing or how it would *or did* impact any of Mr. Regan's opinions."  *Id.* (emphasis in original).  Nor did he explain his "baseless theory that some claims were *possibly* referred for 'special investigations,'" or whether this notation "change[d] any claim's class status."  *Id.*  Finally, plaintiffs note that Dr. Steffey's "sole expertise is in statistics, not the insurance industry or claims processing."  *Id.*; *see* Steffey Dep. at 22:17–23:25.  Taken together, plaintiffs believe that Dr. Steffey's "opinion on this matter is entirely speculative," "likely to mislead the jury," and accordingly must be excluded.  Steffey Exclude Mot. at 9–10.

State Farm counters that Dr. Steffey's rebuttal report criticizing Regan's "new approach to identifying class members and calculating damages" was "based on his knowledge and education in statistics, previous experience, and the materials he reviewed."  Steffey Exclude Oppo. at 9.  "This included his analysis of the Combined *Pitkin* Dataset, review of deposition transcripts and

50

Plaintiffs' expert reports (including the Regan Supplemental Report), and claim records for Plaintiffs' claim." *Id.* Dr. Steffey also reviewed "claim file documents for *all* exemplar claims referenced in the Regan Supplemental Report as well as for 20 claims out of a sample of 100 claims that Dr. Steffey randomly selected from the Combined *Pitkin* Dataset." *Id.* (emphasis in original). From these records, State Farm asserts that Dr. Steffey identified at least one example "within Mr. Regan's own cherry-picked exemplar claim highlighted in the Regan Supplemental Report" that showed how Regan's methodology "produce[d] an invalid result" for class membership. *Id.* at 17.

I agree with State Farm that exclusion is not warranted. As discussed in detail above, Dr. Steffey engaged in a thorough review of the materials provided to him, including all exemplar claims identified by Regan. He then identified at least one "exemplar" plaintiff who potentially lacked injury and damages, thus raising questions about Regan's methodology for identifying class members. While plaintiffs attempt to reduce Dr. Steffey's opinion to just "one instance," his concern is relevant for the trier of fact, who will have to decide whether Regan's methodology can be applied to determine classwide damages. Any attack on Dr. Steffey's opinion sounds in credibility concerns, not admissibility.

### c. Damages Calculations

Plaintiffs also move to exclude Dr. Steffey's criticism that Regan's damages "scenarios" are "unreliable." Steffey Exclude Mot. at 10. Plaintiffs argue that Steffey's criticism focuses on "*hypothetical . . .* and *potential* gaps in information, that *could* have indicated Mr. Regan's calculations were incorrect." *Id.* (emphasis in original). They also claim that Dr. Steffey "never tested any of [Regan's] hypotheticals," despite having "full access to State Farm, its employees, and its records." *Id.* (citing Steffey Dep. at 74:11–76:7). "More fundamentally," they argue, "Dr. Steffey was unable to testify as to whether State Farm depreciates sales tax at all," *Id.* (citing Steffey Dep. at 31:11–20, 34:2–37:15), as he declared such an opinion would be "outside of the scope of [his] assignment," Steffey Dep. at 34:2–18. Plaintiffs conclude that this "utterly glaring omission dooms Dr. Steffey's report" and warrants exclusion. Steffey Exclude Mot. at 10–11.

Plaintiffs similarly take issue with Dr. Steffey's comment that Regan offered "no

51

explanation of the relative merits of the[] two approaches or guidance on when one scenario is indicated, rather than the other." *Id.* at 11; Steffey Reb. at 6. Rather, plaintiffs contend that his opinion "boils down to comparing the 'relationship between the two estimates' and 'how frequently . . . they agree.'" *Id.* (citing Steffey Dep. at 85:20–25). And because "[a]nyone can observe whether two numbers in a chart are the same or not," plaintiffs conclude that Dr. Steffey does not offer an expert opinion that would be helpful to a jury. *Id.*

State Farm responds that plaintiffs "misapprehend" the nature of a Rule 702 challenge and a rebuttal expert. Steffey Exclude Oppo. at 20. "As a rebuttal expert," it maintains, "Dr. Steffey cannot propose a competing methodology or offer opinions beyond the scope of Mr. Regan's initial testimony." *Id.* (citing Fed. R. Civ. P. 26(a)(2)(D)(ii)). Instead, a rebuttal expert's role is to "respond to and identify flaws in Mr. Regan's analysis," which State Farm claims Dr. Steffey did. *Id.* With respect to Regan's two "scenarios," for example, Dr. Steffey noted:

> [W]e're in a position now where Mr. Regan has developed two different methodologies for estimating damages and applying them to individual claims in the Pitkin database, and sometimes those two methods yield the same result but that happens less than half the time. An in – and these estimates can differ greatly. In my review, I found that they could differ sometimes by a factor of 10 or more … and Mr. Regan isn't offering an opinion about how to resolve those differences when they exist. And so I think that … [the] methodology is not accurate. It's neither reliable nor valid in all cases.

*Id.* at 21; Steffey Dep. at 60:21–61:15. Moreover, "Dr. Steffey's opinions are not limited to pointing out the divergence in Mr. Regan's models, but rather extend to quantifying the divergence, critiquing the approaches, and explaining their fatal flaws." Steffey Exclude Oppo. at 21. Taken together, State Farm also asks this: "[h]ow but through a rebuttal expert would criticism of [Regan's approach] come into evidence?" *Id.*

State Farm also argues that Dr. Steffey's "statistical analysis" of Regan's diverging scenarios "directly undermines the reliability, validity and admissibility of [Regan's] opinions," and is "exactly what a rebuttal expert should offer to support his opinion." *Id.* at 22. It highlights that Dr. Steffey found invalid results even "within the handful of exemplar claims that Mr. Regan cherry-picked for his report," raising questions about injury, damage, and class membership. *Id.*

I find that Dr. Steffey's opinions and testimony are admissible. As explained above, Dr.

Steffey raises important questions about Regan's methodology that go to the heart of this dispute—questions regarding standing, injury, and how to identify class membership. His opinions are relevant. They can be tested. And they may assist the trier of fact in resolving the question of damages and standing in this case.

### d.      Data Fields Interpretation

Plaintiffs move to exclude Dr. Steffey's claim that some of Regan's "descriptions of certain data fields in the Combined Pitkin Dataset 'have not been corroborated by anyone with requisite knowledge.'" Steffey Exclude Mot. at 12 (quoting Steffey Reb. at 10). They point out that Dr. Steffey testified that he is "not . . . in a position to judge the accuracy of the fields" in the Dataset, and that he only reviewed one deposition transcript for such information. *See id.* at 12–13 (citing Steffey Dep. at 79:16–21, 102:12–130:1). "Especially considering that he is admittedly not an insurance or claims expert," plaintiffs conclude that his opinion on the data fields should be excluded. *Id.* at 13.

State Farm responds that courts often "recognize that rebuttal opinions highlighting data deficiencies are helpful to evaluating the reliability of an expert's approach generally." Steffey Exclude Oppo. at 24 (citing *United States v. Channon*, No. 13-966 JCH/KK, 2015 WL 13651137, at *6–8 (D.N.M. Dec. 2, 2015)). I agree. Dr. Steffey properly critiqued Regan's assumptions in the Combined *Pitkin* Dataset, a topic which he, as a statistician, may opine. That Dr. Steffey recognized he cannot judge the accuracy of the fields is a different question than identifying Regan's failure to corroborate the Dataset. He is entitled to raise the latter at trial.

### e.      Substantial Revision Opinion

Plaintiffs finally move to exclude Dr. Steffey's opinion that Regan's Supplemental Report represents a "substantial revision" to his analysis in the original Report. Steffey Exclude Mot. at 13 (quoting Steffey Reb. at 4). In their view, "[w]hether or not Mr. Regan's Supplemental Report represents a 'substantial revision' of his initial Report . . . is not an issue that will be presented to the jury, nor is it helpful to the jury in making any determination." *Id.* To the contrary, credibility is always an issue for the jury to consider, and Dr. Steffey's opinion about the "drastic[]" change "underscores the unreliability of [Regan's] approach generally." Steffey Exclude Oppo. at 25.

53

United States District Court
Northern District of California

State Farm is entitled to present this opinion as an attack on Regan's credibility at trial.

In sum, I will not exclude Steffey's testimony.

### III.    SEALING MOTIONS

Both parties have filed requests to seal numerous portions of their motions and accompanying exhibits.  Those requests are DENIED.  Much of the information identified by the parties fails to meet the compelling reasons standard.  *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).  Moreover, this case will soon proceed to trial, where sealing from public view is rarely allowed for exhibits.

To be sure, some information may need to be sealed, including any personally identifiable information about claimants or confidential records that would cause competitive harm.  But the parties must tailor their present requests.  Within fourteen (14) days of this order, the parties shall revisit the information they seek to file under seal and submit a chart identifying any information that may cause it competitive or personal harm.  I will issue a final sealing order after reviewing those charts.  This order presumes that all of the information identified within it is not sealable.

CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is GRANTED with respect to declaratory relief.  I will hold the decision on the UCL cause of action until after trial, but intend to enjoin State Farm for the reasons given following further evidence of injury and damages.  Plaintiffs' motion is otherwise DENIED.  State Farm's motion for summary judgment is GRANTED with respect to the implied covenant of good faith and fair dealing and punitive damages claims and is otherwise DENIED.  The parties' motions to exclude are DENIED.  As indicated in my Order for Trial Plan, plaintiffs shall prepare a trial plan to be filed by July 10, 2026, with any response from State Farm to be filed by July 24, 2026.  *See* Dkt. No. 180.

**IT IS SO ORDERED.**

Dated: June 30, 2026



William H. Orrick
United States District Judge